**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

PROTESTERS IN SUPPORT OF BLACK )
LIVES, TIMOTHY WILGER, ANDREW )
REICHOLD, VERONICA RODRIGUEZ, )
CRYSTAL ESCAMILLA, MICHAEL )
FANSLER, JENNIFER MARSHALL, )
ALEXANDRA BETZEL, TAMARA FOUCHE,)
OLIVIA LOVE-HATLESTAD, MEGAN )
ANGERS, RACHEL BARTZ, BRITTANY )
SOWACKE, RONALD REED, CHARLOTTE )
VAIL, QUINLAN MALLOW, CODY JONES, )
MARGARET GAY, JACQUELINE )
SPREADBURY, SARA ENGIMANN, )
KORRINA ZARTLER, KYLE CRAIG, )
ELIZIA ARTIS, BRENT COLBERT, )
JONATHAN FREUND, ALEXANDRA )
BUNECKY, MILES BENNETT HOGERTY, )
MARINA BASSETT, JEANNINE WISE, )
ADRIANA UNDERWOOD, JUSTIN )
COSBY, AMIKA TENDAJI, DAMON )
WILLIAMS, JASSON PEREZ, )
CHRISTOPHER BROWN, JENNIFER )
PAGAN, MALCOLM LONDON, JACOB )
DAGIT, COPELAND SMITH, IAN "RIVER" )
KERSTETTER, LANDON GEORGE, )
KATHLEEN ROBERTS, RACHEL )
VALENZUELA, MIRACLE BOYD, TIM )
ANDERSON, MICHELLE ZACARIAS, )
LUIS ALDAIR RAFAEL-NIETES, DAVID )
JAWORSKI, NATALIE "BYUL" YOON, )
PATRICK ROMANO, CAROLINE SCOTT, )
ADRIANA ANTUNEZ, JAMEY ARNOLD, )
SARAH KROTH, MAGGIE "MARS" )
ROBINSON, TORI LARSEN, CLARE )
GERVASI, DELANEY DITTMAN, ARCHIT )
BASKARAN, BAILEY PFEIFER, and )
CHARLIE ATCHLEY, )
)
       Plaintiffs, )
)
v. )
)
CITY OF CHICAGO, SUPERINTENDENT )

**23CV2239**

**JUDGE BLAKEY
MAGISTRATE JUDGE GILBERT**

Case No.

JURY DEMAND

1

DAVID BROWN, and CHICAGO POLICE )
OFFICERS IVAN AVILES (#19579), D. P. )
CONDREVA (#7276), TIMOTHY BLAKE )
(#9574), MARCUS MUDD (#14390), )
MICHAEL WILSON (#17643), DAVID )
FLOYD (#13262), DANIEL MORRIN )
(#5605), NICHOLAS NESIS (#13406), S. )
MANNION (#115), WILLIAM GROSSKLAS )
(#17311), BRANDON PATRICK (#13433), )
SHERRICK DAVIS (#12192), LEVON )
LONDON (#18659), A. A. KHAN (#15274), )
R. A. AYALA (#19896), NEBOJSA )
DJURDJEVIC (#9338), DAVID SHARP )
(#12950), NICOLAS JOVANOVICH (#6789), )
BRAYAN JAUREGUI (#4894), PATRICIA )
ZUBER (#351), and JOHN DOES 1-100, )
                                    )
        Defendants.                 )

## COMPLAINT

1.      During the summer of 2020, the United States was in the throes of the largest

social justice movement in history.  In a repudiation of anti-Black racism, white supremacy,

police violence, and mass criminalization and incarceration, millions joined demonstrations

around the globe—often lifting up the names of George Floyd, Breonna Taylor, Tony McDade,

Jacob Blake, and too many other Black people killed by police.

2.      Plaintiffs as well as thousands of other organizers, activists, and community

leaders in Chicago—multi-racial and intergenerational in composition—engaged in a wide range

of actions throughout the summer of 2020, including rallies, marches, and other creative protests

that consistently opposed racist police violence and demanded substantial changes, including the

massive reduction of taxpayer money being used to fund the Chicago Police Department

("CPD").

3.      The CPD and other City agencies responded to these demonstrations with brutal,

violent, and unconstitutional tactics that are clearly intended to injure, silence, and intimidate

2

Plaintiffs and other protesters.  These abuse tactics include beating protesters with batons—often striking them in the head; tackling and beating protesters while on the ground; using chemical agents against protesters; falsely arresting protesters; and trapping protesters in enclosed areas.

4.      CPD consistently targeted protest leaders, marshals, legal observers, medics, and individuals recording the demonstrations with unlawful, retaliatory, and lethal force.

5.      CPD also targeted Plaintiffs' and other protesters' property—destroying cameras, phones, and eyeglasses; and confiscating bikes, backpacks, and other belongings.

6.      CPD officers' animus against Plaintiffs and other protesters is unmistakable— they regularly called protesters vile and vulgar names, often using misogynistic and homophobic words.  Officers were also aggressive, rude, disrespectful, and often affirmatively escalated encounters through taunts, shoves, pushes, and other inappropriate behavior at these protests.

7.      CPD's response to the summer 2020 protests is consistent with the CPD's long-standing policies and practices of using abusive tactics and excessive force against protesters seeking progressive social and political change, including most infamously the assassination of Illinois Black Panther Party Chairman Fred Hampton and member Mark Clark in working in concert with the FBI and Cook County State's Attorney Office.  Dating as far back as 1877, CPD began its long history of using excessive force to quell protesters' rights by targeting protests for labor reform and the eight-hour day.  Their unconstitutional practices against protesters continued throughout history, including, *inter alia*, through the 1919 race riots, the 1968 Democratic National Convention, the 1977 marches against housing discrimination, the 1990 Gulf War protests, the demonstrations in support of people with HIV/AIDs and against governmental indifference led by ACT-UP and others in 1990s and early 2000s, the 2003 mass

anti-Iraq War demonstration, and a counter demonstration to the Presidential candidate Trump's scheduled rally at UIC in 2016, to name a few.

8.      These systemic and ongoing violations continue to occur despite the City of Chicago being subject to a Consent Decree for almost two years.  CPD's documented failure to comply with the Consent Decree deadlines coupled with its consistently illegal and violent response to the summer 2020 protests demonstrate that the Consent Decree has entirely failed to create any meaningful change in the CPD.

9.      CPD's unconstitutional policies and practices against protesters has caused Plaintiffs significant harm, including the violation of their constitutional rights as well as physical, emotional, and mental injuries.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a).  This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over claims arising under Illinois state law.

11.     Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to the claims asserted in this complaint occurred in this judicial district.

## PARTIES

12.     Plaintiff Protesters in Support of Black Lives is a group of individuals who participated in various actions throughout the City of Chicago during the summer of 2020.  Protesters in Support of Black Lives includes the following individual Plaintiffs:

13.     Plaintiff Timothy Wilger is a 24-year-old Asian resident of Berwyn, Illinois who uses he/him pronouns.  Plaintiff Wilger attended a protest in downtown Chicago on May 29, 2020.

14.     Plaintiff Andrew Reichold is a 41-year-old white resident of Chicago, Illinois who uses he/him pronouns.  Plaintiff Reichold attended a protest in downtown Chicago on May 30, 2020.

15.     Plaintiff Veronica Rodriguez is a 20-year-old Latinx[1] resident of Chicago, Illinois who uses she/they[2] pronouns.  Plaintiff Rodriguez attended a protest in downtown Chicago on May 30, 2020.

16.     Plaintiff Crystal Escamilla is a 25-year-old Latinx resident of Chicago, Illinois who uses she/her pronouns.  Plaintiff Escamilla attended a protest in downtown Chicago on May 30, 2020.

17.     Plaintiff Michael Fansler is a 30-year-old white resident of Chicago, Illinois who uses he/him pronouns.  Plaintiff Fansler attended a protest in downtown Chicago on May 30, 2020.

18.     Plaintiff Jennifer Marshall is a 31-year-old white resident of Chicago, Illinois who uses she/her pronouns.  Plaintiff Marshall attended a protest in downtown Chicago on May 30, 2020.

19.     Plaintiff Alexandra Betzel is a 30-year-old white female resident of Chicago, Illinois who uses she/her pronouns.  Plaintiff Betzel attended a protest in downtown Chicago on May 30, 2020.

---

[1]  Several Plaintiffs identify as Latinx.  The Merriam Webster Dictionary defines Latinx as a gender-neutral alternative to Latino or Latina.  *See* https://www.merriam-webster.com/dictionary/Latinx.

[2]  Several Plaintiffs use they/them pronouns.  The Merriam Webster Dictionary defines a person who uses the they or them pronoun as a person whose gender identity is nonbinary.  *See* https://www.merriam-webster.com/dictionary/they.

20.    Plaintiff Tamara Fouche is a 32-year-old Black resident of Chicago, Illinois who uses she/her pronouns.  Plaintiff Fouche attended a protest in downtown Chicago on May 30, 2020.

21.    Plaintiff Olivia Love-Hatlestad is a 22 year-old white resident of Chicago, Illinois who uses she/they pronouns.  Plaintiff Love-Hatlestad attended a protest in downtown Chicago on May 30, 2020, and in Uptown on June 1, 2020.

22.    Plaintiff Megan Angers is a 25-year-old white resident of Chicago, Illinois who uses she/her pronouns.  Plaintiff Angers attended a protest in downtown Chicago on May 30, 2020.

23.    Plaintiff Rachel Bartz is a 24-year-old white resident of Chicago, Illinois who uses she/her pronouns.  Plaintiff Bartz attended a protest in downtown Chicago on May 30, 2020.

24.    Plaintiff Brittany Sowacke is a 30-year-old white resident of Chicago, Illinois who uses she/her pronouns.  Plaintiff Sowacke attended a protest in downtown Chicago on May 30, 2020.

25.    Plaintiff Ronald Reed is a 25-year-old Black resident of Broadview, Illinois who uses he/him pronouns.  Plaintiff Reed attended a protest in downtown Chicago on May 30, 2020.

26.    Plaintiff Charlotte Vail is a 24-year-old white resident of Chicago, Illinois who uses she/her pronouns.  Plaintiff Vail attended a protest in downtown Chicago on May 30, 2020, in Uptown on June 1, 2020, and in Grant Park on July 17, 2020.

27.    Plaintiff Quinlan Mallow is a 32-year-old white resident of Streamwood, Illinois who uses he/him pronouns.  Plaintiff Mallow attended a protest in downtown Chicago on May 30, 2020.

28.     Plaintiff Cody Jones is a 29-year-old white resident of Chicago, Illinois who uses they/them pronouns.  Plaintiff Jones attended a protest in downtown Chicago on May 30, 2020.

29.     Plaintiff Margaret Gay is a 29-year-old white resident of Chicago, Illinois who uses she/her pronouns.  Plaintiff Gay attended a protest in downtown Chicago on May 30, 2020.

30.     Plaintiff Jacqueline Spreadbury is a 31-year-old white resident of Chicago, Illinois who uses she/they pronouns.  Plaintiff Spreadbury attended a protest in downtown Chicago on May 30, 2020 and May 31, 2020.

31.     Plaintiff Sara Engimann is a 25-year-old white resident of Chicago, Illinois who uses they/them pronouns.  Plaintiff Engimann attended a protest in downtown Chicago on May 30, 2020.

32.     Plaintiff Korrina Zartler is a 28-year-old white resident of Chicago, Illinois who uses she/her pronouns.  Plaintiff Zartler attended a protest in downtown Chicago on May 30, 2020.

33.     Plaintiff Kyle Craig is a 31-year-old white resident of Chicago, Illinois who uses he/him pronouns.  Plaintiff Craig attended a protest in downtown Chicago on May 30, 2020.

34.     Plaintiff Elizia Artis is a 30-year-old Black resident of Chicago, Illinois who uses she/her pronouns.  Plaintiff Artis attended a protest in downtown Chicago on May 30, 2020.

35.     Plaintiff Brent Colbert is a 31-year-old white resident of Chicago, Illinois who uses he/him pronouns.  Plaintiff Colbert attended a protest in downtown Chicago on May 30, 2020.

36.     Plaintiff Jonathan Freund is a 28-year-old white resident of Chicago, Illinois who uses he/him pronouns.  Plaintiff Freund attended a protest in downtown Chicago on May 30, 2020.

37.     Plaintiff Alexandra Bunecky is a 25-year-old white resident of Chicago, Illinois who uses she/her pronouns.  Plaintiff Buneck attended a protest in downtown Chicago on May 30, 2020.

38.     Plaintiff Bennett Hogerty is 22-year-old white resident of Chicago, Illinois who uses they/them pronouns. Plaintiff Bennett Hogerty attended a protest in downtown Chicago on May 30, 2020.

39.     Plaintiff Marina Bassett is a 26-year-old white resident of Chicago, Illinois who uses she/her pronouns. Plaintiff Bassett attended a protest in downtown Chicago on May 30, 2020.

40.     Plaintiff Jeannine Wise is a 45-year-old white resident of Chicago, Illinois who uses she/her pronouns.  Plaintiff Wise attended a protest in downtown Chicago on May 30, 2020.

41.     Plaintiff Adriana Underwood is a 22-year old white resident of Chicago, Illinois who uses she/her pronouns.  Plaintiff Underwood attended a protest in downtown Chicago on May 30, 2020.

42.     Plaintiff Justin Cosby is a 19-year-old Black resident of Chicago, Illinois who uses he/him pronouns.  Plaintiff Cosby attended a protest in downtown Chicago on May 30, 2020.

43.     Plaintiff Amika Tendaji is a 39-year-old Black resident of Chicago, Illinois who uses any pronouns.  Plaintiff Tendaji attended a protest in Hyde Park on May 31, 2020.

44.     Plaintiff Damon Williams is a 27-year-old Black resident of Chicago, Illinois who uses he/him pronouns.  Plaintiff Williams attended a protest in Hyde Park on May 31, 2020.

45.     Plaintiff Jasson Perez is a 39-year-old Black resident of Chicago, Illinois who uses he/him pronouns.  Plaintiff Perez attended a protest in Hyde Park on May 31, 2020.

46.     Plaintiff Christopher "Thoughtpoet" Brown is a 29-year-old Black resident of Chicago, Illinois who uses he/him pronouns.  Plaintiff Brown attended a protest in Hyde Park on May 31, 2020

47.     Plaintiff Jennifer Pagán is a 27-year-old Black resident of Chicago, Illinois who uses she/her pronouns.  Plaintiff Pagán attended a protest in Hyde Park on May 31, 2020.

48.     Plaintiff Malcolm London is a 27-year-old Black resident of Chicago, Illinois who uses he/him pronouns.  Plaintiff London attended a protest in Hyde Park on May 31, 2020.

49.     Plaintiff Jacob Dagit is a 24-year-old white resident of Chicago, Illinois who uses they/them pronouns.  Plaintiff Dagit attended a protest in Old Town on June 1, 2020.

50.     Plaintiff Copeland Smith is a 23-year-old white resident of Chicago, Illinois who uses she/her pronouns.  Plaintiff Smith attended a protest in Old Town on June 1, 2020.

51.     Plaintiff Ian "River" Kerstetter is a 28-year-old Native American resident of Chicago, Illinois who uses she/her pronouns.  Plaintiff Kerstetter attended a protest in Grant Park on July 17, 2020.

52.     Plaintiff Landon George is a 24-year-old white resident of Rippin, Wisconsin who uses he/him pronouns.  Plaintiff George attended a protest in Grant Park on July 17, 2020.

53.     Plaintiff Kathleen Roberts is a 31-year-old white resident of Chicago, Illinois who uses she/her pronouns.  Plaintiff Roberts attended a protest in Grant Park on July 17, 2020.

54.     Plaintiff Rachel Valenzuela is a 37-year-old white resident of Chicago, Illinois who uses she/they pronouns.  Plaintiff Valenzuela attended a protest in Grant Park on July 17, 2020.

55.     Plaintiff Miracle Boyd is a 18-year-old Black resident of Chicago, Illinois who uses she/her pronouns.  Plaintiff Boyd attended a protest in Grant Park on July 17, 2020.

56.     Plaintiff Tim Anderson is a 37-year-old white resident of Chicago, Illinois who uses he/him pronouns.  Plaintiff Anderson attended a protest in Grant Park on July 17, 2020.

57.     Plaintiff Michelle Zacarias is a 30-year-old Latinx resident of Berkeley, California who uses she/her pronouns.  Plaintiff Zacarias attended a protest in Grant Park on July 17, 2020.

58.     Plaintiff Luis Aldair Rafael-Nietes is a 25-year-old Latinx resident of Chicago, Illinois who uses he/him pronouns.  Plaintiff Rafael-Nietes attended a protest in Grant Park on July 17, 2020.

59.     Plaintiff David Jaworski is a 29-year-old white resident of Chicago, Illinois who uses he/him pronouns.  Plaintiff Jaworski attended a protest in Grant Park on July 17, 2020.

60.     Plaintiff Natalie "Byul" Yoon is a 28-year-old Asian resident of Chicago, Illinois who uses she/her pronouns.  Plaintiff Yoon attended a protest in Grant Park on July 17, 2020.

61.     Plaintiff Patrick Romano is a 26-year-old white resident of Chicago, Illinois who uses he/him pronouns.  Plaintiff Romano attended a protest in Grant Park on July 17, 2020, and in downtown Chicago on August 15, 2020.

62.     Plaintiff Caroline Scott is a 24-year-old white resident of Chicago, Illinois who uses she/her pronouns.  Plaintiff Scott attended a protest in Grant Park on July 17, 2020.

63.     Plaintiff Adriana Antunez is a 22-year-old Latinx resident of Chicago, Illinois who uses she/her pronouns.  Plaintiff Antunez attended a protest in Grant Park on July 17, 2020.

64.     Plaintiff Jamey Arnold is a 28-year-old white resident of Chicago, Illinois who uses she/her pronouns.  Plaintiff Arnold attended a protest in Grant Park on July 17, 2020.

65.     Plaintiff Sarah Kroth is a 29-year-old white resident of Chicago, Illinois who uses she/they pronouns.  Plaintiff Kroth attended a protest in Grant Park on July 17, 2020.

66.     Plaintiff Maggie "Mars" Robinson is a 20-year-old white resident of Chicago, Illinois who uses they/them pronouns.  Plaintiff Robinson attended a protest in Grant Park on July 17, 2020.

67.     Plaintiff Tori Larsen is a 27-year-old white resident of Chicago, Illinois who uses she/they pronouns.  Plaintiff Larsen attended a protest in Grant Park on July 17, 2020.

68.     Plaintiff Clare Gervasi is a 38-year-old white resident of Chicago, Illinois who uses they/them pronouns.  Plaintiff Gervasi attended a protest in Grant Park on July 17, 2020.

69.     Plaintiff Delaney Dittman is a 28-year-old white resident of Chicago, Illinois who uses she/her pronouns.  Plaintiff Dittman attended a protest in downtown Chicago on August 15, 2020.

70.     Plaintiff Archit Baskaran is a 23-year-old South Asian resident of Chicago, Illinois who uses he/him pronouns.  Plaintiff Baskaran attended a protest in downtown Chicago on August 15, 2020.

71.     Plaintiff Bailey Pfeifer is a 27-year-old white resident of Chicago, Illinois who uses they/them pronouns.  Plaintiff Pfeifer attended a protest in downtown Chicago on August 15, 2020.

72.     Plaintiff Charlie Atchley is a 25-year old white resident of Chicago, Illinois who uses they/them pronouns.  Plaintiff Atchley attended a protest in downtown Chicago on August 15, 2020.

73.     Defendant City of Chicago is and at all times mentioned herein was a municipality organized and operating under the statutes of the State of Illinois.  It is authorized under the statutes of the State of Illinois to maintain the Chicago Police Department, which acts as the City's agent in the areas of municipal law enforcement, and for which the City is

ultimately responsible. Defendant City was, at all times material to this Complaint, the employer and principal of the Defendant Officers.

74. Defendant David Brown is the Superintendent of the Chicago Police Department. At all times relevant to the events at issue in this case, Defendant Brown was employed by the CPD. As such, he was acting under color of law. At all times relevant to the events at issue in this case, Defendant Brown promulgated rules, regulations, policies, and procedures of the CPD. Defendant Brown is responsible for supervising all CPD officers and managing all operations at the CPD. He is sued here in his official and individual capacities.

75. Defendants Officer Ivan Aviles (#19579), Officer D. P. Officer Condreva (#7276), Officer Timothy Blake (#9574), Officer Marcus Mudd (#14390), Officer Michael Wilson (#17643), Officer David Floyd (#13262), Officer Daniel Morrin (#5605), Officer Nicholas Nesis (#13406), Captain S. Mannion (#115), Officer William Grossklas (#17311), Officer Brandon Patrick (#13433), Officer Sherrick Davis (#12192), Officer Levon London (#18659), Officer A.A. Khan (#15274), Officer R. A. Ayala (#19896), Officer Nebojsa Djurdjevic (#9338), Officer David Sharp (#12950), Officer Nicolas Jovanovich (#6789), Officer Brayan Jauregui (#4894), Lieutenant Patricia Zuber (#351), and Officer John Does 1-100 are City of Chicago employees with the CPD. At all times relevant to the events at issue in this case, these defendants were acting under color of law and within the scope of their employment with the CPD. Each is sued in his or her individual capacity for violating Plaintiffs' rights guaranteed by the U.S. Constitution and Illinois state law.

**FACTUAL ALLEGATIONS**

I. **The CPD's Violent and Unconstitutional Response to Protesters Throughout the Summer of 2020**

76.     On May 25, 2020, Minneapolis police officers murdered George Floyd when they suffocated him to death while he was handcuffed in a prone position on the ground in broad daylight on the street.  Floyd begged to breathe, for his mother, and for his life, and witnesses begged the officers to let him go, before he ultimately took his last breath.

77.     Floyd's murder and the police murder of Breonna Taylor in her home in Louisville, Kentucky, in addition to recent police murders of too many additional Black people throughout the United States, sparked the largest social justice movement in the history of the United States and has included protests around the world against anti-Black police violence, white supremacy, systemic racism, and inequality.

78.     Since May 29, 2020, there have been numerous protests and actions throughout the City of Chicago—ranging in size from a few dozen people to thousands.  These protests have occurred all throughout Chicago, including in the Loop and on the South, West, and North sides, and have been attended by people of all ages, races, and demographics.  In particular, protests attended by Plaintiffs occurred on May 29-May 31, June 1, July 17, and August 15, 2020.

79.     The CPD has responded to these protests with brutal, violent, and unconstitutional tactics that are clearly intended to injure and silence protesters who are protesting their violence and the violence of other state actors.

80.     CPD officers consistently targeted protesters who are peacefully exercising their First Amendment rights with unlawful, retaliatory, and lethal force.

81.     Protesters often reported that CPD officers intentionally struck them on their head with batons with enough force to leave people bloodied and in some instances with serious concussions.



82. On June 23, 2020, the Chicago Reader published an in-depth examination of the

CPD's use of lethal force, including baton strikes to the head, during the May 2020 protests

(excluding protests in June, July, and August). The reporter documented:

> 83 baton strikes on at least 32 different people by officers, most captured on video.
> Nearly all appear to violate [CPD] policy, with more than half of the strikes on video
> involving police beating people who were already on the ground. Multiple videos also
> show officers hitting protesters in the head with batons despite rules limiting these strikes
> to situations requiring deadly force.[3]

83. The Chicago Reader article notes that these unlawful uses of force often occurred

in full view of supervisors who failed to intervene and that most officers failed to report their

uses of force.

84. The CPD's brutal response to these protests and protesters has also included

police officers:

    a. driving CPD cars through crowds of protestors;

    b. punching protesters in the face;

    c. tackling protesters to the ground;

---

[3] Andrew Fan and Dana Brozost-Keller, Cops Appear to violate use-of-force rules dozens of times at protests, Chicago Reader (June 23, 2020), https://www.chicagoreader.com/chicago/police-baton-use-of-force-protests/Content?oid=80849109.

    d.   kneeing protesters in the neck and back;

    e.   kicking protesters in the legs to cause them to fall;

    f.   jabbing batons into protesters' bodies;

    g.   trapping protesters on bridges, pushing protesters stranded on bridges, pinning protesters against hard surfaces on bridges and other locations;

    h.   using tear gas and pepper spray;

    i.   dragging protesters through the streets;

    j.   stomping on protesters on the ground; and

    k.   beating protesters severely with batons.

These acts of violence were wholly unwarranted and there was no objectively reasonable basis to use such dangerous and violent force.

85.    CPD officers also targeted those the CPD has identified as protest marshals, legal observers, medics, or leaders with the most brutal violence apparently as part of a strategy to quell the protesters' free expression.

86.    CPD officers also used violence on protesters who expressed concern or were protesting that CPD officers were harming other people at the protests.

87.    CPD officers also targeted those who were filming, or otherwise documenting police violence at the protests, by pushing, shoving, brutalizing, and harassing them in the midst of the protests.  Often this resulted in confiscated or damaged cameras and recording equipment and physical injury to protesters exercising their First Amendment right to record the police.

88.    CPD officers were also aggressive, rude, disrespectful, and often affirmatively escalated encounters through taunts, shoves, pushes and other inappropriate behavior at these protests.  CPD officers used particularly hostile language towards women and members of the LGBTQ community.

89.     CPD officers' animus against protesters is unmistakable—they regularly referred to protesters with terms that are vile, misogynistic, and anti-gay, including officers calling protesters "pussy," "cunt," "bitch," and "faggots," and repeatedly use the word "fuck" when issuing commands.  One officer threatened protesters by yelling "you fucking bitch," and "wait till I get my badge off, you fucking faggot."[4]

90.     CPD's response to the protests also reflects a pattern and practice of breaking, stealing, or otherwise disposing of protesters' belongings, including bikes, cameras, phones, glasses, goggles, backpacks, and, in some instances, canes used to assist with mobility.

91.     CPD has also engaged in a systemic practice of illegal searches of protesters, seizure of protesters, and false arrest of protesters.

92.     Throughout the protests, the CPD has also engaged in racially motivated arrests of protesters, even though the protests were attended by multi-racial crowds of people, the majority of whom were white.  According to CPD records, during the initial weekend of protests (May 29 – 31) CPD arrested 2,172 people.  According to the Chicago Reader, the vast majority of those arrested, over 70 percent, were Black Chicagoans; however, only 32 percent of the City of Chicago identify as Black people.[5]

93.     Despite widespread evidence of unchecked police violence, throughout these events, Mayor Lori Lightfoot has praised the police for their "restraint."

94.     As of November 12, 2020, protesters filed 520 protest-related complaints against CPD officers.  58% of those complaints alleged excessive force and 9% alleged verbal abuse.

---

[4] John Wright, Chicago Officer Who Called Protester a 'F-king Faggot' Likely to Be Stripped of Police Powers: WATCH, Towleroad (June 11, 2020), https://www.towleroad.com/2020/06/chicago-officer-who-called-protester-a-f-king-faggot-likely-to-be-stripped-of-powers-watch/.
[5] Kiran Misra, Most of the people arrested at the protests were Black, Chicago Reader (June 30, 2020), https://www.chicagoreader.com/chicago/protest-arrests-racial-disparity/Content?oid=81018291.

The number of protest complaints is so large, the Civilian Office of Police Accountability ("COPA") formed a specialized team of investigators solely dedicated to investigating these allegations.[6] As a result of COPA's preliminary investigations into the protest complaints, it referred 5 officers to state/federal law enforcement for potential criminal prosecution and has recommended that 8 officers be assigned to modified duty and/or be relieved of police power. No other officers involved in protest-related abuses have been disciplined thus far.[7]

95.     During a City Council budget hearing, COPA's Chief Administrator, Sydney Roberts, informed City lawmakers that "several themes were prevalent" throughout the protest complaints including "excessive use of batons," "excessive verbal abuse" and the failure of officers to comply with CPD's body camera policy as well as policies requiring Chicago police officers to display their names and badge numbers.[8] Chief Roberts also noted that these themes were so "consistent across multiple investigations" that she sent a memo to CPD leadership urging it to "take immediate action to address the deficiencies."[9] Upon information and belief, Defendant Superintendent Brown received Chief Robert's memo during the Summer 2020 uprisings and failed to take any action to redress the documented deficiencies.

96.     Pursuant to the relevant Chicago code provisions, Defendant Superintendent Brown is "responsible for the general management and control of the Police Department" and has "full and complete authority to administer the Department."[10] Defendant Superintendent Brown made all command decisions about the Chicago Police Department's systematic response

---

[6] Fran Spielman, CPA chief says recurring themes dominate complaints against CPD during civil unrest, Chicago Sun-times (Nov. 10, 2020), https://chicago.suntimes.com/2020/11/10/21559391/chicago-police-reform-copa-chief-recurring-themes-dominate-complaints-against-cpd-civil-unrest.
[7] https://www.chicagocopa.org/data-cases/protest-related-information/
[8] Id.
[9] Id.
[10] Chicago Municipal Code § 2-84-040

to protesters during the 2020 uprisings.  Defendant Superintendent Brown, through actions both explicit and implicit, authorized and directed the unlawful conduct described throughout this complaint.  He encouraged and permitted Chicago police officers to target, attack, and harass protesters with violent animus and took no action to halt Chicago police officer's systemic violence against protesters for Black lives.  Further, Defendant Superintendent Brown was physically present for at least one protest where he described standing "shoulder to shoulder" with Chicago police officers.  During the protest(s) Defendant Superintendent Brown attended personally, he failed to intervene to stop officer violence and misconduct.

97.     In an apparent effort to justify and/or conceal his officers' brutal violence and unlawful conduct, Defendant Superintendent Brown made a number of false and misleading statements to the media about the Summer 2020 uprisings and the actions of Chicago police officers.  For example, in reference to the August 15, 2020 downtown protest Defendant Superintendent Brown stated that he and his officers "trailed along" the protesters until the protesters became "confrontational" and began assaulting officers.  Defendant Superintendent Brown asserted that his officers did not engage in the practice of kettling (i.e., detaining a mass of people without justification and failing to provide people opportunities to leave).  After an investigation, a media outlet labeled these assertions as "false" and found evidence of kettling and video depicting Chicago police officers chasing demonstrators and witnesses who described Chicago police officers attacking protesters who did not immediately disperse.[11]  The same outlet also declared that Defendant Superintendent Brown publicly expressed a number of

---

[11]  Jim Daley and Jason Schumer, Fact-Checking Police Supt. David Brown on August 15, South Side Weekly (Sept. 2, 2020), https://southsideweekly.com/fact-checking-david-brown-august-15/.

misleading and unsubstantiated negative statements about protesters including that they carry mace and were "agitators [who] hijacked a peaceful protest."[12]

98.     On October 13, 2020, Defendant Superintendent Brown acknowledged serious ongoing and systemic deficiencies within the CPD during his address to new CPD recruits. Defendant Superintendent Brown informed the recruits that "this civil unrest is about you." He informed them that they would be working alongside officers who "never should have been hired" and "who have lost their way" and that, despite the existence of these officers, the new recruits must "discern" right from wrong. During the same address, Defendant Superintendent Brown also acknowledged that "good cops don't tell on the bad cops" and that CPD has a culture of "protecting each other" and that it is difficult for officers to "hold each other accountable."[13]

## II.     Plaintiffs' Rights Were Violated at Protests Throughout the City

### A.     May 29-31, 2020 Demonstrations Downtown

99.     In the wake of the police murders of George Floyd, Breonna Taylor, and other Black people, there were massive demonstrations against anti-Black police violence in downtown Chicago and the River North area over the weekend of May 29-31, 2020.

---

[12] *Id.*
[13] 'This Civil Unrest Is About You': Police Superintendent David Brown Gives Passionate Speech to New Recruits, NBC Chicago (Oct. 13, 2020), https://www.nbcchicago.com/top-videos-home/this-civil-unrest-is-about-you-police-superintendent-david-brown-gives-passionate-speech-to-new-recruits/2353284/.









Chicago police officers clash with protesters Saturday near Kinzie and State streets as thousands in Chicago joined national outrage over the death of George Floyd, who died in police custody on Memorial Day in Minneapolis. | Ashlee Rezin Garcia / Sun-Times

      **i.**     **May 29, 2020 Attack of Plaintiff Timothy Wilger (Ohio & State)**

100.     On May 29, 2020, at approximately 7:00 p.m., Plaintiff Wilger joined a protest that he encountered as he was skateboarding in downtown Chicago after his work day.  Plaintiff Wilger joined the protest to express his opinions that the CPD and police in general must be held accountable to the communities they serve and for the harm they cause to people within those communities.

101.     When Plaintiff reached the corner of Ohio and State, Plaintiff Wilger observed a cell phone lying on the pavement and bent down to pick it up in order to hold it up in an effort to find its rightful owner.

102.     Plaintiff Wilger was immediately violently grabbed by Defendant Officer Ivan Aviles (#19579), without justification, and slammed to the concrete.

103.     While on the ground, Defendant Officer Aviles placed his fist on Plaintiff Wilger's neck and an unidentified Chicago police officer assisted in pinning Plaintiff Wilger to the asphalt cement street.



104.     Defendant Officer Aviles then yanked Plaintiff Wilger up off the street and violently shoved him away from the police officers.

105.   Plaintiff Wilger did not physically attack, assault, threaten, or resist the Defendant Officers or any other Chicago police officer at any time or in any way.

106.   Plaintiff Wilger did not commit any unlawful act and was engaging in constitutionally protected activity.

107.   As a direct and proximate result of the Defendants Officers' actions as detailed above, Plaintiff Wilger suffered and continues to suffer, *inter alia*, bodily injury, including pain to a pre-existing wrist injury for which he was wearing a brace, as well as pain and suffering, extreme mental distress, anguish, and fear.

### ii.   May 30, 2020 Beating and False Arrest of Plaintiff Andrew Reichold (Trump Tower)

108.   On May 30, 2020, Plaintiff Andrew Reichold attended a protest near Trump Tower in solidarity with Black lives.

109.   At approximately 7:00 p.m., Plaintiff Reichold witnessed a protester being tackled by a Chicago police officer directly in front of him.

110.   While helping to pull the tackled protester up off the ground, Plaintiff Reichold was hit in the head with a baton by an unidentified Chicago police officer.

111.   Around 15 minutes later, Plaintiff Reichold witnessed another Chicago Police officer shove a small woman to the ground and a group of officers proceeding to beat her.

112.   Plaintiff Reichold approached the Chicago police officers and, at a distance of 10 to 20 feet away, began to yell out to the officers, pleading with them to stop beating the small woman.

113.   After Plaintiff Reichold yelled out to the officers, an unidentified female Chicago police officer ran up to Plaintiff Reichold, followed closely behind by 4 to 6 other unidentified Chicago police officers.

23

114.     One or more of the unidentified Chicago police officers then knocked Plaintiff Reichold down, causing him to fall face down on the street.

115.     While laying face down on the street, one or more of the unidentified Chicago police officers beat Plaintiff Reichold with their batons on his back, legs, buttocks, and head. Plaintiff Reichold was also kneed by one of the officers in the rib cage.



116.     After being beat for a few moments, Chicago police officers restrained Plaintiff Reichold in zip-ties and stood him up.

117.     Plaintiff Reichold lost one shoe while being beat.  After being stood up, Plaintiff requested that the officers pick up and return his shoe, but the officers ignored his request, telling him he did not need his shoe.

118.     An unidentified Chicago police officer walked Plaintiff Reichold over broken glass to a police squadrol approximately one-fourth of a block away, all while missing a shoe on one of his feet.

119.    Plaintiff Reichold was falsely arrested and charged with municipal ordinance violation 8-4-10(F) for disorderly conduct, assembly of three or more people, breaching the peace.  Defendant Officer D. P. Condreva (#7276) was the listed arresting officer.

120.    Plaintiff Reichold's false charge was eventually dismissed on August 10, 2020. This legal proceeding was terminated in Plaintiff Reichold's favor.

121.    Plaintiff Reichold did not physically attack, assault, threaten, or resist the Defendant Officers or any other Chicago police officer at any time or in any way.

122.    Plaintiff Reichold did not commit any unlawful act and was engaging in constitutionally protected activity.

123.    As a direct and proximate result of the actions of the unidentified Defendant Officers as detailed above, Plaintiff Reichold suffered and continues to suffer, *inter alia*, bodily injury, contusions on his left thigh and right rib cage, trauma to his head, pain and suffering, and extreme mental distress, anguish and fear.

### iii.    May 30, 2020 Baton Attack of Plaintiff Veronica Rodriguez (Michigan Avenue)

124.    In the afternoon of May 30, 2020, Plaintiff Verónica Rodriguez assembled with thousands in downtown Chicago to protest the police murders of George Floyd, Breonna Taylor, and other Black people in the United States.

125.    Plaintiff Rodriguez joined the demonstration at the Harold Washington Library and followed the crowd of protesters throughout the downtown area.

126.    As the demonstration was heading to Trump Tower, Plaintiff Rodriguez along with scores of others were blocked by several Chicago police officers from proceeding south when they were north of the Michigan Avenue bridge over the Chicago River.

127.     As Plaintiff Rodriguez and others were just north of the Michigan Avenue bridge, Chicago police officers with bicycles aggressively came through the crowd, pushing and hitting people with their bicycles.

128.     The Chicago police officers did not give any orders to disperse to Plaintiff Rodriguez or others in the crowd, or allow them the opportunity to leave.

129.     Another set of Chicago police officers began walking through the crowd of protesters and began pushing people down on the ground and encircling two young Black men.

130.     While Plaintiff Rodriguez was attempting to observe the arrests of the protesters, she and others in the crowd began to chant "Let them go."

131.     Plaintiff Rodriguez approached the officers throwing protesters to the ground and encircling individuals to ask why they were being grabbed and to demand their release.

132.     At some point Plaintiff Rodriguez fell to the ground.

133.     While on the ground, an unidentified Chicago police officer, without justification, swung his baton at Plaintiff Rodriguez, hitting her on the left side of her head, causing her tremendous pain and serious injury.

134.     Individuals in the crowd then grabbed Plaintiff Rodriguez, picked her up, and walked her away from the police officers and to an ambulance.

135.     Plaintiff Rodriguez was severely injured after being hit in the head with a baton, which caused her to sustain a gaping, bleeding cut in her head requiring emergency medical treatment, including receiving several staples in her head to close the wound.  She also sustained other visible injuries.



136. Plaintiff Rodriguez did not physically attack, assault, threaten or resist the Defendant Officer or any other Chicago police officer at any time or in any way.

137. Plaintiff Rodriguez did not commit any unlawful act and was engaging in constitutionally protected activity.

138. As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Rodriguez suffered and continues to suffer, *inter alia*, bodily injury, pain and suffering, extreme mental distress, anguish, and fear.

### iv. May 30, 2020 Baton Attack of Crystal Escamilla (Michigan Avenue)

139. In the afternoon of May 30, 2020, Plaintiff Crystal Escamilla assembled with thousands in downtown Chicago to protest the police murders of George Floyd, Breonna Taylor, and other Black people in the United States.

140. Plaintiff Escamilla joined the demonstration at the Harold Washington Library and followed the crowd of protestors throughout the downtown area.

141.     As the demonstration was heading to Trump Tower, Plaintiff Escamilla along with scores of others were blocked from proceeding south by several Chicago police officers when they were north of the Michigan Avenue bridge over the Chicago River.

142.     As Plaintiff Escamilla and others were just north of the Michigan Avenue bridge, Chicago police officers with bicycles aggressively came through the crowd, pushing and hitting people with their bicycles.

143.     The Chicago police officers did not give any orders to disperse to Plaintiff Escamilla or others in the crowd, or allow them the opportunity to leave.

144.     Plaintiff Escamilla also observed Chicago police officers clad in uniforms and riot gear push protestors with their batons, many of whom they were pushing to the ground.

145.     When Plaintiff Escamilla attempted to help some of the protesters on the ground, Chicago police officers, without justification, began to swing and strike protesters with batons on their body, causing Plaintiff Escamilla to almost fall to the ground.

146.     One or more unidentified Chicago police officers then struck Plaintiff Escamilla on various parts of her body, including her neck and bicep, with a baton for no justifiable reason.

147.     Plaintiff Escamilla did not physically attack, assault, threaten, or resist the Defendant Officers or any other Chicago police officer at any time or in any way.

148.     Plaintiff Escamilla did not commit any unlawful act and was engaging in constitutionally protected activity.

149.     Plaintiff Escamilla suffered physical injuries and pain as a result of the Defendant Officers' unnecessary and excessive use of force, causing her visible injuries.

150.     As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Escamilla suffered and continues to suffer, *inter alia*, bodily injury, pain and suffering, extreme mental distress, anguish, and fear.

**v.     May 30, 2020 Beating of Plaintiff Michael Fansler (Trump Tower)**

151.     On the afternoon of May 30, 2020, Plaintiff Michael Fansler and his wife Plaintiff Jennifer Marshall joined a protest near the James R. Thompson Center.

152.     Plaintiffs Fansler and Marshall marched with other protesters to Trump Tower on Wabash Avenue.

153.     When they arrived at this location, Plaintiff Fansler observed Chicago police officers begin to aggressively advance toward the protesters without giving any warning or dispersal order.

154.     The Chicago police officers, holding their batons horizontally in front of their bodies, began to forcefully push their batons into the bodies of the protesters, including Plaintiffs Fansler and Marshall.

155.     Plaintiff Fansler observed an unidentified Chicago police officer jab his baton into Plaintiff Marshall's ribs without justification.

156.     Plaintiff Fansler wedged himself in between Plaintiff Marshall and the officers in an attempt to protect Plaintiff Marshall from being pushed and jabbed further.

157.     At this point, Defendant Officer Timothy Blake (#9574), without justification, struck Plaintiff Fansler in the back of his head with a baton, causing Plaintiff Fansler serious pain and physical injury.

158.     Plaintiffs Fansler and Marshall witnessed Defendant Officer Blake strike several other protesters with his baton.

159.     As Chicago police officers advanced, Plaintiffs Fansler and Marshall were engaged in a "hands up" demonstration, and were holding their hands up in the air, indicating that they posed no threat to the officers.

160.     Plaintiffs Fansler and Marshall backed away from the officers.

161.     Approximately ten minutes later, the Chicago police officers again aggressively advanced toward Plaintiffs Fansler and Marshall and the other protesters without giving any warning or dispersal order.

162.     An unidentified Chicago police officer, without justification, pushed his shield into Plaintiff Fansler's face and kicked Plaintiff Fansler in his knee, causing him to fall to the ground.

163.     Plaintiff Fansler did not physically attack, assault, threaten, or resist Defendant Officer Blake or any other Chicago police officer at any time or in any way.

164.     Plaintiff Fansler did not commit any unlawful act and was engaging in constitutionally protected activity.

165.     As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Fansler suffered and continues to suffer, *inter alia*, bodily injury, pain and suffering, extreme mental distress, anguish, and fear

**vi.     May 30, 2020 Beating of Plaintiff Jennifer Marshall (Trump Tower)**

166.     On the afternoon of May 30, 2020, Plaintiff Jennifer Marshall and her husband Plaintiff Michael Fansler joined a protest near the James R. Thompson Center.

167.     Plaintiffs Marshall and Fansler marched with other protesters to Trump Tower on Wabash Avenue.

168.    When they arrived at this location, Plaintiff Marshall observed Chicago police officers begin to aggressively advance toward the protesters without giving any warning or dispersal order.

169.    The Chicago police officers, holding their batons horizontally in front of their bodies, began to forcefully push their batons into the bodies of the protesters, including Plaintiffs Marshall and Fansler.

170.    An unidentified Chicago police officer jabbed his baton into Plaintiff Marshall's ribs without justification.

171.    As Chicago police officers advanced, Plaintiffs Marshall and Fansler were engaged in a "hands up" demonstration, and were holding their hands up in the air, indicating that they posed no threat to the officers.

172.    Plaintiffs Marshall and Fansler backed away from the officers.

173.    Approximately ten minutes later, the Chicago police officers again aggressively advanced toward Plaintiffs Marshall and Fansler and the other protesters without giving any warning or dispersal order.

174.    An unidentified Chicago police officer, without justification, aggressively and repeatedly pushed his shield and baton into Plaintiff Marshall's body, causing injuries to her arms.

175.    Plaintiff Marshall did not physically attack, assault, threaten, or resist the Defendant Officers or any other officer at any time or in any way.

176.    Plaintiff Marshall did not commit any unlawful act and was engaging in constitutionally protected activity.

177.    As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Marshall suffered and continues to suffer, *inter alia*, bodily injury, pain and suffering, extreme mental distress, anguish, and fear.

### vii.    May 30, 2020 Beating of Plaintiff Alexandra Betzel (Trump Tower)

178.    On May 30, 2020, at approximately 2:00 p.m., Plaintiff Alexandra Betzel joined a protest at the Picasso statue in Daley Plaza.

179.    Plaintiff Betzel rode her bike to the protest.  She marched north with the other protesters while walking her bike.

180.    At approximately 4:00 p.m., as Plaintiff Betzel and other protesters approached a location between the Trump Tower and The Langham Hotel, numerous Chicago police officers began to aggressively advance and push into the crowd of protesters without giving any warning or dispersal order.

181.    Without justification, an unidentified Chicago police officer ripped Plaintiff Betzel's bike out of her hands while another unidentified officer threw her to the ground.

182.    After Plaintiff Betzel got back to her feet, these same two unidentified Chicago police officers pushed her back into the crowd of protesters and numerous Chicago police officers, holding their batons horizontally in front of their bodies, began pushing the protesters towards the Chicago River west of Wabash Avenue.

183.    During this time, Defendant Officer Angelo Gallegos, without justification, forcefully pushed his baton against Plaintiff Betzel's neck and chest, causing her to choke and experience severe pain.

184.    Plaintiff Betzel did not physically attack, assault, threaten, or resist Defendant Officer Gallegos or any other officer at any time or in any way.

185.    Plaintiff Betzel did not commit any unlawful act and was engaging in constitutionally protected activity.

186.    As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Betzel suffered and continues to suffer, *inter alia*, bodily injury to her chest, neck, and arms, pain and suffering, extreme mental distress, anguish, and fear, and the loss of her bike.

### viii.    May 30, 2020 Abuse of Plaintiff Tamara Fouche (State Street Bridge)

187.    On May 30, 2020, at approximately 2:00 p.m., Plaintiff Tamara Fouche joined a protest at around State and Lake Street.

188.    At approximately 7:15 p.m., Plaintiff Fouche was on the State Street bridge, sitting on the metal traffic divider, when numerous Chicago police officers aggressively marched toward her and other protesters and ordered them to move.

189.    Before Plaintiff Fouche had an opportunity to move off of the divider, an unidentified Chicago police officer, without justification, pushed her with extreme force in the middle of her back, causing her neck to snap backward and causing her to fall off of the divider.

190.    Plaintiff Fouche did not physically attack, assault, threaten, or resist the Defendant Officer or any other police officer at any time or in any way.

191.    Plaintiff Fouche did not commit any unlawful act and was engaging in constitutionally protected activity.

192.    As a direct and proximate result of the Defendant Officer's actions as detailed above, Plaintiff Fouche suffered and continues to suffer, *inter alia*, bodily injury, pain and suffering, extreme mental distress, anguish, and fear.

### ix.    May 30, 2020 Baton Attacks of Plaintiff Olivia Love-Hatlestad (Near Federal Plaza)

193.    On May 30, 2020, Plaintiff Olivia Love-Hatlestad traveled to Federal Plaza in downtown Chicago to participate in a protest in support of Black lives.

194.    Plaintiff Love-Hatlestad arrived at Federal Plaza at approximately 1:00 p.m. prior to the start of the demonstration to be trained as a marshal for the demonstration in order to keep the protesters marching together but encouraging social distancing.

195.    The protesters marched from Federal Plaza through the streets of downtown Chicago, and at approximately 3:30 p.m., the protesters were moving north on Dearborn Street a couple of blocks from Federal Plaza.

196.    There were no directions, instructions or orders from Chicago police officers, including no warnings or dispersal orders.

197.    Plaintiff Love-Hatlestad observed Chicago police officers in full riot gear become increasingly aggressive toward a line of protesters.

198.    Plaintiff Love-Hatlestad turned her attention to an individual being singled out and brutally arrested.

199.    As Plaintiff Love-Hatlestad witnessed this arrest and brutality, an unidentified Chicago police officer, without justification, wielded a baton in one hand, cocked at a 45-degree angle, and brought it rapidly downward, striking her arm with a forceful blow, causing a painful bruise to her upper arm.

200.    Plaintiff Love-Hatlestad was eventually able to make her way back to her car parked near Federal Plaza, and with great difficulty due to police barricades and street closures, was finally able to leave the downtown area.

201.    Plaintiff Love-Hatlestad did not physically attack, assault, threaten, or resist the Defendant Officer or any other officer at any time or in any way.

202.    Plaintiff Love-Hatlestad did not commit any unlawful act and was engaging in constitutionally protected activity.

203.    As a direct and proximate result of the Defendant Officer's actions as detailed above, Plaintiff Love-Hatlestad suffered and continues to suffer, *inter alia*, bodily injury, pain and suffering, extreme mental distress, anguish, and fear.

###    x.    May 30, 2020 Baton Attacks of Megan Angers (Trump Tower)

204.    On the afternoon of May 30, 2020, Plaintiff Megan Angers attended a demonstration in solidarity with Black lives near the steps of Trump Tower.

205.    Behind Plaintiff Angers were hundreds of other protestors.  At some point, Chicago police officers told people to move.  Plaintiff Angers and many others had their hands up, telling the Chicago police officers that they could not move because there was nowhere to go.

206.    Despite having nowhere to go, one or more unidentified Chicago police officers used batons to repeatedly push and shove Plaintiff Angers and other protesters.  An unidentified Chicago police officer also struck Plaintiff Angers on her leg with his baton, without justification.

207.    Plaintiff Angers did not physically attack, assault, threaten, or resist the Defendant Officers or any other police officer at any time or in any way.

208.    Plaintiff Angers did not commit any unlawful act and was engaging in constitutionally protected activity.

209.    As a direct and proximate result of the actions by the Defendant Officers' actions as detailed above, Plaintiff Angers suffered and continues to suffer, *inter alia*, bodily injuries including bruises to her leg and arms, as well as pain and suffering, extreme mental distress, anguish, and fear.

### xi.  May 30, 2020 Beating of Rachel Bartz (State Street and Kinzie Street)

210.  On May 30, 2020, at approximately 2:00 p.m., Plaintiff Rachel Bartz and her sister joined a large demonstration at Federal Plaza in downtown Chicago to protest the police killings of George Floyd, Breonna Taylor, and other instances of anti-Black racism in the United States.

211.  At approximately 7:15 p.m., Plaintiff Bartz was with a group of other protestors marching south on State Street.

212.  Chicago police officers wearing riot gear created a skirmish line, preventing protesters from marching further south on State Street.  This skirmish line was across State Street between Kinzie Street and Hubbard Street and was approximately three rows deep.

213.  Without giving any verbal commands or warning, the officers, holding their batons horizontally in front of their bodies, began to forcefully push their batons into the bodies of the protesters, including Plaintiff Bartz.

214.  After the Chicago police officers began striking Plaintiff Bartz and other protesters, they gave orders for the protesters to move, but did not give an opportunity for the protesters to leave.

215.  Defendants Officer Marcus Mudd (#14390) and an unidentified Chicago police officer repeatedly struck Plaintiff Bartz with their batons without justification.  Plaintiff Bartz was struck in her chest, arms, and hands.  The unidentified officer also struck Plaintiff Bartz in the neck and throat.

216.  After being beaten by Defendant Officers, Plaintiff Bartz and her sister began to go north to get away from the line of officers.  At that point, Plaintiff Bartz saw Chicago police

officer Brink grab a protester by the hair and shirt. Plaintiff Bartz extended her arm in front of Officer Brink and yelled for him to stop physically harming the protester.

217. An unidentified Chicago police officer then struck Plaintiff Bartz on the back of the leg with a baton.

218. Plaintiff Bartz did not physically attack, assault, threaten, or resist the Defendant Officers or any other police officer at any time or in any way.

219. Plaintiff Bartz did not commit any unlawful act and was engaging in constitutionally protected activity.

220. As a result of the Defendant Officers' use of force, Plaintiff Bartz had bruises on her hands and arm, which lasted for weeks, along with a bruise and open wound on the back of her leg, which has now left a scar.

221. As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Bartz suffered and continues to suffer, *inter alia*, bodily injury, pain and suffering, humiliation, extreme mental distress, anguish, and fear.

### xii. May 30, 2020 Beating and False Arrest of Brittany Sowacke (Trump Tower)

222. On May 30, 2020, at approximately 2:30 p.m., Plaintiff Brittany Sowacke joined a large demonstration at Federal Plaza in downtown Chicago to protest the police killings of George Floyd, Breonna Taylor, and other instances of anti-Black racism in the United States.

223. Shortly after 6:00 p.m., Plaintiff Sowacke was with a group of protesters on the Wabash Avenue bridge near Trump Tower.

224. Chicago police officers wearing riot gear had established a skirmish line, preventing protesters from marching further north on Wabash Avenue.

225.     Plaintiff Sowacke was toward the front of the crowd, with a large number of protesters behind her.  There were additional Chicago police officers behind the group of protesters, to the south of the crowd.

226.     The Chicago police officers, holding their batons horizontally in front of their bodies, began to forcefully push their batons into the bodies of the protesters.  One or more unidentified Chicago police officers used their batons without justification to push Plaintiff Sowacke about her body, including her throat, arms, shoulders.

227.     None of the officers in front of Plaintiff Sowacke gave any orders or instructions to anyone in the crowd before using their batons.

228.      Plaintiff Sowacke was wearing a backpack in front of her body, which contained her camera and photography gear.

229.     An unidentified Chicago police officer said, "Get this bitch!" in reference to Plaintiff Sowacke and one or more unidentified Chicago police officers grabbed a hold of her.

230.     An unidentified Chicago police officer pulled open Plaintiff Sowacke's backpack, pulled out her professional grade camera, and tossed it to the ground.  This same officer then pulled out an additional camera lens out of the bag and threw it to the ground.

231.     Multiple unidentified Chicago police officers then grabbed Plaintiff Sowacke and pulled her from the crowd.  These unidentified officers grabbed Plaintiff Sowacke with such force that they left bruises on her arms.

232.     Plaintiff Sowacke was then arrested by unidentified Chicago police officers for no justifiable reason.  She was handcuffed with plastic zip-ties and taken into police custody.

233.    Plaintiff Sowacke was placed on a bus with other arrested protesters and taken to the Chicago police lockup at the intersection of Belmont and Western.  She was released without charges the following morning, spending over 14 hours in police custody.

234.    Plaintiff Sowacke did not physically attack, assault, threaten, or resist any of the Defendant Officers or any other police officer at any time or in any way.

235.    Plaintiff Sowacke did not commit any unlawful act and was engaging in constitutionally protected activity.

236.    As a result of the Defendant Officers' use of force, Plaintiff Sowacke had bruises on her arms and shoulders, which lasted over a week.

237.    As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Sowacke suffered and continues to suffer, *inter alia*, bodily injury, pain and suffering, loss of property, extreme mental distress, anguish, and fear.

### xiii.    May 30, 2020 Beating and False Arrest of Ronald Reed (Near Trump Tower)

238.    On May 30, 2020, Plaintiff Ronald Reed joined a large demonstration in downtown Chicago to protest the police killings of George Floyd, Breonna Taylor, and other instances of anti-Black racism in the United States.

239.    Plaintiff Reed had his skateboard with him, which he rode during most of the protest.

240.    At some point between 6:00 p.m. and 7:00 p.m., Plaintiff Reed was with a group of protesters near Trump Tower.

241.    Chicago police officers wearing riot gear had established a skirmish line.  Plaintiff Reed was toward the front of the crowd.

242.    Other demonstrators began locking arms with one another and Plaintiff Reed joined them.

243.    The officers in the skirmish line began to advance and push against Plaintiff Reed and other demonstrators.

244.    Plaintiff Reed was holding on to his skateboard during this time.  An unidentified Chicago police officer grabbed a hold of the skateboard and began pulling it away from him.  As Plaintiff Reed held on to his skateboard, he was pulled into the crowd of officers.

245.    One or more unidentified Chicago police officers began grabbing ahold of Plaintiff Reed and striking him with batons about his body, including blows to his head.

246.    One or more unidentified Chicago police officers grabbed chunks of Plaintiff Reed's hair, which he wore in dreadlocks.  One of the dreadlocks was ripped out of Plaintiff Reed's head, causing him to bleed from the scalp.

247.    As Plaintiff Reed was bleeding from his head, the Chicago police officers began taunting him, saying, "You have STDs! You have STDs!"

248.    One or more unidentified Chicago police officers took Plaintiff Reed's property from him and discarded it, including his skateboard, cell phone, and a bag full of his personal belongings.  Plaintiff Reed pleaded with the officers to be able to retrieve his property.  The officers responded, "Fuck your shit!"

249.    Plaintiff Reed was handcuffed, transported in a Chicago police vehicle and taken to Chicago police lockup.

250.    While in police custody, one or more unidentified Chicago police officers denied Plaintiff Reed's requests for medical treatment for his injuries.

40

251.     Plaintiff Reed was released from custody the following day, May 31, in the middle of the day.

252.     Plaintiff Reed was falsely charged with municipal ordinance violation 8-4-10(F) for disorderly conduct, assembly of three or more people, breaching the peace.  Defendants Officer Michael Wilson (#17643) and Officer David Floyd (#13262) were listed as the arresting officers.

253.     Plaintiff Reed's false charge was "Non-Suited" on August 13, 2020, and the case was terminated in his favor.

254.     Plaintiff Reed did not physically attack, assault, threaten or resist any of the Defendant Officers or any other police officer at any time or in any way.

255.     Plaintiff Reed did not commit any unlawful act and was engaging in constitutionally protected activity.

256.     As a result of the Defendant Officers' use of force, Plaintiff Reed had injuries to his head and bruises about his body.  Following his release from police custody, he obtained medical treatment, where he received three staples to his head.

257.     As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Reed suffered and continues to suffer, *inter alia*, bodily injury, pain and suffering, loss of property, extreme mental distress, anguish, and fear.

### xiv.     May 30, 2020 Baton Attacks of Plaintiff Charlotte Vail (Downtown)

258.     On May 30, 2020, Plaintiff participated in a protest in support of Black lives in downtown Chicago.  She was a marshal during the demonstration, helping instruct protesters on where to march.  As a marshal, she wore a bright orange shirt.

259.    The protesters started marching from Federal Plaza through the streets of downtown around 2:00 p.m.  However, the protesters were unable to stick to their desired route because police in riot gear blocked their paths.

260.    Plaintiff Vail observed Chicago police officers in riot gear become increasingly aggressive toward protesters.

261.    At one point, Plaintiff Vail observed Chicago police officers grab two protesters from the crowd.  Plaintiff Vail went to see if one of the young men who was grabbed was okay, and before she could reach the young man, an unidentified Chicago police officer pushed her back with a baton.  She attempted to reach the young man again, and one or more unidentified Chicago police officers shoved her hard to the ground.

262.    Plaintiff Vail did not physically attack, assault, threaten or resist the Defendant Officers or any other police officer at any time or in any way.

263.    Plaintiff Vail did not commit any unlawful act and was engaging in constitutionally protected activity.

264.    As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Vail suffered and continues to suffer, *inter alia*, bodily injuries, including bruises to her arms and shoulders, as well as pain and suffering, extreme mental distress, anguish, and fear.

### xv.    May 30, 2020 Attacks of Plaintiff Quinlan Mallow (Downtown)

265.    Plaintiff Malloy broke his back in September 2016 and has since recovered, but doctors informed him that aggravating this pre-existing spinal injury, or suffering a new spinal injury, could force him to be wheelchair-bound.  This is, in part, due to a degenerative disk disease.

42

266.    On May 30, 2020, Plaintiff Mallow took a train into the City of Chicago and arrived at Union Station around 11:30 a.m. to participate in a protest in support of Black lives.

267.    Plaintiff Mallow listened to speakers at Federal Plaza and then started marching around 2:00 p.m.  At some point the march got split up, and the police prevented the two groups from joining up again.

268.    Around 3:45 p.m., Plaintiff Mallow was in the front line of one of the groups of protesters when activists asked everyone to link arms.  While their arms were linked, a protester tripped, which caused the entire link of protesters to lurch forward slightly.  Chicago police officers then started beating protesters with batons.

269.    An unidentified Chicago police officer hit Plaintiff Malloy in the left leg with a baton without justification.  The officer then punched Plaintiff Malloy in the chest and grabbed him by the shirt.  Plaintiff Mallow put his hands up and told the officer, "I didn't touch you, let me go."  The officer eventually let him go.

270.    Plaintiff Malloy and the crowd of protesters resumed marching downtown.

271.    By around 7:45 p.m., the bridges were raised and many streets were blocked off, which caused lots of confusion among protesters on where to go and how to get home.  Plaintiff Malloy joined a crowd of protesters walking south.  As Plaintiff Malloy was walking, Chicago police officers grabbed him and other protesters and shoved them towards moving cars while telling them to keep walking.  Plaintiff Malloy pulled out his phone to record the officers who were pushing protesters towards moving cars and only then did the officers stop pushing protesters.

272.    Around 8:30 p.m., as Plaintiff Malloy was walking back to Union Station, he observed a Chicago police officer threatening a young Black woman and so he pulled out his

phone to record the interaction. Upon observing Plaintiff Malloy recording with his phone, Defendant Officer Daniel Morrin (#5605) came up from behind without warning and pulled Plaintiff Malloy's backpack handle, snapping Plaintiff Malloy backward. Defendant Officer Morrin then shoved Plaintiff Malloy forward.

273. When Plaintiff Malloy attempted to view Defendant Officer Morrin's badge number, a sergeant with the badge number 1103 stood in front of Defendant Officer Morrin to purposefully block Plaintiff Malloy from seeing Defendant Officer Morrin's badge. Plaintiff Malloy explained to the Sergeant that he had a right to know the officer's badge number.

274. Eventually, Defendant Officer Morrin emerged from behind the Sergeant, and Plaintiff Malloy was able to identify his name and badge number.

275. Directly after this interaction, Plaintiff Malloy's adrenaline wore off and he collapsed from the back pain. The pain was so severe because Defendant Officer Morrin likely aggravated Plaintiff Malloy's pre-existing spinal injury.

276. As Plaintiff Malloy could not walk, protesters had to carry him out of the crowd. They then found a medic on the street who fashioned a make-shift brace to stabilize Plaintiff Malloy's back. As the trains were closed, and therefore no way for Plaintiff Malloy to get home, protesters helped to arrange a ride home for Plaintiff Malloy.

277. Plaintiff Malloy now relies on a wheelchair or a mobility-assistance trained service dog to walk anywhere outside of his own home, and he is in constant pain that does not subside.

278. Plaintiff Malloy did not physically attack, assault, threaten, or resist Defendant Officer Morrin or any other police officer at any time or in any way.

279.     Plaintiff Malloy did not commit any unlawful act and was engaging in constitutionally protected activity.

280.     As a direct and proximate result of the actions of the Defendant Officers as detailed above, Plaintiff Malloy suffered and continues to suffer, *inter alia*, bodily injuries, including back pain and bruises, as well as pain and suffering, extreme mental distress, anguish, and fear.

### xvi.     May 30, 2020 Abuse of Cody Jones (State and Wacker; Grand and Dearborn)

281.     On May 30, 2020, Plaintiff Cody Jones joined a protest downtown and walked to State and Wacker around 7:00 p.m.

282.     There, Plaintiff Jones observed an unidentified Chicago police officer dressed in riot gear pepper spray an elderly man—who appeared to be around 70 years old—who was riding a bike.  Plaintiff Jones along with several other protesters, all with their hands above their heads, started walking towards the elderly man to help him.  As Plaintiff Jones approached the elderly man, the unidentified officer turned around and pepper sprayed Plaintiff Jones and several other protesters without justification.  Plaintiff Jones stumbled back and experienced temporary blindness and eye irritation; they were tended to by a medic.

283.     Plaintiff Jones was trapped downtown because all the bridges were raised.  When the LaSalle bridge was eventually lowered, Plaintiff Jones crossed the bridge around 8:30 p.m. and made their way to Grand and Dearborn.

284.     Plaintiff Jones witnessed a young man being chased by Chicago police officers, so they ran after the young man to try to help.  Plaintiff Jones observed officers tackle the young man, beat him, and drag him behind a line of officers.

285.    While Plaintiff Jones was standing with a group of protesters watching the Chicago police officers beat the young man, an unidentified Chicago police officer became enraged when a bottle broke at his feet, and he pulled out his gun, unlocked the safety, put his finger on the trigger, and charged at Plaintiff Jones and the group of protesters while pointing his gun at them.  Plaintiff Jones ran from this officer and other officers that joined in the chase in fear for their life.  While running away from the officers, Plaintiff Jones hurt their knee.

286.    Plaintiff Jones did not physically attack, assault, threaten, or resist the Defendant Officers or any other police officer at any time or in any way.

287.    Plaintiff Jones did not commit any unlawful act and was engaging in constitutionally protected activity.

288.    As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Jones suffered and continues to suffer, *inter alia*, bodily injuries, including eye irritation and knee pain, as well as pain and suffering, extreme mental distress, anguish, and fear.

### xvii.    May 30, 2020 Abuse of Plaintiff Margaret Gay (Trump Tower; Grand and Dearborn)

289.    On May 30, 2020, Plaintiff Gay arrived at the protest in support of Black lives downtown around 2:00 p.m.

290.    Plaintiff Gay marched with protesters to Trump Tower.  Around 5:30 p.m., Plaintiff Gay made her way to the front line of protesters on the north side of Wabash Bridge towards Trump Tower.  While standing in the front line, one or more unidentified Chicago police officers shoved their batons and shields into her ribs and her body, without justification, and pushed her backwards.

291.    Plaintiff Gay observed a Chicago police officer, for no valid reason, grab a Black teenager and pull him forward.  Plaintiff Gay and other protesters threw themselves in between

the officer and the teenager to protect him. When she tried to cover the teenager, she was shoved by Chicago police officers and hit with elbows.

292. Chicago police officers continued to push and shove Plaintiff Gay and protesters on the north side of the bridge backward, but there was nowhere for them to go as protesters and officers on the south side of the bridge were not moving. As a result, Plaintiff Gay and others were being crushed on the bridge and could not move.

293. By around 7:30 p.m., Chicago police officers had pushed Plaintiff Gay and the protesters completely off Wabash bridge.

294. Plaintiff Gay walked to Grand and Dearborn around 8:30 p.m. or later. There, she observed a group of Chicago police officers circling a young man who appeared beaten up and unconscious.

295. She then observed an unidentified Chicago police officer pull out his gun and start pointing it at the group of people observing the officers surrounding the young man. At this point, many of the protesters started to run away from the officer pointing the gun, and in fear for her life, Plaintiff Gay moved out of the way to avoid the officer's line of fire.

296. Plaintiff Gay did not physically attack, assault, threaten, or resist the Defendant Officers or any other police officer at any time or in any way.

297. Plaintiff Gay did not commit any unlawful act and was engaging in constitutionally protected activity.

298. As a direct and proximate result of the actions of Defendant Officers as detailed above, Plaintiff Gay suffered and continues to suffer, *inter alia*, bodily injuries, including bruises on her ribs, arms, elbows, knees, and legs, as well as pain and suffering, extreme mental distress, anguish, and fear.

### xviii. May 30, 2020 Baton Attacks of Plaintiff Jacqueline Spreadbury (Trump Tower)

299. On May 30, 2020, Plaintiff Spreadbury arrived at Federal Plaza around 1:00 p.m. on her bike. Plaintiff Spreadbury volunteered to be a bike legal observer during the protest. As such, she was dressed in a bright green shirt and bright green hat. She was paired with another bike legal observer (her "buddy").

300. The march started from Federal Plaza around 2:00 p.m. and Plaintiff Spreadbury began to bike around and observe. Plaintiff Spreadbury and her buddy rode to Wabash Avenue bridge. She made her way to the north side of Wabash Avenue bridge on the sidewalk around 4:40 p.m.

301. At the north side of the bridge, Plaintiff Spreadbury observed a line of Chicago police officers facing a line of protesters. The officers began to hit the protesters indiscriminately with their batons.

302. Plaintiff Spreadbury then made her way to the front line of the protesters while her buddy stood behind on the sidewalk with their bikes. She began trying to collect people's names who were being beaten and arrested. It was difficult for her to collect names because whenever she would ask for a name, Chicago police officers would swing their batons and scream so that she could not hear the names.

303. Chicago police were screaming at the protesters to move but there was nowhere for the protesters to move. Chicago police in riot gear cleared off the sidewalks and lined the sidewalks with police so that protesters were surrounded by police. Police did not let anyone hop the barricade to get out of the street, in effect cramming protesters on the bridge.

304. Plaintiff Spreadbury was trapped on the bridge for over an hour observing protesters get beaten and arrested by Chicago police for no legitimate reason.

305.     Plaintiff Spreadbury identified herself a number of times as a legal observer who was trying to get the names of people who were arrested.  Plaintiff Spreadbury was hit by one or more unidentified Chicago police officers with batons multiple times when she tried to ask for the names of protesters who were being beaten and arrested.  Plaintiff Spreadbury was also repeatedly shoved back by one or more unidentified Chicago police officers who held their batons horizontally with two hands.  As a result, Plaintiff fell on the ground two times and was helped up by protesters.

306.     The Chicago police officers who shoved and hit Plaintiff Spreadbury were not wearing name badges.

307.     Plaintiff Spreadbury tried to get off the bridge by asking Chicago police officers several times if she could exit onto the sidewalk, but she was told no every time she asked.  Plaintiff eventually was able to weave her way through protesters and off the bridge on the south end.

308.     Plaintiff Spreadbury did not physically attack, assault, threaten, or resist the Defendant Officers or any other police officer at any time or in any way.

309.     Plaintiff Spreadbury did not commit any unlawful act and was engaging in constitutionally protected activity.

310.     As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Spreadbury suffered and continues to suffer, *inter alia*, bodily injuries, including bruises all over her body, as well as pain and suffering, extreme mental distress, anguish, and fear.

   **xix.    May 30, 2020 Baton Attacks and False Arrest of Plaintiff Sara Engimann (Trump Tower)**

49

311.    On May 30, 2020, Plaintiff Engimann joined a protest in support of Black lives in Federal Plaza around 1:00 p.m.  They listened to speakers in Federal Plaza and then started to march around 2:00 p.m.

312.    Around 2:45 p.m., Plaintiff Engimann headed down Wabash Avenue and arrived in front of Trump Tower.  They observed Chicago police officers on the steps of Trump Tower and in the street, and they joined a group of protesters who all locked arms in the street and sidewalk by Trump Tower.

313.    Chicago police started to become aggressive toward the protesters who were standing with locked arms.  Officers began to push the protesters back with batons.  An unidentified Chicago police officer started hitting Plaintiff Engimann with a baton on the arms and did not stop until another officer told him to stop.

314.    Police continued to push the protesters back on Wabash Avenue away from Trump Tower.  Plaintiff Engimann and other protesters then sat down on the ground on the sidewalk facing towards Trump Tower.

315.    Shortly after sitting down, Plaintiff Engimann and other protesters had to stand up again because another row of Chicago police officers arrived.  When additional police arrived, the Chicago police officers became more violent.

316.    Without warning, the Chicago police officers started yelling at the protesters to move and began hitting protesters in the neck with their batons before giving them any opportunity to move.  An unidentified Chicago police officer held his baton horizontally with hands on both ends and rammed his baton into Plaintiff Engimann's neck; he pushed their neck so hard that they fell to the ground.  While on the ground, Plaintiff Engimann was trampled by protesters running away from the Chicago police officers who were hitting them.

317.    Another officer pulled Plaintiff Engimann up and let Plaintiff Engimann go back into the crowd.

318.    Shortly thereafter, Plaintiff Engimann made their way to the front of the line again and locked arms with other protesters.  They and the line of protesters stood with their backs facing the police.

319.    One or more unidentified Chicago police officers started ramming their batons into Plaintiff Engimann's back without justification.  These officers then pulled Plaintiff Engimann's backpack, ripping it open, and kicked Plaintiff Engimann's legs out from under them.  The officers then dragged Plaintiff Engimann out of the line.  Everything in Plaintiff Engimann's backpack fell out, including their glasses, which were damaged as a result.

320.    Plaintiff Engimann was quickly put in metal handcuffs and arrested by one or more unidentified Chicago police officers for no justifiable reason.  Plaintiff Engimann asked a sergeant to explain why they were being arrested and the sergeant responded, "we will find out."  Plaintiff Engimann was then taken to a Chicago police squadrol around 3:30 p.m.

321.    Plaintiff Engimann was taken to the 18th precinct and detained until around 2:30 a.m.  While they were detained, they were denied a phone call and food.  Chicago police officers refused to tell Plaintiff Engimann what they were being charged with.  They were eventually let go with no criminal charges.

322.    Plaintiff Engimann did not physically attack, assault, threaten, or resist the Defendant Officers or any other police officer at any time or in any way.

323.    Plaintiff Engimann did not commit any unlawful act and was engaging in constitutionally protected activity.

324. As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Engimann suffered and continues to suffer, *inter alia*, bodily injuries, including bruises to her elbow and extreme soreness in their back and neck, as well as pain and suffering, extreme mental distress, anguish, fear, and damage to her property.

### xx. May 30, 2020 Baton Attacks of Korrina Zartler (Trump Tower)

325. On May 30, 2020, Plaintiff Zartler arrived at Federal Plaza around 2:00 p.m. to participate in a protest in support of Black lives.

326. Plaintiff Zartler marched across the Wabash Avenue bridge and to the front of Trump Tower around 3:00 p.m. Plaintiff Zartler observed Chicago police officers in riot gear all over the steps of Trump Tower and in the street.

327. Plaintiff Zartler was at the front line of the protesters sitting down when Chicago police officers started to get aggressive. She had to stand up quickly because the officers started moving toward the protesters and pushing them with their batons. An unidentified Chicago police officer pushed Plaintiff Zartler with his baton in her stomach without justification.

328. Plaintiff Zartler then turned around so that her back was toward the officers and linked arms with other protesters.

329. An unidentified Chicago police officer wearing "thin blue line" gloves pointed to Plaintiff Zartler and said, "she has everyone linking arms, it's hard to move them." One or more unidentified Chicago police officers then began pushing Plaintiff Zartler and others in the back with their batons. Plaintiff Zartler observed Chicago police officers grab people by their backpacks and rip them out of the line. She also observed Chicago police officers beat protesters for no valid reason.

330.    Plaintiff Zartler was repeatedly pushed by one or more unidentified Chicago police officers with their batons in her back.  The officers continued to push Plaintiff Zartler and the protesters further and further back onto Wabash Avenue bridge.

331.    Once Plaintiff Zartler was on the bridge, she could not move anywhere.  Chicago police officers were yelling to move back but there was nowhere to go.  Plaintiff Zartler eventually was able to get off the bridge around 6:30 p.m.

332.    Plaintiff Zartler did not physically attack, assault, threaten, or resist the Defendant Officers or any other police officer at any time or in any way.

333.    Plaintiff Zartler did not commit any unlawful act and was engaging in constitutionally protected activity.

334.    As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Zartler suffered and continues to suffer, *inter alia*, bodily injuries, including soreness in her back, as well as pain and suffering, extreme mental distress, anguish, and fear.

      **xxi.**    **May 30, 2020 Baton Attacks of Plaintiff Kyle Craig (State and Kinzie)**

335.    On May 30, 2020, Plaintiff Kyle Craig and his wife Plaintiff Elizia Artis arrived at Federal Plaza in downtown Chicago around 2:00 p.m. to participate in a protest in support of Black lives.

336.    Plaintiff Craig marched around downtown, then to Trump Tower, and then proceeded to Lake Shore Drive, where he watched protesters give speeches and recite poetry.  Plaintiff Craig then continued marching and ended up at State Street and Kinzie Street around 5:30 p.m.

337.    Plaintiff Craig and Plaintiff Artis were standing on the corner in front of the Public House restaurant when he observed two Chicago police officers for no valid reason start

to beat a protester with batons.  Plaintiff Artis yelled at the officers to try to get them to stop

beating the protester, but they ignored her pleas and continued beating him.  A young woman

standing next to Plaintiff Craig and Plaintiff Artis then threw a handful of dirt from a planter in

the direction of the officers to try to get them to stop beating the protester.  Three officers then

charged at them with their batons out.

338.    The young woman was knocked over by protesters running away from the

charging officers and fell to the ground.

339.    Plaintiff Craig tried to help the young woman get up.  While doing so, an

unidentified Chicago police officer started pushing Plaintiff Craig back with his baton, which he

was holding horizontally with hands on each end, without justification.  The officer pushed

Plaintiff Craig back with his baton all the way around the corner and then knocked Plaintiff

Craig to the ground.  The fall knocked off Plaintiff's Craig's glasses and also broke his camera.

340.    After picking up his glasses, Plaintiff Craig tried to walk back to find his

wife.  Plaintiff Craig told the Chicago police officer that his wife was over there and asked to

please allow him to go find her.  The officer then hit Plaintiff Craig in the face with his baton,

holding it horizontally with two hands, without justification.  The officer then said, "I don't give

a shit, you shouldn't have come here fucker," and hit Plaintiff Craig again in the face with his

baton, knocking him to the ground.

341.    Other protesters helped Plaintiff Craig up and he walked a different way to find

his wife.

342.    Plaintiff Craig did not physically attack, assault, threaten, or resist the Defendant

Officer or any other police officer at any time or in any way.

343. Plaintiff Craig did not commit any unlawful act and was engaging in constitutionally protected activity.

344. As a direct and proximate result of the Defendant Officer's actions as detailed above, Plaintiff Craig suffered and continues to suffer, *inter alia*, bodily injuries, including bruises on his arm and pain in his face, as well as pain and suffering, extreme mental distress, anguish, and fear.

### xxii. May 30, 2020 Baton Attacks of Plaintiff Elizia Artis (State and Kinzie)

345. On May 30, 2020, Plaintiff Elizia Artis and her husband Plaintiff Kyle Craig arrived at Federal Plaza in downtown Chicago around 2:00 p.m. to participate in a protest in support of Black lives.

346. Plaintiff Artis marched around downtown, then to Trump Tower, and then proceeded to Lake Shore Drive, where she watched protesters give speeches and recite poetry. Plaintiff Artis then continued marching and ended up at State Street and Kinzie Street around 5:30 p.m.

347. Plaintiff Artis and her husband were standing on the corner in front of the Public House restaurant when she observed two Chicago police officers for no valid reason start to beat a protester with batons. Plaintiff Artis yelled at the officers to try to get them to stop beating the protester, but they ignored her pleas and continued beating him. A young woman standing next to Plaintiff Artis and Plaintiff Craig then threw a handful of dirt from a planter in the direction of the officers to try to get them to stop beating the protester. Three officers then charged at them with their batons out.

348. The young woman was knocked over by protesters running away from the charging officers and fell to the ground.

349.    Plaintiff Artis tried to cover the young woman on the ground with her body so that others would not run over the young woman.  While doing so, an unidentified Chicago police officer started hitting Plaintiff Artis in the back repeatedly with his baton without justification.

350.    The Chicago police officer then stopped hitting Plaintiff Artis and yelled, "get the fuck out of here."  Plaintiff Artis tried to help the young woman up and the officer yelled at her again.  Plaintiff Artis put her hands in the air and told the officer that she will go wherever he wanted her to go.  In response the officer told her, "you just need to get the fuck out of here."

351.    Plaintiff Artis did not physically attack, assault, threaten, or resist the Defendant Officer or any other police officer at any time or in any way.

352.    Plaintiff Artis did not commit any unlawful act and was engaging in constitutionally protected activity.

353.    As a direct and proximate result of the Defendant Officer's actions as detailed above, Plaintiff Artis suffered and continues to suffer, *inter alia*, bodily injuries, including pain and soreness in her back, as well as pain and suffering, extreme mental distress, anguish and fear.

**xxiii.    May 30, 2020 Beating of Plaintiff Brent Colbert (Trump Tower)**

354.    On May 30, 2020, at approximately 2:30 p.m., Plaintiffs Brent Colbert and Jonathon Freund, who are a couple, rode together on their bikes to join a protest in support of Black lives in downtown Chicago.

355.     After joining a demonstration at Federal Plaza, Plaintiffs Colbert and Freund marched with other protesters until they ended up in front of Trump Tower.

356.    When they arrived in front of Trump Tower, Chicago police officers began to box protesters in by aggressively pushing them back with their shields.

357.    Plaintiffs Colbert and Freund did not hear Chicago police officers give any warnings or orders to disperse.

358.    One or more unidentified Chicago police officers then begin hitting protesters with their batons, including Plaintiffs Colbert.

359.    As Chicago police officers were hitting and pushing Plaintiffs Colbert and Freund and other protesters back, officers were yelling, "Get back," without telling protesters where to move or giving them an opportunity to go in a different direction.  Officers effectively pushed the protesters into a crowd so tight that then protesters had nowhere to go.

360.    Protesters then linked arms in an attempt to protect themselves.  Plaintiff Colbert put his hands up to indicate he posed no threat to the officers.

361.    An unidentified Chicago police officer with #18627[14] on his helmet told Plaintiff Colbert, "If you didn't want to get hurt you shouldn't come to protest."

362.    The unidentified Chicago police officer then jabbed his baton into Plaintiff Colbert's right rib twice, causing him to hunch over in serious pain, which also prevented him from being able to move temporarily.

363.    Other protesters, noticing Plaintiff Colbert hunched over in pain, grabbed him and moved him out of harm's way.

364.    Plaintiff Colbert sought emergency medical treatment for the pain and injuries he sustained to his ribs, which were visibly bruised for a significant period of time and required he receive prescription medication for the pain.

365.    Plaintiff Colbert did not physically attack, assault, threaten, or resist the Defendant Officers or any other Chicago police officer at any time or in any way.

---

[14] This was the number on the officer's helmet, but it is unclear if this was a valid badge number or this officer's badge number.

366.     Plaintiff Colbert did not commit any unlawful act and was engaging in constitutionally protected activity.

367.     As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Colbert suffered and continues to suffer, *inter alia*, bodily injuries, pain and suffering, extreme mental distress, anguish, and fear.

### xxiv.     May 30, 2020 Abuse of Plaintiff Jonathan Freund (Trump Tower)

368.     On May 30, 2020, at approximately 2:30 p.m., Plaintiffs Jonathan Freund and his partner Plaintiff Colbert rode their bikes downtown to join a protest in support of Black lives in downtown Chicago.

369.     After joining the demonstration at Federal Plaza, Plaintiffs Freund and Colbert marched with other protesters until they ended up in front of Trump Tower.

370.     When they arrived in front of Trump Tower, Chicago police officers began to aggressively push protesters back with their shields, effectively boxing them in, as they did not have anywhere to go.

371.     Plaintiff Freund did not hear Chicago police officers give any warnings or orders to disperse.

372.     One or more unidentified Chicago police officers then began hitting protesters with their batons.

373.     An unidentified Chicago police officer pushed Plaintiff Freund on his left arm with a heavy force without justification, causing Plaintiff Freund pain and a bruising on his left arm.

374.     Chicago police officers continued to hit and push Plaintiffs Freund and Colbert and other protesters back.  Officers were yelling, "Get back," without telling protesters where to

move. Officers effectively pushed the protesters into a crowd so tight that the protesters had nowhere to go.

375. Protesters then linked arms to protect themselves.

376. Around this same time, an unidentified Chicago Police officer hit Plaintiff Freund in his head and face with a shield, without justification, knocking Plaintiff Freund's glasses to the ground.

377. Plaintiff Freund was unable to retrieve his glasses as the crowd trampled and broke them.

378. Plaintiff Freund was able to leave the protest with Plaintiff Colbert.

379. The force to Plaintiff Freund's left arm resulted in bruising that remained for several weeks.

380. Plaintiffs Freund did not physically attack, assault, threaten, or resist the Defendant Officers or any other Chicago police officer at any time or in any way.

381. Plaintiffs Freund did not commit any unlawful act and was engaging in constitutionally protected activity.

382. As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiffs Freud suffered and continues to suffer, *inter alia*, bodily injuries, pain and suffering, extreme mental distress, anguish, and fear.

### xxv. May 30, 2020 Abuse of Plaintiff Alexandra Bunecky (the Wrigley Building)

383. On May 30, 2020, at approximately 5:00 p.m., Plaintiff Alexandra Bunecky joined a protest in solidarity with Black lives along Lake Shore Drive.

384. The protest proceeded to march toward the Loop. At approximately 6:15 p.m., the protest reached the north side of the DuSable Bridge on Michigan Avenue, but Plaintiff Bunecky and the other protesters were unable to cross the bridge as it had been raised up.

385. Plaintiff and the crowd subsequently marched to the courtyard of the Wrigley Building where they were met by a large group of Chicago police officers.

386. Plaintiff Bunecky was at the front line of the protest and was met by a wall of Chicago police officers.

387. At approximately 6:30 p.m., one or more unidentified Chicago police officers, without any warning or order to disperse, and without any justification, began to physically move Plaintiff Bunecky and other protestors back by hitting them with batons and pushing them with their hands and protective shields.

388. Plaintiff Bunecky was struck several times in the arms and hands by the officers with their batons without justification.

389. Plaintiff Bunecky began moving backwards but could only do so slowly as there were lines of protesters directly behind her and pressed up against her.

390. Plaintiff Bunecky then heard Defendant Officer Nicholas Nesis (#13406) say something like "I'm done with this girl," and, without warning or justification, Defendant Officer Nesis grabbed the back of Plaintiff Bunecky's hair, forcefully pulled her head to the side, and pulled her down towards the ground.



391.     Plaintiff Bunecky was helped up by surrounding protesters and subsequently pulled to safety by them.

392.     Plaintiff Bunecky did not physically attack, assault, threaten, or resist the Defendant Officers or any other officer at any time or in any way.

393.     Plaintiff Bunecky did not commit any unlawful act and was engaging in constitutionally protected activity.

394.     As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Bunecky suffered and continues to suffer, *inter alia*, bodily injury, pain and suffering, extreme mental distress, anguish, and fear.

     **xxvi.**    **May 30, 2020 Baton Attacks and False Arrest of Plaintiff Miles Bennett Hogerty (Trump Tower)**

395.     In the afternoon of May 30, 2020, Plaintiff Miles Bennett Hogerty assembled with thousands in downtown Chicago to protest the police murders of George Floyd, Breonna Taylor, and other Black people in the United States.

396.     Plaintiff Bennett Hogerty joined the demonstration at Federal Plaza and followed the crowd of protesters throughout the downtown area.

397.    Plaintiff Bennett Hogerty marched across the Wabash Avenue bridge and neared the entrance to Trump Tower.  Plaintiff Bennett Hogerty observed Chicago police officers both in front and behind the protesters stopped on the Wabash bridge.

398.    Several of the Chicago police officers' badges were covered up preventing Plaintiff Bennett Hogerty from observing their names and badge numbers.

399.    Plaintiff Bennett Hogerty and other protesters were packed on the bridge and Plaintiff Hogerty believed they had no place to go.

400.    Plaintiff Bennett Hogerty did not hear any orders to disperse and believed there were no opportunities to leave.

401.    While Plaintiff Bennett Hogerty was standing with others, chanting "No Justice No peace, say their names George Floyd, Breonna Taylor," Chicago police officers approached the protesters and began to hit those at the front of the crowd with their batons and use their shields to push several protesters to the ground.

402.    Plaintiff Bennett Hogerty moved to the front of the crowd and attempted to pick someone up who was shoved to the ground by the police when Plaintiff Bennett Hogerty was hit in the back with a baton by an unidentified Chicago police officer, causing them to fall to the ground.

403.    Plaintiff Bennett Hogerty was hit with a baton a few additional times by one or more unidentified Chicago police officers.

404.    Plaintiff Bennett Hogerty was then grabbed by one or more unidentified Chicago police officers and dragged behind a line of police officers when they were put on their stomach and handcuffed behind their back.

405.    Plaintiff Bennett Hogerty was transported to the 2nd district (51st and Wentworth) where they were detained for several hours before they were released from custody pursuant to an I-bond the following day on May 31, 2020.

406.    Plaintiff Bennett Hogerty was falsely charged with municipal violation 8-4-10(F) for disorderly conduct, assembly of three or more people, breaching the peace by Defendant Chicago Police Captain S. Mannion (#115), who served as his arresting officer.

407.    Plaintiff Bennett Hogerty was forced to attend one court date before their false charge was dismissed and their legal case was terminated in their favor on September 10, 2020.

408.    Plaintiff Bennett Hogerty did not physically attack, assault, threaten, or resist the Defendant Officers or any other police officer at any time or in any way.

409.    Plaintiff Bennett Hogerty did not commit any unlawful act and was engaging in constitutionally protected activity.

410.    As a result of the egregious and excessive force, Plaintiff Bennett Hogerty sustained visible physical injuries including bruises on their back, and left and right bicep.

411.    As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Bennett Hogerty suffered and continues to suffer, *inter alia*, bodily injuries, pain and suffering, extreme mental distress, anguish, and fear.

### xxvii.    May 30, 2020 Baton Attack of Plaintiff Marina Bassett (Trump Tower)

412.    In the afternoon on May 30, 2020, Plaintiff Basset joined a demonstration in downtown Chicago to protest the police murders of George Floyd, Breonna Taylor, and other Black people in the United States.

413.    Plaintiff Bassett and other protesters marched to Trump Tower where they stopped outside the west entrance on Wabash Avenue.

414.    Plaintiff Bassett observed Chicago police officers clad in uniforms with riot gear standing on the stairs of Trump Tower.

415.    Protesters remained in this location chanting, among other things, "Who Do You Serve, Who Do You Protect;" "We are here for Black lives, we are here for Black futures;" "We need allyship;" "No Justice, No Peace, No Racist Police;" and "Black Lives Matter."

416.    At one point, a police officer said move, but the order was not directed at any one person or group of people, and there was no order as to where anyone was to move.

417.    The Chicago police officers did not give any orders to disperse, opportunities to leave, or warnings people would be arrested if they did not comply with their orders.

418.    Chicago police officers began to push the crowd with their batons, knocking a young female protester to the ground.

419.    As Plaintiff Bassett leaned down to try to help this woman off the ground, an unidentified Chicago police officer, without justification, hit her in the head with his baton, causing her severe pain and injury.

420.    Upon information and belief, this Defendant Officer (whose picture is below), who had removed his badge from his uniform, continued to strike Plaintiff Bassett with his baton in her ribs, causing her pain and injury.



421.    Plaintiff Bassett then retreated to the back of the crowd, away from the Chicago

police officers.

422.    At this location, Plaintiff Bassett continued to observe Chicago police officers

and noted some of the officers had tape covering their badge numbers on their badges.



423.     Plaintiff Bassett grew tired and started to feel pain from being repeatedly struck by a baton and returned home.

424.     Later that evening, Plaintiff Bassett's friends observed that she was unable to focus and she was growing incoherent.

425.     A friend of Plaintiff Bassett brought her to the emergency room at Swedish Covenant Hospital where she was treated by medical professionals.

426.     Medical treaters diagnosed that Plaintiff Bassett sustained a concussion, a bruised and swollen eye, and bruises on her side.

427.     Since the protest on May 30, 2020, Plaintiff Bassett continues to suffer injury from the unidentified Chicago police officer's excessive force, including intermittent ringing in her ears.

428.     Plaintiff Bassett did not physically attack, assault, threaten, or resist the Defendant Officer or any other officer at any time or in any way.

66

429.    Plaintiff Bassett did not commit any unlawful act and was engaging in constitutionally protected activity.

430.    As a direct and proximate result of the Defendant Officer's actions as detailed above, Plaintiff Bassett suffered and continues to suffer, *inter alia*, bodily injury, pain and suffering, extreme mental distress, anguish, and fear.

###### xxviii.    May 30, 2020 Abuse and False Arrest of Jeannine Wise (Trump Tower)

431.    On May 30, 2020, at around 2:30 p.m., Plaintiff Jeannine Wise joined a protest in support of Black lives at Federal Plaza in downtown Chicago.

432.    At around 4:00 p.m., Plaintiff Wise arrived at the Wabash Avenue bridge near Trump Tower.  Plaintiff Wise was in the front line of protesters on the north side of the bridge where she observed a line of Chicago police officers and another horse-mounted line of police officers behind them.

433.    Without any warning or order to disperse, and without justification, an unidentified Chicago police officer began pushing his baton horizontally into Plaintiff Wise's chest and ribcage, causing her pain.

434.    Plaintiff Wise asked the officer to stop, but he ignored her pleas and kept repeatedly shoving her with his baton in her chest.  When Plaintiff Wise put her hands up to protect her chest, the officer shoved his baton into her fingers.

435.    After Plaintiff Wise again pleaded with the officer to stop pushing her, the officer looked her in the eye, then looked at a Black protester standing right next to Plaintiff Wise, and began violently shoving the Black protester with his baton for no justifiable reason.

436.    When Plaintiff Wise asked the officer to stop pushing the Black protester, another unidentified Chicago police officer said to Plaintiff Wise, "You want to be in it.  Now you're in

it," and grabbed her by the neck and lifted her into the air so aggressively that her hat and shoe flew off. The officer then dragged Plaintiff Wise down the street by her neck and hooded sweatshirt through horse manure, causing her back to scrape and bleed.

437.     Two other unidentified Chicago police officers then swarmed her. To deter them from beating her, she yelled "you got me, you won."

438.     One or more unidentified Chicago police officers then put Plaintiff Wise in zip-ties, and she waited on the curb near Trump Tower for approximately three hours before being placed on a bus and transported to the police station at Belmont and Western.

439.     After arriving at the police station, Plaintiff Wise sat on the bus another approximately three hours, waiting to be booked. She mentioned to an officer on the bus that she needed to use the bathroom, but was not allowed to.

440.     Plaintiff Wise was finally booked into the police station at around 11:00 p.m. While at the station, she was not given any food, water, or a mask. Plaintiff Wise remained at the police station until she was released the following morning with no charges around 8:00 a.m.

441.     Plaintiff Wise did not physically attack, assault, threaten, or resist the Defendant Officers or any other police officer at any time or in any way.

442.     Plaintiff Wise did not commit any unlawful act and was engaging in constitutionally protected activity.

443.     As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Wise suffered and continues to suffer, *inter alia*, bodily injuries, including bruises, scratches, and scars, as well as pain and suffering, extreme mental distress, anguish, and fear.

     **xxix.**    **May 30, 2020 Abuse of Plaintiff Adriana Underwood (Federal Plaza)**

444.    In the afternoon on May 30, 2020, Plaintiff Adriana Underwood joined the demonstration against anti-Black police violence and systemic racism at Federal Plaza in downtown Chicago.

445.    After protesting throughout the Loop, the march headed toward Lakeshore Drive that evening.  At this point, Plaintiff Underwood split off from the group to try to return to her car, but Chicago Police officers were preventing protesters from crossing several of the bridges downtown.  An unidentified female-presenting officer told Plaintiff Underwood that she could still use the Wabash bridge.

446.    When Plaintiff Underwood reached the Wabash bridge, she sat on the barrier that divides the sidewalk from the road, facing the road.  There were other people sitting along the barrier across the bridge.

447.    Plaintiff Underwood and the surrounding people she observed were sitting calmly on the bridge.

448.    At approximately 7:00 p.m., while Plaintiff Underwood and other protesters were sitting on the Wabash bridge, numerous Chicago police officers began to aggressively advance towards her and other protesters and ordered them to move.

449.    Plaintiff Underwood and the other protesters were not given any time to move or leave the area.

450.    As the Chicago police officers advanced, Defendant Officer William Grossklas (#17311) came up behind Plaintiff Underwood and used his forearm to forcefully shove Plaintiff Underwood on her lower back, pushing her off the barrier and into the road.  Defendant Officer Grossklas pushed Plaintiff Underwood without any warning or justification.

451.    Plaintiff Underwood landed in front of an unidentified Chicago police officer, who did not intervene when Plaintiff Underwood pointed out that she had just been pushed without warning or justification.

452.    Plaintiff Underwood observed Defendant Officer Grossklas continuing to advance down the bridge and push other protesters from the barrier without justification.

453.    Plaintiff Underwood did not physically attack, assault, threaten, or resist Defendant Officer Grossklas or any other officer at any time or in any way.

454.    Plaintiff Underwood did not commit any unlawful act and was engaging in constitutionally protected activity.

455.    As a direct and proximate result of the actions by the Defendant Officers as detailed above, Plaintiff Underwood suffered and continues to suffer, *inter alia*, pain and suffering, extreme mental distress, anguish, and fear.

       **xxx.     May 30, 3030 Beating and False Arrest of Justin Cosby (Grand Avenue)**

456.    On May 30, 2020, Plaintiff Justin Cosby participated in a demonstration in support of Black lives in downtown Chicago.

457.    Plaintiff Cosby was on Grand Avenue near the intersection of Clark Street when he observed multiple unidentified Chicago police officers spraying a chemical agent at protesters.

458.    Plaintiff Cosby approached the officers and sprayed them with a toy water pistol.

459.    Multiple unidentified Chicago police officers converged on Plaintiff Cosby and threw him to the ground.  Plaintiff Cosby allowed his body to go completely limp, however instead of immediately arresting him, the officers continued to hold him down on the ground.

An unidentified Chicago police officer pressed Plaintiff Cosby's face into the ground, causing abrasions and bruising.



460.    Unidentified Chicago police officers finally placed zip-tie cuffs on Plaintiff Cosby, picked him up, and carried him towards a Chicago police squadrol.  While being carried, Plaintiff Cosby lost consciousness and one of his hands slipped out of the zip-ties.

461.    Unidentified Chicago police officers slammed Plaintiff Cosby to the ground, and one officer held his legs down while another officer stepped on Plaintiff Cosby's head, and then stepped on his hand.  That same officer then pulled out his baton and repeatedly hit Plaintiff Cosby over the head with it.  This assault caused bruising and abrasions to Plaintiff Cosby's head, hand, and legs.

462.    Unidentified Chicago police officers then lifted Plaintiff Cosby and carried him into the Chicago police squadrol.  At this point, Plaintiff Cosby realized that he was missing one

of his shoes. He asked one of the officers if he could retrieve it. An unidentified Chicago police officer replied "fuck you." Plaintiff Cosby never retrieved his shoe. Plaintiff Cosby also never recovered his cell phone, which was lost while he was being beaten.



463.    Once in the squadrol, Plaintiff Cosby's left hand began going numb. He requested that the Chicago police officers loosen the zip-ties around his wrists, and the driver of the vehicle refused. The zip-ties caused abrasions and bruising to Plaintiff Cosby's wrists.

464.    Plaintiff Cosby was arrested at 8:40 p.m. and taken to the Chicago Police Department's 1st precinct.

465.    While in custody, Plaintiff Cosby was denied use of the restroom for 4 hours. He was denied food and water for approximately 12 hours despite repeated requests. He was denied a phone call for approximately 24 hours despite repeated requests.

466.    Plaintiff Cosby's friends and family attempted to locate Plaintiff Cosby. They repeatedly called the 1st precinct and were told that he was not there. Chicago police officers at

the 1st precinct also made inappropriate jokes, telling Plaintiff Cosby's friends and family that he was tied up in the basement of the precinct.

467.     Plaintiff Cosby was charged with Disorderly Conduct, and was finally released at 3 a.m. on June 1, 2020, after being detained for approximately 31 hours.

468.     These false charges were eventually dismissed on August 13, 2020, and the case was terminated in his favor.

469.     Plaintiff Cosby did not physically attack, assault, threaten, or resist the Defendant Officers or any other officer at any time or in any way.

470.     Plaintiff Cosby did not commit any unlawful act and was engaging in constitutionally protected activity.

471.     As a direct and proximate result of the actions of the Defendant Officers as detailed above, Plaintiff Cosby suffered and continues to suffer, *inter alia*, bodily injuries, pain and suffering, extreme mental distress, anguish, fear, and loss of property.

> **xxxi.     May 31, 2020 Abuse of Plaintiff Jacquelin Spreadbury (Van Buren and Wabash; Clark and Hubbard)**

472.     On May 31, 2020, Plaintiff Spreadbury arrived at the Thompson Center around 2:00 p.m. to be a legal observer for a protest scheduled to begin at 3:00 p.m.  As such, she was wearing a bright green hat.

473.     Plaintiff Spreadbury marched with protesters south to CPD headquarters, and then marched back downtown.

474.     When the protesters reached Van Buren and Wabash Avenue around 7:00 p.m., the Chicago police without warning started to get aggressive with the protesters, many of whom were teenagers, and started shoving the protesters with bikes.  Plaintiff Spreadbury observed protesters link arms and the Chicago police officers responded by shoving them back with bikes.

475.     Plaintiff Spreadbury then observed a group of teenagers run down Wabash Avenue and she followed them.  When the teenagers and Plaintiff Spreadbury got to Wabash Avenue and Adams Street, they stopped running and stood around on the sidewalk to wait for the rest of the march to catch up.

476.     As they were standing on the sidewalk, at around 7:45 p.m., two unidentified Chicago police officers, wearing full SWAT gear, jumped out of an armored SWAT vehicle. Without warning and for no legitimate reason, the officers started pepper spraying the teenagers.  Plaintiff observed the officers run up to the teenagers, and the officer holding the pepper spray gun pepper sprayed the teenagers in the face while the other officer stood by.

477.     The two Chicago police officers then ran up to Plaintiff Spreadbury and pepper sprayed her in the face and on the left arm for no legitimate reason.  The pepper spray caused Plaintiff Spreadbury's eyes to burn and she began coughing.

478.     After the officers pepper sprayed about five people, including Plaintiff Spreadbury, they jumped back in their vehicle.

479.     Eventually Plaintiff Spreadbury began marching again with protesters and made her way to Clark Street and Hubbard Street.  At Clark and Hubbard, around 8:10 p.m., she observed Chicago police officers grab two teenagers who appeared to be 18 or 19 years old for no reason and form a barricade with their bikes around the teenagers.  More Chicago police officers joined the barricade and expanded it, trapping two legal observers in the barricade.

480.     When more officers joined the barricade, the Chicago police officers began to beat up both of the teenagers who they grabbed and trapped inside the barricade.

481.     As the Chicago police officers continued to beat up the teenagers, Plaintiff Spreadbury tried to ask the officers their names.  An unidentified Chicago police officer told her

to "shut up," and she pointed to her hat and told him that she was a legal observer and asked for his name again. In response, the officer shoved Plaintiff Spreadbury to the ground and threw his bike on top of her. This officer did not have a name badge.

482. Protesters helped get the bike off of Plaintiff Spreadbury and helped her up.

483. Plaintiff Spreadbury did not physically attack, assault, threaten, or resist the Defendant Officers or any other officer at any time or in any way.

484. Plaintiff Spreadbury did not commit any unlawful act and was engaging in constitutionally protected activity.

485. As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Spreadbury suffered and continues to suffer, *inter alia*, bodily injuries, including bruises on her leg and a large cut on her left arm, as well as pain and suffering, extreme mental distress, anguish, and fear.

### B. May 31, 2020 Demonstration in Hyde Park

486. On May 31, 2020, several hundred individuals attended a protest in Hyde Park on Chicago's Southside. During this action, Chicago police officers targeted Black organizers and activists with violent and often lethal force. Chicago police officers used particularly violent and retaliatory force against prominent Black leaders who attempted to help other protesters navigate a protest dispersal.

### i. May 31, 2020 Beating of Plaintiff Amika Tendaji (Hyde Park)

487. On the evening of May 31, 2020, Plaintiff Amika Tendaji, accompanied by her teenage children, participated in a protest in solidarity with Black lives in Hyde Park.

488. Plaintiff Tendaji joined the protest on 53rd Street west of South Lake Park Avenue and marched east toward Lake Michigan.

489.    The march ended east of South Lake Park Avenue where the organizers leading the march announced the end of the demonstration and told the protesters to disperse.

490.    As protesters attempted to head back west towards their cars and modes of public transportation, Chicago police officers arriving from the west formed a line and prevented the protesters from dispersing.  Other Chicago police officers drove squad cars to form  a semi-circle around the protesters, trapping them in place and preventing protesters from leaving the area.  As protesters continued to attempt to move westward in an effort to disperse, Chicago police officers began to violently push the protesters using their batons.

491.    Plaintiff Tendaji witnessed one squad car approach from the west on 53rd Street, driving towards the protesters at a low speed.  Upon reaching the protesters, a Chicago police officer brandishing a rifle exited the car and shouted at the crowd.

492.    Unable to disperse to the west, protesters sat down in the street and a standoff between protesters and police officers ensued for a period of time.

493.    Sometime later, Chicago police officers wearing white shirts arrived and ordered the police officers involved in the standoff to stand down and allow the protesters to disperse to the west.

494.    As Plaintiff Tendaji and her children began to head towards her car, which was parked near the Ulta Beauty Store near the northwest corner of South Lake Park Avenue and 53rd Street, she saw Chicago police officers apprehending people near the Ulta Beauty Store.

495.    Plaintiff Tendaji attempted to approach a person Chicago police officers had handcuffed and left on the sidewalk, in order to learn the individual's name and emergency contact information.  Plaintiff Tendaji intended to provide this information to a legal aid organization.  As Plaintiff Tendaji approached the person to gather this information, an

unidentified Chicago police officer slammed his baton against a nearby car and then headed towards Plaintiff Tendaji's children.

496.     The Chicago police officer descended upon Plaintiff Tendaji's children and began yelling statements to the effect of "get the fuck back" while simultaneously pushing her children with his baton.  Plaintiff Tendaji stepped in front of her children to protect them from the officer's pushing, at which point the officer began shoving Plaintiff Tendaji in the chest and forearms with his baton and subsequently swung his baton at her, striking her on the arm without justification.

497.     Neither Plaintiff Tendaji nor her children were warned or given any opportunity to leave prior to being physically pushed and struck by the officer.

498.     The unidentified Chicago police officer forced Plaintiff Tendaji and her children into a corner near the Ulta Beauty Store by the officer and attempted to hold them there.  When the officer turned his attention to other protesters, Plaintiff Tendaji and her children left the corner .

499.     While walking away from the corner, Plaintiff Tendaji witnessed Chicago police officers deploying OC spray on protesters.  She also witnessed Chicago police officers beating protesting with batons and kicking people who were on the ground.

500.     Plaintiff Tendaji attempted to get closer to the violence in order to witness and document Chicago police officers' actions.  One or more unidentified Chicago police officers intercepted her, using their batons to push and strike her and her children without justification.

501.      An unidentified Chicago police officer pushed Plaintiff Tendaji from behind into the path of a moving all-black squad car.  Plaintiff Tendaji fell face forward on the ground and narrowly missed being struck by the car.  As Plaintiff Tendaji stood up, she witnessed multiple

Chicago police officers beating several people, including Plaintiff Jasson Perez. Plaintiff Tendaji witnessed Chicago police officers surrounding Plaintiff Perez, who was lying on the ground in the fetal position. Plaintiff Tendaji witnessed officers kick and beat Plaintiff Perez who was bleeding profusely.

502.    Plaintiff Tendaji managed to gather her children and maneuver away from the chaos and she encountered a Black Chicago police officer, whose uniform was covered with what she perceived to be her friends' blood. While pushing her, this officer told her his goal was to protect Black people—including herself. Shortly thereafter, she was able to locate Plaintiff Perez and provide him with assistance.

503.    Plaintiff Tendaji did not physically attack, assault, threaten, or resist the Defendant Officers or any other officer at any time or in any way.

504.    Plaintiff Tendaji did not commit any unlawful act and was engaging in constitutionally protected activity.

505.    As a direct and proximate result of the actions of the Defendant Officers' as detailed above, Plaintiff Tendaji suffered and continues to suffer, *inter alia*, bodily injury, including bruises on her arms, legs, torso, and ribs, and difficulty breathing and exhaling, as well as pain and suffering, extreme mental distress, anguish, and fear.

### ii.    May 31, 2020 Beating and False Arrest of Plaintiff Damon Williams (Hyde Park)

506.    On the evening of May 31, 2020, Plaintiff Damon Williams participated in a protest in solidarity with Black lives in Hyde Park.

507.    Upon arriving at the protest, Plaintiff Williams parked around East 53rd Street and South Cornell Avenue. Plaintiff Williams then observed protesters in a contentious standoff with police on 53rd Street near South Lake Park Avenue. A few minutes later the standoff and

78

protest ended, and protesters started dispersing to the west.

508.     Plaintiff Williams subsequently observed protesters and Chicago police officers running back east on 53rd Street towards Lake Park Avenue.  Upon reaching Lake Park Avenue, the officers turned north and proceeded up Lake Park Avenue.  Plaintiff Williams witnessed a group of unidentified Chicago police officers battering a group of 5 or 6 protesters near the Ulta Beauty Store just north of 53rd Street on the west side of Lake Park Avenue.  The officers were using their shields to jab at and strike protesters.  Some of the protesters had been knocked to the ground by the officers.

509.     Plaintiff Williams headed towards the group to assist the protesters.  An unidentified Chicago police officer for no justifiable reason targeted and hit Plaintiff Williams, who then tripped and fell to the ground.

510.     Plaintiff Williams observed Chicago police officers push and throw other protesters on the ground.  He saw a Chicago police officer attempt to throw his partner, Plaintiff Pagan.  As the officer was pushing Plaintiff Pagan, Plaintiff Williams caught her and pulled her to the ground.  Plaintiff Williams rolled his body on top of his partner in order to shield her from being attacked.

511.     As Plaintiff Williams laid on the ground shielding his partner, an unidentified Chicago police officer beat him, forcefully striking him several times with a baton in the arm and side of his body between his shoulder and hips.

512.     Plaintiff Williams subsequently stood, after which he heard the unidentified Chicago police officer say something to the effect of "there is more where that came from."

513.     Plaintiff Williams helped other protesters who had been knocked to the ground. Plaintiff Williams also attempted to organize others to support the protesters by asking them to

chant in support of the protesters.

514.    At one point, Plaintiff Williams heard an officer press his baton onto a friend's body and say something to the effect of "if you say anything else I'm going to knock those titties off."

515.    Plaintiff Williams then witnessed Chicago police officers holding another friend in a chokehold.  Plaintiff Williams and others began chanting "let him go" and linked arms together to stand their ground.  Plaintiff Williams encouraged support from bystanders by asking them to join the chant.

516.    As Plaintiff Williams and others were linked by the arms and chanting, a group of unidentified Chicago police officers plowed through the protest line, knocking down Plaintiff Williams in the process.

517.    Plaintiff Williams stood, but one or more unidentified Chicago police officers hit him again and knocked him to the ground.  Plaintiff Williams again stood up.  And again, one or more unidentified Chicago police officers knocked him to the ground and began beating him violently with their batons.  After this beating, Plaintiff Williams again attempted to stand up, and an unidentified Chicago police officer grabbed him from behind, picked him up, and forcefully slammed him on the ground.  Plaintiff Williams' head hit the ground, causing him to sustain a concussion.  Plaintiff Williams' nose began bleeding from a laceration he sustained when the officer slammed his face into the concrete.

518.    An unidentified Chicago police officer pressed their knee on Plaintiff Williams' neck, pressing his head into the street.  Plaintiff Williams continues to have scars from where his face was pressed into the concrete.



519.     Plaintiff Williams was subsequently arrested for no justifiable reason by Defendants Officer Brandon Patrick (#13433) and Officer Sherrick Davis (#12192).  These Defendant Officers along with one or more unidentified Chicago police officers handcuffed him, picked his limp body off the ground, and dragged him away to a police vehicle.

520.     Plaintiff Williams was released from police custody the morning of June 1, 2020. He was falsely charged with municipal code violation 8-4-10(F) for disorderly conduct, assembly of three or more people, breaching the peace.

521.     The false charge lodged against Plaintiff Williams was eventually dismissed and his legal case was terminated in his favor.

522.     Plaintiff Williams did not physically attack, assault, threaten, or resist the Defendant Officers or any other officer at any time or in any way.

523.     Plaintiff Williams did not commit any unlawful act and was engaging in constitutionally protected activity.

524.     As a direct and proximate result of the actions of the Defendant Officers as detailed above, Plaintiff Williams suffered and continues to suffer, *inter alia*, bodily injury including a large contusion on his nose, scarring around his forehead, bruising and contusions on

his head, and a concussion, as well as pain and suffering, and extreme mental distress, anguish and fear.

### iii.   May 31, 2020 Beating of Jasson Perez (Hyde Park)

525.     On the evening of May 31, 2020, Plaintiff Jasson Perez participated in a protest in support of Black lives in Hyde Park.

526.     Plaintiff Perez joined the protest near the intersection of 53rd Street and Lake Park Avenue as protestors marched east towards Lake Michigan.

527.     As the protest neared Lake Michigan, organizers of the protest announced that the march had ended.  Protesters attempted to disperse west on 53rd Street towards where their vehicles were parked, but Chicago police officers formed a line to prevent protesters from continuing in that direction.  After a standoff, the Chicago police officers appeared to disperse and allow the protesters to continue west.

528.     After continuing west on 53rd Street, Plaintiff Perez observed multiple unidentified Chicago police officers standing over another protester near the intersection of 53rd Street and Lake Park Avenue, hitting him with punches and with their batons.

529.     Plaintiff Perez approached and began encouraging other protesters to chant "let him go" while linking arms.

530.     Without warning and for no justifiable reason, multiple unidentified Chicago police officers began punching and beating Plaintiff Perez with their batons until he fell to the ground.  Plaintiff Perez was bleeding from his head from the blows that he sustained.

531.     Plaintiff Perez stood and moved away from the officers who were beating him, and within minutes witnessed unidentified Chicago police officers pick up Plaintiff Pagan and throw her to the ground.

532.     When Plaintiff Perez approached to check on the well-being of his friend, while again encouraging other protesters to chant "let her go," multiple unidentified Chicago police officers again began beating Plaintiff Perez's head and body with their batons.  After this beating subsided, Plaintiff Perez witnessed an unidentified Chicago police officer kneeling on Plaintiff Damon Williams' neck.

533.     Plaintiff Perez approached and asked the officer to get off Plaintiff Williams' neck, and again was hit with batons by multiple unidentified Chicago police officers on his head, body, and legs for no justifiable reason until he fell to the ground.

534.     After being beat, Plaintiff Perez began to feel dizzy and sat on the street curb.

535.     Plaintiff Perez's friends and family assisted in getting him to the hospital.

536.     At the hospital, he received seven staples to close wounds in two places on his head.  He was also diagnosed with a concussion.

537.     Plaintiff Perez has continued to suffer from the effects of the concussion that he sustained, experiencing nausea, dizziness, lack of appetite, difficulty working, weight loss, and challenges being physically active.

538.     Plaintiff Perez did not physically attack, assault, threaten, or resist the Defendant Officers or any other officer at any time or in any way.

539.     Plaintiff Perez did not commit any unlawful act and was engaging in constitutionally protected activity.

540.     As a direct and proximate result of the actions by the Defendant Officers detailed above, Plaintiff Perez suffered and continues to suffer, *inter alia*, bodily injuries to his head, body, and legs, as well as pain and suffering, extreme mental distress, anguish, and fear.

      **iv.**    **May 31, 2020 Beating and False Arrest of Christopher Brown (Hyde Park)**

541. In the afternoon and the evening of May 31, 2020, Plaintiff Christopher Brown participated in a protest, which included a march, in support of Black lives in Hyde Park.

542. During the course of the march, Plaintiff Brown witnessed Chicago police officers hit demonstrators with batons.

543. At some point thereafter, Chicago police officers surrounded the entire crowd, kettling them in one place. Prior to this kettling, Chicago police officers failed to give members of the crowd an order to disperse or an opportunity to leave.

544. Eventually, after a prolonged period of time, Chicago police officers were dispersing the crowd.

545. As Plaintiff Brown was walking away from the demonstration, Chicago police officers began to run towards him and other civilians at or near the demonstration.

546. Plaintiff Brown then witnessed Chicago police officers hitting Plaintiff Malcolm London on his head and body with their batons without justification.

547. As Plaintiff London was being beaten by Chicago police officers, Plaintiff London fell to the ground.

548. As Plaintiff Brown was attempting to aid Plaintiff London off the ground, several unidentified Chicago police officers repeatedly hit Plaintiff Brown with their batons without justification, striking him on his arm and head, causing him pain and for his glasses to fall off his head.

549. As protesters were attempting to de-escalate the situation, there was a great deal of commotion in the crowd of civilians, causing some to be pushed accidentally towards Chicago police officers.

550. Chicago police officers reacted unjustifiably by repeatedly striking people with

their batons.

551.    Eventually, Plaintiff Brown fell to the ground.

552.    Unidentified Chicago police officers repeatedly struck Plaintiff Brown on different parts of his body with their batons without justification causing him significant pain and injury.

553.    During the course of the beating, Plaintiff Brown lost a shoe and his phone.

554.    Unidentified Chicago police officers arrested Plaintiff Brown, handcuffed him, and then detained him in a police vehicle.  He was transported  to 51st and Wentworth.

555.    Plaintiff Brown was then falsely charged with a municipal code violation 8-4-10(F) for disorderly conduct, assembly of three or more people, breaching the peace by Defendants Officer Brandon Patrick (#13433) and Officer Sherrick Davis (#12192), who were listed as his arresting officers.

556.    The false charge lodged against Plaintiff Brown was dismissed on August 17, 2020, and his legal case was terminated in his favor.

557.    Plaintiff Brown did not physically attack, assault, threaten, or resist the Defendant Officers or any other officer at any time or in any way.

558.    Plaintiff Brown did not commit any unlawful act and was engaging in constitutionally protected activity.

559.    As a result of the egregious and excessive force, Plaintiff Brown sustained several painful injuries including bruises on his ribs, left arm, left leg and knee.

560.    Days after the demonstration, Plaintiff Brown sought medical treatment from a medical treater for his injuries.

561.    As a direct and proximate result of the actions of the Defendant Officers as

detailed above, Plaintiff Williams suffered and continues to suffer, *inter alia*, bodily injury as well as pain and suffering, and extreme mental distress, anguish, and fear.

### v.    May 31, 2020 Beating of Plaintiff Jennifer Pagán (Hyde Park)

562.    On the evening of May 31, 2020, Plaintiff Jennifer Pagán participated in a protest in solidarity with Black lives in Hyde Park.

563.    Plaintiff Pagán observed protesters and Chicago police officers running east on 53rd Street towards Lake Park Avenue after a contentious standoff between Chicago police officers and protesters on 53rd Street near South Lake Park Avenue.  Plaintiff Pagán followed the officers to ensure that other protesters were safe.

564.    Plaintiff Pagán witnessed a group of unidentified Chicago police officers beating a group of protesters near the Ulta Beauty Store just north of 53rd Street on the west side of Lake Park Avenue.  The officers were using their shields and batons to strike protesters, some of whom were pushed to the ground as a result.

565.    Plaintiff Pagán approached the protesters to provide assistance to those who had been beaten and knocked to the ground by Chicago police officers.  As she approached, an unidentified Chicago police officer pushed Plaintiff Pagan to the ground.  Plaintiff Pagán's partner, Plaintiff Williams attempted to prevent her fall and pulled her to the ground.  Once both Plaintiff Pagán and Plaintiff Williams were on the ground, Plaintiff Williams rolled on top of Plaintiff Pagán to shield her.

566.    As Plaintiff Pagán lay on the ground with Plaintiff Williams, unidentified Chicago police officers kicked Plaintiff Pagán and beat her using a baton.  Eventually, Plaintiff Pagán and Plaintiff Williams were finally allowed to stand up and they attempted to help other protesters harmed by Chicago police officers.

567.    Plaintiff Pagán then witnessed a Chicago police officer placing one of her friends in a chokehold.  Plaintiff Pagán and others began chanting "let him go" and linked arms together to stand their ground.

568.    As Plaintiff Pagán and other protesters were linked by the arms and chanting around her friend, a group of unidentified Chicago police officers plowed through the protest line, knocking down Plaintiff Williams in the process.

569.    Plaintiff Pagán ended up on the ground next to Plaintiff Williams, and she tried to support Plaintiff Williams as he was beaten and knocked to the ground multiple times by Chicago police officers.  While Plaintiff Pagán was attempting to support Plaintiff Williams, an unknown Chicago police officer threw her in the air and slammed her on the ground.

570.    Plaintiff Pagán did not physically attack, assault, threaten, or resist the Defendant Officers or any other officer at any time or in any way.

571.    Plaintiff Pagán did not commit any unlawful act and was engaging in constitutionally protected activity.

572.    As a direct and proximate result of the actions of the Defendant Officers as detailed above, Plaintiff Pagán suffered and continues to suffer, *inter alia*, bodily injury including bruising, as well as pain and suffering, extreme mental distress, anguish, and fear.

### vi.    May 31, 2020 Beating of Plaintiff Malcolm London (Hyde Park)

573.    On the evening of May 31, 2020, Plaintiff Malcom London participated in a protest in solidarity with Black lives in Hyde Park.

574.    Plaintiff London observed protesters and Chicago police officers running east on 53rd Street towards Lake Park Avenue after a contentious standoff between Chicago police officers and protesters on 53rd Street near South Lake Park Avenue.

575.     When Plaintiff London observed Chicago police officers surrounding one of his friends, he attempted to de-escalate the situation.  In response, unknown Chicago police officers beat him with a baton and pushed him back for no justifiable reason.  Defendant Officer Levon London (#18659) used his baton to strike Plaintiff London on his face and his body.

576.     Plaintiff London stepped away from Defendant Officer London with his hands raised.  In the process, Plaintiff London dropped his phone.  Plaintiff London reached down to pick up his phone, and at that moment, Defendant Officer London resumed beating Plaintiff London on his head with a baton.

577.     Plaintiff London attempted to run away from the Chicago police officer.  He ran a few feet before he tripped and fell.  While Plaintiff London was on the ground, multiple unidentified Chicago police officers beat him, striking both his head and his body.

578.     Plaintiff London attempted to flee.  Unidentified Chicago police officers chased him and then beat him repeatedly on his head until he fell to the ground.  An unidentified Chicago police officer then placed his knee on Plaintiff London's back, handcuffed him and placed him under arrest.  Two unidentified officers then dragged Plaintiff London by his arms to the squad car.

579.     Plaintiff London was hospitalized for his injuries while he was in police custody.

580.     Plaintiff London was falsely charged with 720 ILCS 5.0/12-3.05-A-3 for aggravated battery of a police officer and municipal code violation 8-4-10(F) for disorderly conduct, assembly of three or more people, breaching the peace by Defendants Officer Levon London (#18659) and Officer A.A. Khan (#15274), who were listed as his arresting officers.

581.     The false charges lodged against Plaintiff London were eventually dismissed, and his legal case was terminated in his favor.

582.     Plaintiff London did not physically attack, assault, threaten or resist the Defendant officers or any other officer at any time or in any way.

583.     Plaintiff London did not commit any unlawful act and was engaging in constitutionally protected activity.

584.     As a direct and proximate result of the Defendant Officers as detailed above, Plaintiff London suffered and continues to suffer, *inter alia*, bodily injuries including bruising, as well as pain and suffering, extreme mental distress, anguish, and fear.

### C. June 1, 2020 Demonstrations in Uptown and Old Town

585.     On June 1, 2020, several hundred people attended a demonstration in the Uptown neighborhood in Chicago that began in the late afternoon.  After a series of speeches, the demonstration began to march on City streets, including on Lake Shore Drive.  As the demonstration continued on throughout the evening, the numbers of protesters began to dwindle. As the numbers diminished, many protesters headed toward the Wilson stop of the CTA located at Wilson and Broadway.  At or near Wilson and Broadway, Chicago police officers without warnings advanced on protesters and attacked them with batons.

586.     During the afternoon of June 1, 2020, scores of high school students and others participated in a demonstration against anti-Black police violence in support of Black lives at around Division and Larrabee in Old Town, Chicago.  Chicago police officers, armed with shields and batons, and some with the use of bicycles, walled off the streets and eventually encircled the protesters.  Without issuing any orders to disperse, Chicago police officers then began using their bicycles, shields, or batons to push protesters back while yelling at them to move, even though the protesters had nowhere to go because they were hemmed in by Chicago police officers on all sides.

i.    **June 1, 2020 Baton Attacks of Plaintiff Olivia Love-Hatlestad (Uptown)**

587.    On June 1, 2020, Plaintiff Love-Hatlestad responded to a social media post to meet others to demonstrate in support of Black lives in the Uptown area of Chicago.  At around 6:00 p.m. Plaintiff Love-Hatlestad arrived at the meeting spot near the Target store on Broadway between Wilson and Montrose Avenues.

588.    Plaintiff participated in the demonstration and march and eventually by about 8:30 p.m. returned back to the area of North Broadway and Wilson Avenue.

589.    At approximately 9:00 p.m., numerous Chicago police officers began aggressively advancing toward the protesters including Plaintiff Love-Hatlestad without giving any warning or dispersal order.

590.    Plaintiff Love-Hatlestad, who was using a cane for assistance in walking, witnessed numerous Chicago police officers push, hit, and beat predominantly Black protesters, including a man she believed to be about 65 years of age.

591.    Plaintiff Love-Hatlestad pleaded with the officers, reminding them that they were armed with guns and the protesters were unarmed.

592.    As Plaintiff Love-Hatlestad observed Chicago police officers chasing and brutalizing a man, she was grabbed and wrestled to the ground by one or more unidentified Chicago police officers.  She felt a foot on her shoulder and knee pushing her into the ground and a Chicago police officer, who wore no facial covering or mask, began yelling in her face.

593.    Plaintiff Love-Hatlestad managed to get up off the ground, only to again be viciously pushed by an unidentified Chicago police officer with enough force to knock her again to the ground.

594.    Plaintiff Love-Hatlestad was then surrounded by a semicircle of Chicago police

90

officers and as an unidentified Chicago police officer struck her with a baton from behind, causing her scalp to bleed and smashing her glasses, an officer facing her told her "that's what you get."

595.    Once she was able to regain her footing again, Plaintiff Love-Hatlestad was thrown to the ground a third time.

596.    Plaintiff Love-Hatlestad was able to eventually locate her partner and they made their way to a friend's house where they realized that their injuries required medical attention. They were assisted in traveling to the Emergency Room at Illinois Masonic Hospital.

597.    Plaintiff Love-Hatlestad was treated for her injuries, given a CT scan and X-rays and diagnosed with having suffered a concussion.

598.    Plaintiff Love-Hatlestad did not physically attack, assault, threaten, or resist the Defendant Officers or any other officer at any time or in any way.

599.    Plaintiff Love-Hatlestad did not commit any unlawful act and was engaging in constitutionally protected activity.

600.    As a direct and proximate result the Defendant Officers' actions as detailed above, Plaintiff Love-Hatlestad suffered and continues to suffer, *inter alia*, concussive symptoms and effects, recurrence of symptoms of previously diagnosed Post Traumatic Stress Disorder (PTSD), pain and suffering, extreme mental distress, anguish, and fear.

       **ii.**    **June 1, 2020 Baton Attacks of Plaintiff Charlotte Vail (Uptown)**

601.    On June 1, 2020, at around 8:30 p.m., Plaintiff Vail joined her friends who were marching on Lake Shore Drive in a protest in support of Black lives.

602.    Plaintiff Vail and her friends then began walking back toward Broadway and Wilson Avenue.  When they reached the Wilson red line train station, Plaintiff Vail observed

protesters standing on the corners surrounded by a large number of Chicago police officers in riot gear.

603.    At around 9:00 p.m., a line of officers started charging toward the protesters without giving any warning or dispersal order.

604.    Plaintiff Vail observed a Latinx man being pushed with batons by a group of Chicago police officers, so she went to help him.

605.    Plaintiff Vail then observed Chicago police officers knock down an elderly Black man, who she estimated to be about 60 years old, and start beating him with batons and stomping on him.  She ran over to the elderly man and squatted over him to protect him.  As she squatted over him, one or more unidentified Chicago police officers hit her on the back multiple times with their batons without justification.  She was eventually able to get away from the officers and help the man over to the side of the street.

606.    Plaintiff Vail also saw another Black man on the ground being beat by a number of Chicago police officers with batons.  Plaintiff Vail helped this man to the side of the street too.

607.    Chicago police officers were screaming at her telling her to leave but there was nowhere for her to go because officers blocked off all sides of the street.

608.    She eventually found her friend Plaintiff Love-Hatlestad after Plaintiff Love-Hatlestad had been hit in the head with a baton.  While searching for their other friend, an unidentified Chicago police officer shoved her to the ground with a baton.

609.    Plaintiff Vail and Plaintiff Love-Hatlestad managed to find their way back to their car where they met up with their friend.

610.    Plaintiff Vail did not physically attack, assault, threaten, or resist the Defendant Officers or any other officer at any time or in any way.

611.     Plaintiff Vail did not commit any unlawful act and was engaging in constitutionally protected activity.

612.     As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Vail suffered and continues to suffer, *inter alia*, bodily injuries, including bruises to her back, arms, and leg, as well as pain and suffering, extreme mental distress, anguish, and fear.

### iii.     June 1, 2020 Beating and False Arrest of Plaintiff Jacob Dagit (Old Town)

613.      On the afternoon of June 1, 2020, Plaintiff Jacob Dagit participated in a protest in solidarity with Black lives that arrived at Division and Larrabee.

614.      At Division and Larrabee, dozens of Chicago police officers walled off the streets.

615.     Plaintiff Dagit, sensing danger from the police, stayed at the rear end of the crowd so that they could safely leave in the event the police turned violent,

616.     Plaintiff Dagit and dozens of protesters—many of them high school students— were virtually encircled by Chicago police officers with shields and batons.

617.     Chicago police officers gave no warning to disperse; they just began pushing the protesters back, yelling at them to move, but there was nowhere for them to move to, as police had them hemmed in.

618.     Due to one or more unidentified Chicago police officers shoving Plaintiff Dagit and other protesters who had nowhere to move, Plaintiff Dagit was knocked to the ground, where they curled up in a fetal position trying to protect themself as other protesters – pushed by police – also fell.

619.     While Plaintiff Dagit was on the ground, one or more unidentified Chicago police

officers trampled Plaintiff Dagit and others.

620.    Defendants Officer R. A. Ayala (#19896) and Officer Nebojsa Djurdjevic
(#9338), who had no probable cause to believe Plaintiff Dagit had committed or was about to
commit an offense, arrested them, charging them with the municipal ordinance violation of
Disorderly Conduct 8-4-10(D) for allegedly failing to disperse although Plaintiff Dagit had heard
no order to disperse, police hemmed them and others in and attacked them, and did not allow
them to disperse.

621.    Plaintiff Dagit was released on their own recognizance after approximately three
and a half hours in custody, during which time they were never given the opportunity to make a
phone call.

622.    These false charges were eventually dismissed on July 28, 2020, and the case was
terminated in their favor.

623.    Plaintiff Dagit did not physically attack, assault, threaten or resist the Defendant
Officers or any other officer at any time or in any way.

624.    Plaintiff Dagit did not commit any unlawful act and was engaging in
constitutionally protected activity.

625.    As a direct and proximate result of the actions of the Defendant Officers detailed
above, Plaintiff Dagit lost their bicycle and wristwatch, and suffered and continues to suffer,
*inter alia*, bodily injuries including bruises to their hands, wrist, ankle, knee and ribs, as well as
pain and suffering, extreme mental distress, anguish and fear.

### iv.    June 1, 2020 Beating of Plaintiff Copeland Smith (Old Town)

626.    On the afternoon of June 1, 2020, Plaintiff Copeland Smith was at a
demonstration in solidarity with Black lives that arrived at Division Street and Larrabee Street.

94

627.    At Division and Larrabee, dozens of Chicago police officers walled off the streets, planting a row of officers on bicycles in a line in front of several rows of officers on foot, some clad in full riot gear.

628.    Plaintiff Smith and dozens of protesters were virtually encircled by Chicago police officers.

629.    With no warning, the bicycle officers began pushing the protesters, and immediately made way for the Chicago police officers armed with batons, who then also pushed the protesters and used their batons to push and strike the protesters.

630.    As a result of the Chicago police officers' unwarranted pushing and shoving of protesters, and the protesters having no place to go, Plaintiff Smith was knocked to the ground upside down over the curb, where she curled up in a fetal position trying to protect herself. Rows of unidentified Chicago police officers trampled her.

631.    Two unidentified Chicago police officers pulled her up by her hair to make her stand up, shoved her, and separated her from her fellow protesters.

632.    Plaintiff Smith did not physically attack, assault, threaten, or resist the Defendant Officers or any other officer at any time or in any way.

633.    Plaintiff Smith did not commit any unlawful act and was engaging in constitutionally protected activity.

634.    As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Smith suffered and continues to suffer, *inter alia*, bodily injuries including bruises to her face, eye, arm, hands, legs, and back, as well as pain and suffering, extreme mental distress, anguish, and fear.

**E.  July 17, 2020 Black, Indigenous Solidarity Rally (Decolonize Zhigaagoong) in Grant Park**

635. On July 17, 2020, hundreds of protesters participated in a demonstration to demonstrate solidarity for Indigenous people's struggles against colonization, genocide, and to oppose the prominent tribute to Christopher Columbus, embodied by the statue of him in Grant Park, Chicago.

636. The demonstration started at Buckingham Fountain with a series of speeches and prayer, and later progressed into a march that headed south on Columbus Drive to Grant Park.

637. At Grant Park, protesters marched into the park and surrounded the statue of Columbus, which was heavily guarded by Chicago police officers.

638. A small group of individuals in the protest threw frozen water bottles and other objects at the Chicago police officers, causing the officers to retreat from the statue and the park. These handful of protesters then attempted to pull the statue down with rope.

639. Chicago police officers then returned to the park attempting to retake the statue and in the process engaged in extreme forms of violence in retaliation for the actions of a small minority.



640.     Police officers descended into the park swinging their batons and hitting people's heads and bodies, indiscriminately using pepper spray or tear gas on the entire crowd of demonstrators, without justification, causing many people to experience trouble breathing, and engaging in other forms of violence.



641.     In addition to the excessive force, Chicago police officers forcibly took over 70 bicycles away from the protesters and refused to return them that evening.[15]

---

[15]  Monica Eng, What Happened to the 76 Bikes Chicago Police Took After Friday's Clash with Protesters?, WBEZ (July 21, 2020), https://www.wbez.org/stories/what-happened-to-the-76-bikes-chicago-police-took-after-fridays-clash-with-protesters/ae29fb14-3189-4044-9896-c1d416b5c515.



### i. July 17, 2020 Chemical Agent Attacks on Plaintiff Charlotte Vail (Grant Park)

642.    On July 17, 2020, Plaintiff Vail and her friends arrived at Buckingham Fountain around 4:30 p.m. to participate in the Black, Indigenous Solidarity Rally (Decolonize Zhigaagoong).

643.    After listening to speakers and watching Indigenous prayer ceremonies, Plaintiff Vail and her friends began marching toward Columbus statue around 6:30 p.m.

644.    When Plaintiff Vail realized that protesters at the front of the march were having a standoff with police near the statue, Plaintiff Vail tried to make her way toward the front to figure out if anyone needed help.  While walking, Plaintiff Vail felt tear gas or pepper spray that was sprayed by one or more unidentified Chicago police officers in the air.  Plaintiff Vail's throat instantly closed up and she could not breathe from the gas.  She fell to the ground and started coughing on her hands and knees.

645.    After Plaintiff Vail recovered, she got up and ran to find her friends.  She then ran to assist other protesters who were trying to form walls to protect against attacks from the

Chicago police.

646.     Plaintiff Vail observed more Chicago police arrive by the statue and then was tear gassed or pepper sprayed again by one or more unidentified officers.  Plaintiff Vail fell to the ground, unable to breathe.  She started to crawl away while gasping, coughing, and vomiting.

647.     Someone picked her up and carried her to the medic encampment which was located near the base of a bridge.  She laid down in that area and was given water.

648.     As Plaintiff Vail was in the medic encampment, she observed the Chicago police continue to push the protesters back toward her.  At that point she was tear gassed or pepper sprayed a third time by one or more unidentified officers.  She again could not breathe and crawled and then ran down a hill to get away from the gas.

649.     Eventually Plaintiff Vail found her friends and they left the area.

650.     Plaintiff Vail continued to vomit when she got home, and also had bad cramps.

651.     Plaintiff Vail did not physically attack, assault, threaten, or resist the Defendant Officers or any other officer at any time or in any way.

652.     Plaintiff Vail did not commit any unlawful act and was engaging in constitutionally protected activity.

653.     As a direct and proximate result of the actions of the Defendant Officers as detailed above, Plaintiff Vail suffered and continues to suffer, *inter alia*, bodily injuries, pain and suffering, extreme mental distress, anguish, and fear.

### ii.     July 17, 2020 Baton Attacks of Plaintiff Ian "River" Kerstetter (Grant Park)

654.     On July 17, 2020, Plaintiff Kerstetter arrived at Buckingham Fountain around 5:00 p.m. to participate in the Black, Indigenous Solidarity Rally (Decolonize Zhigaagoong) in Grant Park.

655.    After listening to speakers and watching ceremonies, Plaintiff Kerstetter and her friend marched toward the Columbus statue.

656.    When she arrived near the statue, Plaintiff Kerstetter linked arms with other protesters to make a blockade around the statue and protect people from the police.  Chicago police officers began advancing at the protesters from every angle.

657.    Around 7:00 p.m. or 7:30 p.m., Plaintiff Kerstetter observed Chicago police officers use tear gas or pepper spray on protesters nearby.

658.    Plaintiff Kerstetter continued to stand, linking arms with her friend on her right and another protester with a bike on her left.  Chicago police officers ordered the protesters to move and then immediately started to push the line of protesters without giving them any opportunity to move.

659.    Without justification, an unidentified Chicago police officer targeted Plaintiff Kerstetter and pushed her—either with his baton or with his hands—causing her to fall to the ground and slightly roll down a hill.



660.    While Plaintiff Kerstetter remained on the ground, lying on her stomach with her

back exposed, another unidentified Chicago police officer hit her with his baton at least two times, striking her on the back and on her right side, without justification.

661.    Other protesters eventually helped Plaintiff Kerstetter stand up.  She then walked away to find her friend.  After reuniting, Plaintiff Kerstetter and her friend tried to leave, but then got separated again when Chicago police officers let her white friend walk through to leave but stopped Plaintiff.  A female Chicago police officer refused to let Plaintiff pass even though she informed the officer that she was trying to leave with her friend.  While Plaintiff Kerstetter was standing, waiting for the officers to let her through so that she could go home, she observed a young person get gassed or sprayed in the eyes, and helped that person by giving them water.  Eventually Plaintiff Kerstetter was able to walk through the line of Chicago police and leave the park around 8:00 p.m.

662.    The pain in Plaintiff Kersetter's right side did not subside, so she eventually had to see a doctor on July 27, 2020.  The doctor informed her that she likely had a bruised rib.

663.    Plaintiff Kersetter did not physically attack, assault, threaten, or resist the Defendant Officers or any other officer at any time or in any way.

664.    Plaintiff Kersetter did not commit any unlawful act and was engaging in constitutionally protected activity.

665.    As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Kersetter suffered and continues to suffer, *inter alia*, bodily injuries, including a bruised rib, a large bruise on her back, and cuts on the back of her knee, as well as pain and suffering, extreme mental distress, anguish, and fear.

### iii.    July 17, 2020 Baton Attacks of Plaintiff Landon George (Grant Park)

666.    On July 17, 2020, Plaintiff George traveled to Chicago to participate in the Black,

Indigenous Solidarity Rally (Decolonize Zhigaagoong) in Grant Park.

667.    Plaintiff George had volunteered to be a foot marshal during the protest and so he arrived at Buckingham Fountain around 4:00 p.m. to meet with all the marshals prior to the start of the demonstration.  Plaintiff George wore a yellow tie around his arms to signal that he was a marshal.

668.    When the protesters started marching to Columbus statue, Plaintiff George stayed in the back and on the perimeters to make sure everyone was okay.

669.    When he arrived at the statue, Plaintiff George observed a wall of Chicago police with bikes surrounding the statue.  Plaintiff George observed Chicago police become aggressive when protesters started to approach the statue.

670.    Plaintiff George observed Chicago police begin to come down from the statue and advance towards the protesters, pushing and shoving them with their batons and with bikes.

671.    When Plaintiff George observed a Chicago police officer dragging a protester by his hair, Plaintiff tried to run over to help.  While en route, an unidentified Chicago police officer appeared in front of him and grabbed Plaintiff George by his neck, squeezed his neck, and tried to throw him down.  The officer pushed Plaintiff George forward as he was choking him for a few seconds, and then eventually let Plaintiff George go.

672.    The protesters and marshals then began forming a wall and walking forward as a unit with their hands up away from the statue.  Plaintiff George eventually made his way to the front of the line as Chicago police attempted to charge the line and break through the protesters.

673.    While standing in the front line with his hands up, an unidentified Chicago police officer, holding his baton horizontally with both hands, without any warning or order to disperse, and without justification, began repeatedly shoving and hitting Plaintiff George in his chest with

the baton.

674.    After many shoves to his chest, the officer grabbed Plaintiff George's shirt and then swung his baton without justification, hitting Plaintiff George in his head at least two times. The first strike hit Plaintiff George above his right eyebrow, causing him to immediately start bleeding, and the second strike hit him on the left side of his face, cutting his lip.

675.    Plaintiff George was bleeding profusely and could not see out of his right eye. Someone pulled him out of the crowd and walked him back to the steps of the statue, where a medic helped clean and bandage his wound.

676.    Plaintiff George sustained a two-inch gash on his head.



677.    After receiving this treatment, Plaintiff George walked back to Buckingham Fountain, where another medic checked his pupil dilation for a concussion.  The medic informed

Plaintiff George that he might have a concussion and recommended that he go to the hospital.

678.    Plaintiff George met up with a friend who drove him to a hospital in Wisconsin, where doctors tended to his wound and took a CT scan.

679.    Plaintiff George did not physically attack, assault, threaten, or resist the Defendant Officers or any other officer at any time or in any way.

680.    Plaintiff George did not commit any unlawful act and was engaging in constitutionally protected activity.

681.    As a direct and proximate result of Defendant Officers' actions as detailed above, Plaintiff George suffered and continues to suffer, *inter alia*, bodily injuries, including a cut above his right eyebrow, a cut on the inside of his lip, a concussion, and bruises on his chest and legs, as well as pain and suffering, extreme mental distress, anguish, and fear.

### iv.  July 17, 2020 Baton Attacks of Plaintiff Kathleen Roberts (Grant Park)

682.    On July 17, 2020, Plaintiff Roberts arrived at Buckingham Fountain around 4:00 p.m. to participate in the Black, Indigenous Solidarity Rally (Decolonize Zhigaagoong) in Grant Park.

683.    After listening to speakers and watching ceremonies, Plaintiff Roberts and her partner, with their bikes, went to the Columbus statue.

684.    Around 6:00 p.m., Plaintiff Roberts formed a line with other protesters and their bikes.  Plaintiff was standing in the line when officers started to use their bikes to break through the line.

685.    Without any warning or order to disperse, and without justification, an unidentified Chicago police officer pushed Plaintiff Roberts with his baton while holding it horizontally with hands on each end, knocking her to the ground.  The officer also took Plaintiff

Roberts' bike and threw it behind him.

686.    When Plaintiff Roberts attempted to get back up, the officer pepper sprayed or tear gassed her directly in the face.  The chemical agent burned her eyes and her skin, causing her to fall back on the ground again.

687.    The officer then grabbed her by her backpack, picked her up, and sat her down on her bottom.

688.    At this point, Plaintiff Roberts observed that her partner had also fallen down and Plaintiff attempted to crawl over to her partner.  While crawling, the officer repeatedly hit her with his baton in her back and legs without justification.

689.    When Plaintiff Roberts reached her partner, they both helped each other up.  After they stood up, the Chicago police officer pepper sprayed or tear gassed Plaintiff Roberts and her partner in the face again.  Plaintiff and her partner ran toward the medics to receive medical treatment.  The medics sprayed water and baking soda in her eyes to stop the intense burning.

690.    After receiving medical attention, Plaintiff Roberts tried to find her bike but Chicago police were in front of all the bikes, preventing protesters from getting them back.

691.    Plaintiff Roberts was unable to recover her bike.

692.    Plaintiff Roberts observed Chicago police officers hitting people in the head with batons, so she went back to link arms with other protesters.  While standing with linked arms, officers repeatedly sprayed pepper spray or tear gas into the air while shoving protesters to try to break the line.  When the pepper spray or tear gas became unbearable again, Plaintiff Roberts left the line.

693.    Plaintiff Roberts did not physically attack, assault, threaten, or resist the Defendant Officer or any other officer at any time or in any way.

694. Plaintiff Roberts did not commit any unlawful act and was engaging in constitutionally protected activity.

695. As a direct and proximate result of the Defendant Officer's actions as detailed above, Plaintiff Roberts suffered and continues to suffer, *inter alia*, bodily injuries, including bruises on her hip and thigh, heavy menstruation for a week and a half afterward, and burning skin for over 24 hours, as well as pain and suffering, extreme mental distress, anguish, and fear.

### v. July 17, 2020 Abuse and False Arrest of Plaintiff Rachel Valenzuela (Grant Park)

696. On July 17, 2020, Plaintiff Valenzuela was a medic during the Black, Indigenous Solidarity Rally (Decolonize Zhigaagoong) in Grant Park. As such, she wore gray shorts with a cross on them, and also had a backpack with a cross on it that said medic.

697. During the demonstration, she treated several people who were pepper sprayed or tear gassed by police.

698. Around 7:00 or 8:00 p.m., when many protesters were leaving, Plaintiff Valenzuela stayed behind with a group of protesters to make sure two organizers, who were searching for their belongings, were protected from the police. While the two organizers were searching for their belongings close to the statue, a large group of Chicago police officers arrived.

699. This large group of Chicago police officers approached the protesters and told them that if they did not leave, they were going to get arrested. However, the officers gave the protesters no time to leave, and immediately started arresting people.

700. Without warning or any legal justification, Defendant Officer David Sharp (#12950) immediately grabbed Plaintiff Valenzuela's backpack and flung her to the ground. Defendant Officer Sharp then dragged her across the ground by her backpack for about 20 feet.

701.    When Plaintiff Valenzuela's backpack came off, she tried to stand up.  Before she could stand up, one or more unidentified Chicago police officers grabbed her and threw her on her stomach.  One Chicago police officer pressed his knee hard into Plaintiff Valenzuela's back as other Chicago police officers, including Defendant Officer Michael Wilson (#17643), arrested her.

702.    The Chicago police officers handcuffed her with plastic ties that they tied too tight.  When she informed the Chicago police officers that the ties were too tight, the officers replied, "too bad."

703.    While Plaintiff Valenzuela was still on the ground, Chicago police threw another girl on top of her who they also arrested.

704.    As a Chicago police officer walked Plaintiff Valenzuela to a squadrol, she told the officer that she lost her backpack during the arrest and that her epilepsy medication was in her backpack.  This officer simply told her to tell the officers at the squadrol.

705.    At the squadrol, she told the two Chicago police officers that she needed her backpack with her epilepsy medication.  One officer said he did not care, the other officer told her she needed to tell someone else.

706.    Plaintiff Valenzuela was taken to the 51st Street police station.  When she arrived at the police station, she told two officers there that she needed her epilepsy medication, which was in her backpack that was left at Grant Park.  These officers refused to help Plaintiff Valenzuela.

707.    About ten minutes later, while Plaintiff Valenzuela was sitting in a hall waiting to get processed, she had a seizure and her head hit the floor.

708.    After Plaintiff Valenzuela had a seizure, Chicago police officers finally cut off her

107

cuffs—which they had a hard time taking off because the cuffs were so tight—and transported her to St. Bernard emergency department around 9:00 or 9:30 p.m.

709.    Medical treaters informed Plaintiff Valenzuela that she had suffered a concussion.

710.    While she was at the hospital, she was not allowed to make a phone call, and therefore her loved ones had a difficult time figuring out where she was.

711.    After being in the emergency room for over five hours, Plaintiff Valenzuela was discharged around 3:30 a.m.  While she was getting discharged, two Chicago police officers came to the hospital to give her papers that indicated her charges and her court date.

712.    Plaintiff Valenzuela was unjustifiably charged with municipal code violation 8-4-10(F) for disorderly conduct, assembly of three or more people, breaching the peace.

713.    Her charges were eventually dismissed on August 7, 2020, and her case was terminated in her favor.

714.    Plaintiff Valenzuela continues to suffer nerve damage from the handcuffs—she cannot feel her thumb, pointer finger, and middle finger on her right hand.

715.    Plaintiff Valenzuela was never given back her backpack, which had her medication, ID, and other personal belongings.  When Plaintiff Valenzuela eventually got a hold of Defendant Officer Sharp and asked him where her backpack was, he replied that her bag was with streets and sanitation.

716.    Plaintiff Valenzuela did not physically attack, assault, threaten, or resist the Defendant Officers or any other officer at any time or in any way.

717.    Plaintiff Valenzuela did not commit any unlawful act and was engaging in constitutionally protected activity.

718.    As a direct and proximate result of the actions of the Defendant Officers as

detailed above, Plaintiff Valenzuela suffered and continues to suffer, *inter alia*, bodily injuries including bruises on her knees and arms, soreness in her back, nerve damage in her right hand, intermittent migraines, sensitivity to light, and memory loss associated with her concussion, as well as pain and suffering, extreme mental distress, anguish, fear, and loss of property.

### vi. July 17, 2020 Abuse of Plaintiff Miracle Boyd (Grant Park)

719.    On July 17, 2020, Plaintiff Miracle Boyd spoke at the Black, Indigenous Solidarity Rally (Decolonize Zhigaagoong) at Buckingham Fountain in Grant Park.  She is an organizer with GoodKids MadCity, a violence prevention organization at the Solidarity Rally.

720.    After she spoke, Plaintiff Boyd walked with friends and other protesters to the Columbus statue in Grant Park.  Around this time, Plaintiff Boyd began recording a Facebook Live video and she stayed away from the statue focusing her attention on documenting the police violence she witnessed.

721.    Plaintiff Boyd observed Chicago police officers near the statue throw a bike on top of a woman and start beating her with batons, and she recorded this incident from a distance.

722.    The Chicago police officers observed Plaintiff Boyd recording their actions and shouted that she should  "get back."  A Chicago police sergeant nearby told Plaintiff Boyd not to move beyond the officers.  Plaintiff Boyd exchanged words with these officers.

723.    Plaintiff Boyd then observed Chicago police officers arresting Plaintiff Patrick Romano.  Plaintiff Boyd began moving towards Plaintiff Romano to ask for his name and birthdate so she could assist him in obtaining legal representation.  Plaintiff Boyd followed Plaintiff Romano and the officers, but Plaintiff Romano was quickly moved into an area that was full of Chicago police officers and so she stopped following him.

724.    While still recording Plaintiff Romano's arrest, Plaintiff Boyd observed one of the

officers she had interacted with moments earlier and Defendant Officer Nicolas Jovanovich (#6789) walking aggressively toward her, and she heard Defendant Officer Jovanovich say something like "piece of shit," and so she began moving backward.



725.     Then without justification, Defendant Officer Jovanovich struck Plaintiff Boyd in the face on the left side of her lip, causing her severe pain, and either his fist or her phone knocked her tooth out.  As blood was rushing from her mouth, Defendant Officer Jovanovich told her to "give me that fucking phone."



726.    Defendant Officer Jovanovich then picked up her phone, which had fallen out of Plaintiff Boyd's hand onto the ground.  Plaintiff Boyd never recovered her phone.

727.    Plaintiff Boyd's entire mouth area was injured and so she went to Chicago Freedom School to get assistance in obtaining treatment.

728.    She then went to Holy Cross Hospital and received a prescription for pain but was not treated for her injuries, which included abrasions to her face, the loss of a tooth on the left side of her mouth, and another tooth that shifted.

729.    Plaintiff Boyd later had to get root canals on both teeth and received a veneer to replace the lost tooth.

730.    Plaintiff Boyd continues to experience pain in her right front tooth due to nerve damage.

731.     Plaintiff Boyd did not physically attack, assault, threaten, or resist the Defendant Officers or any other officer at any time or in any way.

732.     Plaintiff Boyd did not commit any unlawful act and was engaging in constitutionally protected activity.

733.     As a direct and proximate result of the actions of the Defendant Officers as detailed above, Plaintiff Boyd suffered and continues to suffer, *inter alia*, bodily injuries, pain and suffering, extreme mental distress, anguish, fear, and a damaged and lost phone.

**vii.     July 17, 2020 Abuse of Plaintiff Tim Anderson (Grant Park)**

734.     On July 17, 2020, at approximately 5:30 p.m., Plaintiff Tim Anderson arrived at Buckingham Fountain to participate in the Black, Indigenous Solidarity Rally (Decolonize Zhigaagoong) in Grant Park.

735.     After listening to speeches and watching Indigenous prayer ceremonies, Plaintiff Anderson began marching with his bicycle to the Columbus statue in Grant Park at approximately 6:50 p.m.

736.     At approximately 7:30 p.m., Plaintiff Anderson arrived at the grassy hill between the statue and Roosevelt Road and was observing protesters gathering at the statue.

737.     Several minutes later, Plaintiff Anderson observed Chicago police officers storm down the hill towards the statue, pepper spraying or tear gassing protesters and beating protesters with batons.  Those officers were simultaneously telling protesters that it was "time to go," but Plaintiff Anderson did not hear any formal warnings or orders to disperse.

738.     An unidentified Chicago police officer approached Plaintiff Anderson and yelled at him to "move."  When Plaintiff Anderson did not immediately move, the officer shoved him with both hands, causing him to fly backwards and fall onto his back.

739. The same officer then grabbed Plaintiff Anderson's bike and tossed it into the road, causing the chain to pop off.

740. Plaintiff Anderson gathered his bike and repaired it before leaving the area at approximately 8:15 p.m.

741. Plaintiff Anderson did not physically attack, assault, threaten, or resist the Defendant Officer or any other officer at any time or in any way.

742. Plaintiff Anderson did not commit any unlawful act and was engaging in constitutionally protected activity.

743. As a direct and proximate result of the actions by the Defendant Officer detailed above, Plaintiff Anderson suffered and continues to suffer, *inter alia*, bodily injuries, including bruises and abrasions to his legs and arms, as well as pain and suffering, extreme mental distress, anguish, and fear.

### viii. July 17, 2020 Abuse of Michelle Zacarias (Grant Park)

744. On July 17, 2020, at approximately 4:00 p.m., Plaintiff Michelle Zacarias arrived at Buckingham Fountain to participate in the Black, Indigenous Solidarity Rally (Decolonize Zhigaagoong) in Grant Park.

745. Plaintiff Zacarias is an amputee, with her right leg amputated above the knee, and on July 17th she was wearing shorts which revealed her prosthetic leg.

746. After listening to speeches and watching Indigenous prayer ceremonies, Plaintiff Zacarias began marching with the group of protesters to the Columbus statue in Grant Park.

747. Several minutes after arriving to the northwest of the statue, Plaintiff Zacarias observed one or more as yet unidentified officers spraying a red chemical agent at the group of protesters assembled near the statue.

748.    The chemical agent caused Plaintiff Zacarias to experience irritation in her lungs and burning on her skin.

749.    Approximately 30 minutes later, Plaintiff Zacarias observed a young woman who appeared to be distressed because of an unidentified Chicago police officer's aggression and threatening behavior.

750.    Plaintiff Zacarias stood between this woman and the unidentified Chicago police officer, seeking to de-escalate the situation while maintaining a distance of several feet from the officer.

751.    The unidentified Chicago police officer grabbed Plaintiff Zacarias' arm and shoved her to the ground.

752.    Plaintiff Zacarias looked up at the Chicago police officer and he said to her "how did that feel? Did you like that?" while he banged his baton against his shield in a threatening manner.

753.    After getting up, Plaintiff Zacarias located a friend that she attended the protest with and left the area approximately 15 minutes later.

754.    Plaintiff Zacarias did not physically attack, assault, threaten, or resist the Defendant Officers or any other officer at any time or in any way.

755.    Plaintiff Zacarias did not commit any unlawful act and was engaging in constitutionally protected activity.

756.    As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Zacarias suffered and continues to suffer, *inter alia*, bodily injuries, including bruising to her arm, as well as pain and suffering, extreme mental distress, anguish, and fear.

### ix.    July 17, 2020 Abuse of Plaintiff Luis Aldair Rafael-Nietes (Grant Park)

757.    On July 17, 2020, Plaintiff Luis Aldair Rafael-Nietes went to the Black, Indigenous Solidarity Rally (Decolonize Zhigaagoong) at Buckingham Fountain in Grant Park.

758.    Plaintiff Rafael-Nietes attended the demonstration as a volunteer medic because he had completed emergency medical training at Malcolm X College.

759.    At approximately 8:00 p.m., Plaintiff Rafael-Nietes had followed the protest to the area of 1200 South Columbus Drive near the base of the Columbus statue in Grant Park.

760.    At that time, Plaintiff Rafael-Nietes observed a Chicago police officer pin a protester to the ground with a bicycle and then proceed, with a closed fist, to repeatedly punch the defenseless protester in the face without provocation.

761.    Plaintiff Rafael-Nietes verbalized his concern to the Chicago police officer, specifically expressing that he understood if the officer was going to arrest the protester but there was no reason to continue punching them in their face, as Plaintiff Rafael-Nietes bent his body over the injured protester.

762.    At this point, without any warning or justification, an unidentified Chicago police officer picked up a white colored pipe from the ground and brutally struck Plaintiff Rafael-Nietes in his head, causing him severe pain and blood to stream down his face and in his eyes.



763.    Plaintiff Rafael-Nietes observed this unidentified Chicago police officer striking other civilians with the pipe and asked the officer to identify himself by his badge number.

764.    This unidentified Chicago police officer responded by turning his body to obscure his identifying insignia, walking away and throwing the pipe to the ground far away from himself.

765.    Plaintiff Rafael-Nietes did not physically attack, assault, threaten, or resist the Defendant Officer or any other officer at any time or in any way.

766.    Plaintiff Rafael-Nietes did not commit any unlawful act and was engaging in constitutionally protected activity.

767.    As a direct and proximate result of the Defendant Officer's actions as detailed above, Plaintiff Rafael-Nietes suffered and continues to suffer, *inter alia*, bodily injury, pain and suffering, extreme mental distress, anguish, and fear.

### x. July 17, 2020 Abuse of Plaintiff David Jaworski (Grant Park)

768.     On July 17, 2020, Plaintiff David Jaworski rode his bicycle to attend the Black, Indigenous Solidarity Rally (Decolonize Zhigaagoong) in Grant Park arriving between 5:00 p.m. and 6:00 p.m.

769.     Plaintiff Jaworski marched with others to the Columbus statue in Grant Park and parked his bicycle in front of protesters near the west side of the statue.

770.     Plaintiff Jaworski heard screaming and cries of help and positioned himself and his bicycle to protect unarmed protesters fearful of a surging line of baton wielding Chicago police officers.

771.     The Chicago police provided no verbal directions and no orders to disperse before they stormed into the park.  Without cause or provocation, an unidentified Chicago police sergeant approached Plaintiff Jaworski and grabbed him by his throat with both hands and threw him to the ground.



772.    Plaintiff Jaworski tried to get back on his feet and was pushed again to the ground.  Plaintiff Jaworski was trampled and his foot got caught in the spokes of a bicycle, causing a bone in his toe to snap.

773.    Plaintiff Jaworski picked up his damaged bicycle and hobbled away, trying to leave the area only to find he was surrounded with other protesters by Chicago police officers.

774.    Plaintiff Jaworski then observed a reddish orange cloud of pepper spray or tear gas and those around him began to cough.

775.    He heard cries for medical assistance as people around him struggled and gasped for air through their masks.

776.    Plaintiff Jaworski did not physically attack, assault, threaten, or resist the Defendant Officer or any other officer at any time or in any way.

777.    Plaintiff Jaworski did not commit any unlawful act and was engaging in constitutionally protected activity.

778.    As a direct and proximate result of the Defendant Officer's actions as detailed above, Plaintiff Jaworski suffered and continues to suffer, *inter alia*, bodily injury, pain and suffering, extreme mental distress, anguish, and fear as well as damage to his property and lost wages.

### xi.    July 17, 2020 Baton Attacks of Plaintiff Natalie "Byul" Yoon (Grant Park)

779.    On July 17, 2020, Plaintiff Natalie "Byul" Yoon arrived at Buckingham Fountain around 5:00 p.m. to participate in the Black, Indigenous Solidarity Rally (Decolonize Zhigaagoong).

780.    After listening to speakers and watching Indigenous prayer ceremonies, Plaintiff

Yoon began marching down Columbus Drive toward the section of Grant Park containing the Columbus statue around 6:30 p.m.

781.     Plaintiff Yoon, with scores of others, stood in Grant Park and watched the events unfold, including the individuals and Chicago police officers surrounding the statue.

782.     At one point, after the Chicago police officers surrounding the statue retreated from that location, a storm of Chicago police officers flooded into Grant Park from many different entry points.

783.     The Chicago police officers descending on the park were aggressive, hostile and they were indiscriminately and unjustifiably swinging their batons at people standing in Grant Park.

784.     The Chicago police officers did not give any orders to disperse to Plaintiff Yoon or others or allow them the opportunity to leave.

785.     One protester was yelling at the Chicago police officers to stop hitting people.

786.     A large unidentified Chicago police officer, over half of Plaintiff Yoon's size, said words to the effect of: "I can do whatever the fuck I want, and I will hit whoever the fuck I want."

787.     This unidentified Chicago police officer, without justification, then hit Plaintiff Yoon on the back of her head with his baton, causing her pain and to bleed profusely.

788.     Blood poured from Plaintiff Yoon's head and ran down her neck and on her arm.

789.     Plaintiff Yoon was then helped by a protester to sit by a tree in the park, where she was treated by a paramedic at the demonstration, who washed out the wound on her head.

790.     Plaintiff Yoon suffered dizziness from being struck in the head and had to sit for approximately twenty minutes before she could stand and walk.

791.    Plaintiff Yoon feared that she was going to pass out.

792.    Plaintiff Yoon also breathed the chemical agent used indiscriminately and excessively by one or more unidentified Chicago police officers in Grant Park on people.

793.    Eventually, Plaintiff Yoon was able to leave Grant Park and return home.

794.    For two days after she was unjustifiably struck in the head with the baton, Plaintiff Yoon was nauseated, fatigued, and suffered from a severe headache and neck pain.

795.    Plaintiff Yoon also had trouble concentrating for days which prevented her from being able to work.

796.    Days after the demonstration, Plaintiff Yoon sought medical treatment and she was informed by a medical treater that she likely suffered a concussion.

797.    Plaintiffs Yoon did not physically attack, assault, threaten, or resist the Defendant Officers or any other officer at any time or in any way.

798.    Plaintiffs Yoon did not commit any unlawful act and was engaging in constitutionally protected activity.

799.    As a direct and proximate result of the Defendant Officer' actions as detailed above, Plaintiffs Yoon suffered and continues to suffer, *inter alia*, bodily injury, pain and suffering, extreme mental distress, anguish, and fear.

>    **xii.    July 17, 2020 Beating and False Arrest of Plaintiff Patrick Romano (Grant Park)**

800.    On July 17, 2020, at around 5:00 p.m., Plaintiff Romano arrived at Buckingham Fountain in Grant Park to attend the Black, Indigenous Solidarity Rally (Decolonize Zhigaagoong).  After the rally, Plaintiff Romano marched with the crowd to the Columbus statue.

801.    When Plaintiff Romano arrived at the Columbus statue, he witnessed Chicago

police officers pepper spraying or tear gassing large groups of protesters who were holding umbrellas. Plaintiff Romano also witnessed officers violently taking bikes away from protesters and beating protesters with batons.

802. Plaintiff Romano observed a Chicago police officer begin to violently take the bike of a protester who was standing right next to Plaintiff Romano. When Plaintiff Romano attempted to help protect the protester from the officer, two unidentified Chicago police officers grabbed Plaintiff Romano's arms and yanked him from the crowd without justification.

803. The two Chicago police officers held Plaintiff Romano's arms while one or more unidentified Chicago police officers beat both of Plaintiff Romano's calves with batons, causing him significant pain.

804. One or more of the Chicago Police officers also punched Plaintiff Romano in the chest and back.

805. One or more of the Chicago police officers also ripped off both of Plaintiff Romano's shoes and his mask.

806. After beating Plaintiff Romano, one or more of the unidentified Chicago police officers then bound Plaintiff Romano's wrists using zip-ties. The officers secured these ties so tightly that it cut off Plaintiff Romano's circulation in his wrists.



807.    One or more of the Chicago police officers proceeded to forcibly move Plaintiff Romano across Columbus Drive, which is four lanes wide.  In the process, Plaintiff Romano's toe was cut and bleeding because he no longer had on his shoes.

808.    When Plaintiff Romano asked the officers if he could get his shoes, a Chicago police officer replied, "fuck you, you smelly bitch" and told him to "shut the fuck up."

809.    As Plaintiff Romano was being forcibly moved by Chicago police officers, he yelled out his name and birthdate so that others would be able to find and identify him if he was taken to jail.

810.    Chicago police officers shoved Plaintiff Romano into a squadrol with another protester who was bleeding heavily from an open head wound and under serious emotional distress.  Because the protester was covered in blood, Plaintiff Romano yelled for the officers to get medical attention.  After one Chicago police officer asked what was wrong with the bleeding protester, it took twenty more minutes for the protester to be seen by the EMTs.

811.    Plaintiff Romano was brought to the 18th and State precinct and chained to a bench for around 6 hours.  Plaintiff Romano was never told why he was being detained or what charges he faced.  Plaintiff did not receive any water, food, or access to a bathroom.  He was not given an opportunity to make a phone call, was not given access to a lawyer, or given any medical treatment.

812.    At around 1:00 a.m. on July 18, 2020, Plaintiff Romano was released from the precinct with no charges.  He was released with no shoes, no property, and his right leg was injured causing him to limp on it.

813.    At no point during the demonstration did Plaintiff Romano hear a dispersal order.

814.    Plaintiff Romano did not physically attack, assault, threaten, or resist the Defendant Officers or any other Chicago police officer at any time or in any way.

815.    Plaintiff Romano did not commit any unlawful act and was engaging in constitutionally protected activity.

816.    As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Romano suffered and continues to suffer, *inter alia*, bodily injury to both of his legs, his chest, and his back, pain and suffering, trouble sleeping, extreme mental distress, anguish, fear, and the loss of his shoes.

### xiii.    July 17, 2020 Chemical Agent Attacks on Plaintiff Carolina Scott (Grant Park)

817.    On July 17, 2020, at approximately 5:00 p.m., Plaintiff Scott arrived at Buckingham Fountain to participate in the Black, Indigenous Solidarity Rally (Decolonize Zhigaagoong) in Grant Park.

818.    After the rally, Plaintiff Scott marched with the crowd to the Columbus statue.

819.    While near the Columbus statue, Plaintiff Scott and other white individuals

formed a line at the front of the group of protesters.

820.     Chicago police officers in full riot gear approached the line of protesters.  Plaintiff
Scott then observed the officers look at the line of white protesters, and for no justifiable reason,
grab the one Black man who was standing next to the line, pull him to the ground face down, and
arrest and remove him from the protest.

821.     Sometime between 7:00 p.m. and 8:00 p.m., Plaintiff Scott started to notice the
presence of tear gas or pepper spray in the air.  Plaintiff Scott started to have a difficult time
breathing and her eyes started to burn.

822.     Shortly thereafter, an unidentified Chicago police officer then directly tear gassed
or pepper sprayed three people about six to ten feet away from Plaintiff Scott without any
warning or justification.  Plaintiff Scott watched the yellow and white spray coming out and
immediately felt the effects of the chemical agent and began coughing and struggling to breathe.
Plaintiff Scott felt her skin and her eyes burning.

823.     Plaintiff Scott backed up and tried to recover from the chemical agent.  Plaintiff
Scott had to remove her mask and share water with other protesters to combat the gas or pepper
spray, which was especially dangerous given the presence of a global pandemic.

824.     After recovering from the gas or pepper spray, Plaintiff Scott attempted to leave
the protest.  While trying to leave the park, a Chicago police officer screamed at Plaintiff Scott to
walk faster.  Plaintiff Scott was trying to wait for her friend whose bike was damaged by
officers.  As she was leaving, Plaintiff Scott observed many protesters who were bloody and
beaten by officers.

825.     After returning home, Plaintiff Scott washed her mouth out and noticed that she
kept spitting out a red chemical substance.  When she woke up the next day, her arms were still

burning, and she was still spitting out the red chemical substance from her mouth.

826.    Plaintiff Scott did not physically attack, assault, threaten, or resist the Defendant Officers or any other police officer at any time or in any way.

827.    Plaintiff Scott did not commit any unlawful act and was engaging in constitutionally protected activity.

828.    As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Scott suffered and continues to suffer, inter alia, bodily injuries, pain and suffering, extreme mental distress, anguish, and fear.

### xiv.    July 17, 2020 Abuse of Plaintiff Adriana Antunez (Grant Park)

829.    On July 17, 2020, in the late afternoon, Plaintiff Antunez arrived at Buckingham Fountain to participate in the Black, Indigenous Solidarity Rally (Decolonize Zhigaagoong).

830.    After listening to speakers and watching Indigenous ceremonies, Plaintiff Antunez marched with the crowd to the Columbus statue.

831.    Plaintiff Antunez maintained her distance from the statue, but still felt the effects of chemical agents, either tear gas or pepper spray, spread in the air by the Chicago police officers.  She observed a young woman who had been pepper sprayed in the eyes and assisted her.

832.    Plaintiff Antunez then observed Chicago police officers shove her friend, who had his hands in the air, to the ground for no justifiable reason, and beat him with batons while he curled up into a ball.  Her friend sustained bruises on his back and his knee was bloodied, with the blood soaking through his pant leg.  After the officers stopped beating him, Plaintiff Antunez dragged him to a hill.

833.    While Plaintiff Antunez was holding her friend who had been beaten, officers

started to approach them and shouted to move. Without giving Plaintiff Antunez any opportunity to move, and for no justifiable reason, an unidentified Chicago police officer dug his baton holding it horizontally into Plaintiff Antunez's chest. The officer touched Plaintiff Antunez's breast, which was particularly traumatic for her because she is a survivor of sexual assault. Plaintiff Antunez cried out, "That's my chest. You're touching my chest. That's still my chest. You're touching my boobs," but despite her pleas, the officer continued to push his baton into her stomach and her chest.

834. Shortly thereafter, without any warning or justification, one or more unidentified Chicago police officers started hosing protesters with pepper spray. Plaintiff Antunez observed an unidentified Chicago police officer unload a red canister of pepper spray on a young girl next to her. When Plaintiff Antunez turned to try to shield herself and another friend from the pepper spray, Plaintiff Antunez felt the effects of the spray on her neck. Plaintiff Antunez's throat started burning as a result of the spray and she began choking on the spray. Plaintiff Antunez tried to help others around her who had been directly pepper sprayed, but the police officers refused to let her help them.

835. Chicago police officers continued shouting at protesters to move while simultaneously shoving them aggressively with batons to push them further up the hill. As Plaintiff Antunez and her friends were complying with the officers' orders and moving up the hill away from the officers, she and her friend were shoved by one or more as yet unidentified officers.

836. Plaintiff's friend, who had been beaten and also pepper sprayed in the eyes, tripped after being shoved by the officers and fell to the ground. When Plaintiff Antunez caught his fall, her hands got coated with pepper spray.

837.    As Plaintiff Antunez was attempting to address her friend's injuries after he fell, an officer towered over them and yelled at them to keep moving.  After Plaintiff Antunez got up, officers continued to shove her, her friends, and other protesters over a concrete barrier.

838.    Plaintiff Antunez sustained bruises on her breasts due to the Defendant Officer striking her repeatedly with his baton.

839.    Plaintiff Antunez also endured hours of pain due to being pepper sprayed. Plaintiff Antunez repeatedly washed her hands and took multiple showers to try to alleviate the pain, and threw up in the shower while trying to wash away the spray.

840.    Plaintiff Antunez also sustained bruises on her legs and scratches on her knees from being shoved to the ground and climbing over the concrete barrier to get away from the officers.

841.    Plaintiff Antunez did not physically attack, assault, threaten, or resist the Defendant Officers or any other police officer at any time or in any way.

842.    Plaintiff Antunez did not commit any unlawful act and was engaging in constitutionally protected activity.

843.    As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Antunez suffered and continues to suffer, *inter alia*, bodily injuries, pain and suffering, extreme mental distress, anguish, and fear.

### xv.    July 17, 2020 Chemical Agent Attacks on Jamey Arnold (Grant Park)

844.    On July 17, 2020, around 5:45 p.m., Plaintiff Arnold arrived at Buckingham Fountain to participate in the Black, Indigenous Solidarity Rally (Decolonize Zhigaagoong) in Grant Park.

845.    After listening to speakers and watching ceremonies, Plaintiff Arnold marched

with the crowd to the Columbus statue.

846.     As more and more Chicago police arrived near the statue, Plaintiff Arnold observed officers become increasingly aggressive toward protesters, violently grabbing, dragging, and arresting them.

847.     Around 7:30 p.m., Plaintiff Arnold formed a semicircle with other protesters. While standing in the semicircle, without any warning or justification, one or more unidentified Chicago police officers from about 15 feet away indirectly tear gassed or pepper sprayed Plaintiff Arnold, causing her to cough and gag and her eyes to burn.

848.     As she and other protesters stumbled back to find a place to wash off the chemical agent, Chicago police officers charged at the protesters and Plaintiff Arnold was indirectly tear gassed or pepper sprayed again.

849.     After recovering from the chemical agent, and helping others do the same, Plaintiff Arnold observed Chicago police officers forming a line.

850.     Plaintiff Arnold then joined other protesters in a line and linked arms for protection.

851.     Without warning or justification, a line of Chicago police officers charged at the line of protesters and one or more unidentified Chicago police officers tear gassed or pepper sprayed Plaintiff Arnold and the others from about 5 feet away.

852.     Plaintiff Arnold turned around to flee as Chicago police officers charged, and felt the gas or pepper spray hit the back of her head, neck, and upper back, burning her skin.

853.     As Plaintiff Arnold was trying to leave, Chicago police officers continued to rush at her and the other protesters.

854.     Around 8:15 p.m., an unidentified Chicago police officer pushed Plaintiff Arnold

down with his hands, causing her to fall backward onto another protester's bike and hit her left shoulder on the bike's handlebars. Plaintiff Arnold suffered severe shoulder pain as a result of this injury. Plaintiff was helped up by two other protesters.

855. Plaintiff Arnold and other protesters continued to be pushed, shoved, and yelled at by Chicago police officers as they tried to leave the park.

856. Plaintiff Arnold did not physically attack, assault, threaten, or resist the Defendant Officers or any other police officer at any time or in any way.

857. Plaintiff Arnold did not commit any unlawful act and was engaging in constitutionally protected activity.

858. As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Arnold suffered and continues to suffer, *inter alia*, bodily injuries, including burns to her skin and severe left shoulder pain, as well as pain and suffering, extreme mental distress, anguish, and fear.

**xvi.    July 17, 2020 Beating of Plaintiff Sarah Kroth (Grant Park)**

859. On July 17, 2020, Plaintiff Sarah Kroth went to Buckingham Fountain to participate in the Black, Indigenous Solidarity Rally (Decolonize Zhigaagoong) in Grant Park.

860. Plaintiff Kroth had her bicycle with her, which she carried with her throughout the protest.

861. At some point between 7:00 p.m. and 8:00 p.m., Plaintiff Kroth followed the protest march to the Columbus statue.

862. Near the statue, Chicago police officers wearing riot gear had established a skirmish line. Plaintiff Kroth was near the front of the line.

863. Other protesters began locking arms and bikes as part of a group shield against the

Chicago police officers.

864.    The Chicago police officers in the skirmish line began to advance and push against Plaintiff Kroth and other protesters.

865.    Plaintiff Kroth was holding on to her bicycle during this time.  An unidentified Chicago police officer grabbed a hold of the bicycle and began pulling it away from her.

866.    One or more unidentified Chicago police officers then began grabbing a hold of Plaintiff Kroth and unjustifiably striking her with batons about her body, including blows to her head.

867.    After the Chicago police officers began striking Plaintiff Kroth and other protesters, they gave orders for the protesters to move, but did not give an opportunity for the protesters to leave.

868.    One or more unidentified Chicago police officers grabbed Plaintiff Kroth and threw her and her bicycle to the ground saying, "Fuck your bike, fuck your bag."

869.    Plaintiff Kroth crawled away from her bike and walked away from the assault.

870.    Plaintiff Kroth then received medical attention from a street medic for her elbow, which was bleeding badly.

871.    One or more unidentified Chicago police officers took Plaintiff Kroth's bicycle from Kroth and discarded it.

872.    Plaintiff was later able to recover the bicycle, which had been significantly damaged due to the actions of one or more as yet unidentified Chicago police officers.

873.    As a result of the Defendant Officers' unlawful use of force, Plaintiff Kroth had injuries to her elbow and bruises about her body.

874.    Defendant Officers' actions caused substantial damage to Plaintiff's bike,

requiring her to pay for repairs at a bike shop.

875.    Plaintiff subsequently received medical treatment on July 18, 2020 for her physical injuries, including the gash on her elbow, which required stitches.

876.    Plaintiff Kroth did not physically attack, assault, threaten or resist any of the Defendant Officers or any other police officer at any time or in any way.

877.    Plaintiff Kroth did not commit any unlawful act and was engaging in constitutionally protected activity.

878.    As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Kroth suffered and continues to suffer, *inter alia*, bodily injury, pain and suffering, loss of property, extreme mental distress, anguish, and fear, in addition to the medical bill and property damage.

> **xvii.    July 17, 2020 Beating of Plaintiff Maggie "Mars" Robinson (Grant Park)**

879.    On July 17, 2020, Plaintiff Robinson went to Buckingham Fountain to participate in the Black, Indigenous Solidarity Rally (Decolonize Zhigaagoong) in Grant Park.

880.    After listening to speeches and watching Indigenous prayer ceremonies, Plaintiff Robinson began marching with their bicycle to the Columbus statue.  Plaintiff Robinson arrived at the grassy hill between the statue and Roosevelt Road and began observing protesters gathering at the statue.

881.    Several minutes later, Plaintiff Robinson observed Chicago police officers storm down the hill towards the statue and begin pepper spraying protesters and beating protesters with batons.

882.    At approximately 7:30 p.m., Defendant Officer David Floyd (#13262) approached Plaintiff Robinson and grabbed Plaintiff Robinson's bike with both hands for no justifiable

reason.

883.     Defendant Officer Floyd then repeatedly shoved the bike into Plaintiff Robinson, striking them with it approximately 10 times, breaking their right middle finger, and causing them to fall and strike their head on the ground.

884.     Once Plaintiff Robinson was on the ground, Defendant Officer Floyd discarded their bike and stomped on their hands and legs and kicked their back and side.

885.     Once the beating was over, Plaintiff Robinson retrieved their bike and proceeded to the top of the hill towards Roosevelt Road.

886.     Plaintiff Robinson then observed an unidentified Chicago police officer striking another protester with his baton.  When Plaintiff Robinson approached the attacking officer to check on the protester being beat, the officer struck Plaintiff Robinson on their right elbow with his baton, spraining their elbow.

887.     This unidentified Chicago police officer then shoved Plaintiff Robinson with both hands and they flew back, rolling down the hill and striking their head on the ground again, causing them to sustain a concussion.

888.     Plaintiff Robinson observed the same Defendant Officer walking away with Plaintiff Robinson's bike.  Plaintiff Robinson followed after him, asking for their bike back.  The officer refused to return the bike to Plaintiff Robinson.  Plaintiff Robinson never got back their bike.

889.     Plaintiff Robinson received medical treatment from a medic on site for their injuries and left the area.

890.     The next day, Plaintiff Robinson received medical treatment for their injured elbow.

891.     Plaintiff Robinson continues to suffer from the symptoms of their injuries, including pain to their elbow and back, which makes it difficult to exercise and complete basic tasks at work.

892.     Plaintiff Robinson did not physically attack, assault, threaten, or resist the Defendant Officers or any other officer at any time or in any way.

893.     Plaintiff Robinson did not commit any unlawful act and was engaging in constitutionally protected activity.

894.     As a direct and proximate result of the actions by the Defendant Officers detailed above, Plaintiff Robinson suffered and continues to suffer, *inter alia*, bodily injuries including a broken finger, sprained elbow, a concussion, bruising on their arms, legs, and back, as well as pain and suffering, extreme mental distress, anguish, fear, and loss of property.

**xviii.     July 17, 2020 Abuse of Plaintiff Tori Larsen (Grant Park)**

895.     On July 17, 2020, at around 5:30 p.m., Plaintiff Larsen arrived at Buckingham Fountain to participate in the Black, Indigenous Solidarity Rally (Decolonize Zhigaagoong) in Grant Park.  Plaintiff Larsen attended the rally with her friend.

896.     After the rally ended, Plaintiff Larsen marched with other protesters south toward the Columbus statue.  As she approached the statue, she observed the Chicago police surrounding it.

897.     Plaintiff Larsen joined a line of protesters that were facing a line of Chicago police officers.  Both the protesters and the police had bikes in their respective lines.

898.     Plaintiff Larsen observed several Chicago police officers arbitrarily, and quickly, advance to snatch protesters' bikes and then use the bikes to push the protesters down to the ground.  At no point did the officers provide directions or explanations as to why they were

shoving protesters with bikes.

899.     Plaintiff Larsen attempted to catch a protester who had been pushed by one or more unidentified Chicago police officers.  The force caused both the protester and Plaintiff Larsen to fall back into a bush, cutting her right wrist and right calf badly.  After standing up and collecting herself, Plaintiff moved away from the bushes and joined a group of protesters near the statue.

900.     Around 7:45 p.m., more Chicago police arrived in full, green military gear and began to march toward the protesters.  Plaintiff and other protesters linked arms to protect themselves from the police that were encroaching upon them.  The Chicago police began spraying canisters of tear gas or pepper spray that created white smoke and quickly broke the front line of the protesters.  Plaintiff Larsen and the protesters began yelling, "please no, don't do it!" and "you don't have to do it!"

901.     After Chicago police officers broke the line of protesters, Plaintiff Larsen crouched down to protect a protester next to her.  Plaintiff was wearing a helmet, but the other protester was not.  Plaintiff Larsen crouched on the ground, over the protester, out of fear that the officers would begin to strike them with batons.

902.     While Plaintiff Larsen was crouching on the ground, an unidentified Chicago police officer began to spray tear gas or pepper spray from a canister directly at her and the other protester.  The officer was standing above, while they crouched, and was only a few feet away.  Plaintiff Larsen got sprayed with the gas or pepper spray all over her body, causing her to cough uncontrollably and her entire body to burn.

903.     Another protester helped Plaintiff Larsen get off the ground and to a medic on a hill north of the statue.  The medic sprayed water in her burning eyes.  Plaintiff also had to take

off her mask because it was filled with mucus after coughing from the chemical agenting.

904.    Because of the gas or pepper spray, Plaintiff Laresen could not see for at least fifteen minutes.

905.    When she was able to see again, Plaintiff Larsen observed protesters form a new line with their bikes, marching north.  Plaintiff joined up with the protesters on Columbus Drive and linked arms with other protesters despite her pain from the chemical agent.

906.    When the protesters reached the intersection of Balbo Drive and Columbus Drive, Plaintiff Larsen and other protesters circled up to try to assess who had been arrested and how to help people get home.

907.    Around 9:00 p.m., Plaintiff Larsen was helping protect people from oncoming traffic on Columbus Drive when a line of Chicago police officers on bikes charged at the protesters at full speed.  Plaintiff Larsen and the protesters shouted at the officers to slow down but they continued at full speed and an unidentified Chicago police officer on his bike slammed into Plaintiff's shoulder, causing her to spin.  Plaintiff observed another Chicago police officer slam into another protester while the officer screamed "Fuck you!"

908.    Plaintiff Larsen's burns from the tear gas or pepper spray burned all through the night and until late afternoon the next day.

909.    Plaintiff Larsen did not physically attack, assault, threaten, or resist the Defendant Officers or any other officer at any time or in any way.

910.    Plaintiff Larsen did not commit any unlawful act and was engaging in constitutionally protected activity.

911.    As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Larsen suffered and continues to suffer, *inter alia*, bodily injury to her right wrist

and calf, and burning to her body, pain and suffering, extreme mental distress, anguish, and fear.

### xix.    July 17, 2020 Abuse of Plaintiff Clare Gervasi (Grant Park)

912.    On July 17, 2020, Plaintiff Gervasi volunteered to be a bike marshal during the Black, Indigenous Solidarity Rally (Decolonize Zhigaagoong) in Grant Park.  Plaintiff Gervasi arrived at Buckingham Fountain around 4:00 p.m. to meet with all the marshals prior to the start of the demonstration.

913.    After the rally ended, protesters marched toward the Columbus statue.  Plaintiff Gervasi biked in front of the crowd to help keep people safe as they marched through intersections.

914.    Plaintiff Gervasi then stopped biking near the Columbus statue and helped to direct people out of the street and into the park.

915.    Plaintiff Gervasi later served as a safety marshal by joining with other volunteers to form a line with their bikes between the Chicago police officers on Columbus Street and those protesting in front of the Columbus statue.

916.    While standing in line, more Chicago police officers arrived in riot gear and formed their own line facing the line Plaintiff Gervasi was standing in 10-15 feet away.

917.    Without provocation or warning, the Chicago police officers charged the line of protesters.  An unidentified Chicago police officer unjustifiably used his arms to push Plaintiff Gervasi into the bikes and people behind them.  Plaintiff Gervasi's leg was cut and bruised as a result of being pushed.

918.    Then the unidentified Chicago police officer grabbed Plaintiff Gervasi's bike and threw it behind him.  Plaintiff Gervasi's bike flew approximately 15 feet and smashed into a tree. The front of Plaintiff Gervasi's bike and its brakes were damaged from being thrown, rendering

it unrideable.

919.    After attending to their bike, Plaintiff Gervasi later moved with 10-15 other protesters to form another line, this time standing near the retaining wall parallel to Roosevelt Road.

920.    Plaintiff Gervasi stood in line while Chicago police officers stood in front of them for approximately 20 minutes.

921.    At approximately 7:30 p.m., Chicago police officers began to advance on the line of protesters.  Plaintiff Gervasi did not hear the officers issue a dispersal order prior to advancing on the protesters.

922.    Plaintiff Gervasi observed an unidentified Chicago police officer beat the man standing next to them with his baton on the head, shoulder, and ribs.

923.    The unidentified Chicago police officer then tried to take the man's bike, and Plaintiff Gervasi grabbed the back of the bike to prevent it from being thrown.  As Plaintiff Gervasi was holding the back of the bike, without warning, the unidentified Chicago police officer unjustifiably used his baton to strike Plaintiff Gervasi's right hand, causing them to let go of the bike. Once Plaintiff Gervasi let go of the bike, the unidentified Chicago police officer then used his baton to hit Plaintiff Gervasi in the stomach.

924.    Plaintiff Gervasi realized that their hand was starting to swell and was concerned it was broken.  Plaintiff Gervasi then decided to leave the protest because of their injuries.

925.    On Sunday, July 19, 2020, Plaintiff Gervasi went to an urgent care in Edgewater to receive medical attention for the injury sustained to their hand, which was still bruised and severely swollen.

926.    Plaintiff Gervasi had X-rays taken and was told that the bone in their right thumb

was chipped and that some of their tendons were also damaged. Plaintiff Gervasi was given a brace for their hand and told to refrain from moving it to help it heal.

927. Plaintiff Gervasi still has pain in their thumb and has not regained a full range of motion.

928. Plaintiff Gervasi did not physically attack, assault, threaten, or resist the Defendant Officers or any other officer at any time or in any way.

929. Plaintiff Gervasi did not commit any unlawful act and was engaging in constitutionally protected activity.

930. As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Gervasi suffered and continues to suffer, *inter alia*, bodily injury to their right thumb, scrapes and bruising on their leg, bruising on their stomach, as well as pain and suffering, extreme mental distress, anguish, fear, and damage to their property.

### F. August 15, 2020 Demonstration Downtown

931. On August 15, 2020, hundreds of protesters participated in a demonstration downtown that began in the afternoon. The protesters started at Millennium Park and marched through the streets of downtown before Chicago police officers blocked their route and became aggressive. Officers surrounded protesters on all sides, engaging in the unlawful tactic of "kettling," and brutally beat many protesters, including youth.









i.    **August 15, 2020 Abuse of Plaintiff Patrick Romano (Downtown)**

932.     On August 15, 2020, Plaintiff Patrick Romano attended a Black youth-led protest calling for defunding CPD, CPD out of CPS, and abolishing ICE in downtown Chicago. Plaintiff Romano arrived at Millennium Park at approximately 2:00 p.m. and marched into the Loop to Michigan Avenue and Wacker Drive.

933.     Plaintiff Romano and other protesters arrived at the Michigan Avenue bridge. The Michigan Avenue bridge was raised so that the protesters could not cross over it.  When the protesters attempted to march east on Wacker, at least fifty Chicago police officers were blocking their only path to continue their march.  While Plaintiff Romano and the other protesters stood and chanted to be let through, more Chicago police officers arrived in riot gear. Many of the Chicago police officers had their batons out.  After about twenty minutes, there were twice as many Chicago police officers as there were protesters.

934.     Plaintiff Romano and other protesters opened umbrellas because of the rain.  A Chicago police officer ripped Plaintiff Romano's umbrella out of his hand as other Chicago police officers did the same to other protesters.

935.     Chicago police officers also began to push protesters' bikes to move the protesters backward.  Plaintiff Romano witnessed a Chicago police officer slam a protester's head into their bicycle spokes.

936.     Plaintiff Romano and other protesters began to retreat south on Michigan away from the CPD blockade on Wacker, but Chicago police officers continued to follow the protesters banging on their riot shields and yelling "move back."

937.     Plaintiff Romano and the other protesters attempted to march in directions that were not blocked by Chicago police officers, but at each intersection more Chicago police officers would shove the protesters' bikes and indiscriminately release pepper spray on the

protesters, making it impossible for the protesters to assemble anywhere.

938.    Chicago police officers chased the protesters around the downtown area.

939.    Plaintiff Romano arrived near the intersection of Randolph Street and Wabash Avenue. He was toward the back of the crowd with the protesters on bikes. Plaintiff then observed one or more unidentified Chicago police officers, about twenty feet away, indiscriminately spray pepper spray from an industrial-sized canister and then saw orange mist coming his direction. The pepper spray heavily hit his entire torso, including his arms, neck, and chest. Plaintiff Romano had to throw off his mask because it was covered in pepper spray.

940.    Plaintiff Romano and other protesters headed toward State Street and Randolph Street where a group of Chicago police officers trapped Plaintiff Romano and others in a kettle. Once the officers trapped Plaintiff and the other protesters, officers tackled and beat anyone who attempted to leave the kettle.

941.    When Plaintiff Romano attempted to leave, a line of Chicago police officers' bicycles blocked his exit. Plaintiff Romano and his friend told an unidentified Chicago police sergeant that they wanted to leave. The sergeant yelled at Plaintiff Romano and his friend to drop the water bottles they were holding, to empty their backpacks, and to lift their shirts above their waistbands. The sergeant forced Plaintiff Romano to leave his backpack.

942.    Plaintiff Romano did not physically attack, assault, threaten, or resist the Defendant Officers or any other Chicago police officer at any time or in any way.

943.    Plaintiff Romano did not commit any unlawful act and was engaging in constitutionally protected activity.

944.    As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Romano suffered and continues to suffer, *inter alia*, bodily injury, including

burns to his arms, neck, and chest, as well as pain and suffering, extreme mental distress, anguish, fear, and the loss of his backpack and mask.

      **ii.    August 15, 2020 Abuse and False Arrest of Plaintiff Delaney Dittman (Downtown)**

945.    On August 15, 2020, Plaintiff Dittman arrived at Millennium Park around 3:45 p.m. to serve as a medic during the protest. As such, she was wearing a shirt with a red cross on her chest and was carrying a backpack with a red cross.

946.    Around 5:00 p.m., Plaintiff Dittman began following the crowd walking north on Michigan Avenue toward Wacker Drive. When the crowd arrived at Michigan Avenue and Wacker Drive, the protesters were prevented from walking further north because the Michigan Avenue bridge was raised. As the crowd was standing at the intersection of Michigan Avenue and Wacker Drive, Plaintiff Dittman observed more and more police begin to arrive to the point where police outnumbered and surrounded the protesters.

947.    Around 6:00 p.m., Plaintiff Dittman observed multiple Chicago police officers, without warning and justification, begin to pepper spray protesters. Plaintiff Dittman, who was wearing a gas mask, ran over to help a young woman who was screaming because she had been pepper sprayed in the face. As Plaintiff Dittman was attempting to drag the young woman away from the police to the medics' triage area on the northwest corner of the intersection, one or more unidentified Chicago police officers pepper sprayed Plaintiff Dittman all down her left arm and back, causing her skin to burn.

948.    Plaintiff Dittman was able to help the young woman over to the triage area and flush her eyes out with water. Plaintiff Dittman also provided care to a number of other protesters who were pepper sprayed in the face.



949.    Shortly thereafter, Chicago police officers deployed a second burst of pepper spray while simultaneously pushing protesters back with their shields and batons south on Michigan Avenue.  While Plaintiff Dittman was trying to grab protesters who had been pepper sprayed to help them move away to safety, three or more unidentified Chicago police officers repeatedly pushed her into a building with their shields and batons.

950.    The officers continued to push the protesters south on Michigan Avenue and then forced the protesters to turn onto Randolph Street.  Around 7:00 p.m., near the intersection of Randolph Street and Dearborn Street, a line of officers rushed the crowd of protesters, knocking people over.

951.    Plaintiff Dittman observed one protester get thrown to the ground by a number of officers and hit his head on the ground.  This protester was trapped under his bike and was bleeding profusely from the head.

952.    Plaintiff Dittman went over to the protester to help him, and while she reached for him from under his bike, she was thrown to the ground by one or more unidentified Chicago police officers.

953.     Multiple Chicago police officers then proceeded to beat her while she was on the ground, kicking her and hitting her with batons all over her body, including in her back, butt, ribs, neck, head, right thigh, and arms.  While the officers were beating her for no justifiable reason, Plaintiff Dittman was screaming that she was a medic, but the officers ignored her cries.



954.     After beating her, one or more unidentified Chicago police officers pulled her arms behind her back and zip-tied her hands.  Two or more unidentified Chicago police officers held her down on the ground by kneeling on her, while multiple unidentified Chicago police officers surrounded her.  Plaintiff continued to tell the officers that she was a medic.

955.     One or more unidentified Chicago police officers then ripped off her gas mask, which had been damaged by the officers during her beating.  When they ripped off her gas mask, her glasses also flew off.  Plaintiff asked the officers if they could please give her back her glasses, as she could barely see without them, and in response two unidentified Chicago male police officers and one unidentified Chicago female police officer kicked her glasses away and laughed.  Eventually another officer picked up her broken glasses and placed them in her pocket.

956.     One or more unidentified Chicago police officers then yanked her up off the ground and escorted her over to a squadrol.

957.    While standing near the squadrol, Plaintiff Dittman observed a protester covered in blood and so she yelled at the officers to get the protester medical care.  An unidentified Chicago police officer, who was not wearing a mask, responded by screaming at Plaintiff Dittman and laughing at her, calling her a "bitch" and an "idiot" and saying she "should go back to the suburbs."  This same officer also screamed at the other individuals who had been arrested and were being placed in the squadrol.

958.    Plaintiff Dittman was put in the squadrol with about five other people, some of whom had been pepper sprayed.  While in the squadrol, the pepper spray caused everyone to cough repeatedly, and officers refused to give them masks.

959.    While at the police station at 51st and Wentworth, officers refused to tell Plaintiff Dittman why she was arrested or what she was being charged with, despite her repeated requests for information.

960.    Plaintiff Dittman remained at the police station until around 11:00 a.m. the following morning.  When she was released, officers again refused to tell her what she was being charged with, and instead directed her to numbers on a piece of paper.  However, the numbers on the paper were not associated with any charges.

961.    Plaintiff Dittman was falsely charged with misdemeanor 720 ILCS 5.0/25-1-A-2 for mob action.  Defendant Brayan Jauregui (#4894) was listed as the arresting officer.

962.    Her false charge was dismissed at her first court hearing on September 15, 2020.  This legal proceeding was terminated in Plaintiff Dittman's favor.

963.    Plaintiff Dittman did not physically attack, assault, threaten, or resist the Defendant Officers or any other officer at any time or in any way.

964.    Plaintiff Dittman did not commit any unlawful act and was engaging in

146

constitutionally protected activity.

965.    As a direct and proximate result of the actions of the Defendant Officers as detailed above, Plaintiff Dittman suffered and continues to suffer, *inter alia*, bodily injuries, pain and suffering, extreme mental distress, anguish, fear, and damaged property.

### iii.    August 15, 2020 Abuse of Plaintiff Archit Baskaran (Downtown)

966.    On August 15, 2020, Plaintiff Archit Baskaran arrived at Millennium Park at approximately 4:00 p.m. to participate in a Black-youth led protest calling for defunding CPD, CPD out of CPS, and abolishing ICE.

967.    Plaintiff Baskaran and other protesters marched from Millennium Park to Michigan Avenue, and then turned north on Michigan Avenue towards Wacker Drive.

968.    When the crowd arrived at the intersection of Michigan Avenue and Wacker Drive, the protesters were prevented from walking further north because the Michigan Avenue Bridge was raised.  As the crowd was standing in the intersection, Plaintiff Baskaran observed Chicago police officers forming lines to the east and west of the protesters, blocking them from moving in either direction.

969.    Protest marshals called for additional support to the front of the march, and Plaintiff Baskaran proceeded to the eastern edge of the group, where he was given a bicycle to hold.  Plaintiff Baskaran stood in a line with other protesters holding bikes.

970.    Two to three lines of Chicago police officers in riot gear holding shields and batons faced Plaintiff Baskaran and the other protesters holding bikes.

971.    An unidentified Chicago police officer ripped the umbrella that Plaintiff Baskaran was holding and threw it to the ground.  Plaintiff Baskaran witnessed other Chicago police officers take umbrellas from protesters and discard them.

972.     Plaintiff Baskaran observed the line of Chicago police officers begin pushing the line of protesters holding bikes.  The Chicago police officers started yelling and hitting other protesters on their hands with batons.

973.     Plaintiff Baskaran heard the sound of a canister shaking, and observed an unidentified Chicago police officer hold a chemical agent canister approximately one foot from him and spray it directly into his face without justification or issuing any warning.

974.     Plaintiff Baskaran recoiled from the excruciating pain of the chemical agent.

975.     Seconds later, Plaintiff Baskaran looked up and saw an unidentified Chicago police officer spraying a chemical agent indiscriminately in the air above the protesters.

976.     The chemical agent rained down on Plaintiff Baskaran, dripping down his face, soaking through his clothes, and causing his skin to burn.

977.     The Chicago police officers surged forward.  An unidentified Chicago police officer unjustifiably struck Plaintiff Baskaran on each of his hands with a baton, causing Plaintiff Baskaran to drop the bike.  As Plaintiff Baskaran turned to run he was struck with a baton on his back by an unidentified Chicago police officer.

978.     Plaintiff Baskaran could not see and was struggling to breathe because of the chemical agent sprayed in his face.  Another protester guided him to a medic who treated Plaintiff Baskaran and rinsed his eyes out.



979.    The Chicago police officers continued surging toward the protesters, pushing them south on Michigan Avenue, and Plaintiff Baskaran left the protest to the southwest.

980.    Plaintiff Baskaran did not physically attack, assault, threaten, or resist the Defendant Officers or any other officer at any time or in any way.

981.    Plaintiff Baskaran did not commit any unlawful act and was engaging in constitutionally protected activity.

982.    Plaintiff Baskaran experienced blurry vision for hours after the attack, and for days he experienced a persistent cough, burning on his skin, and pain in his back as a result of the baton strike.  Plaintiff Baskaran is a medical student completing a surgical rotation and has struggled with surgical techniques due to pain in his hands and wrists from the baton strikes. Plaintiff Baskaran has also been participating in therapy and support groups to process the trauma that he experienced.

983.    As a direct and proximate result of the actions of the Defendant Officers as detailed above, Plaintiff Baskaran suffered and continues to suffer, *inter alia*, bodily injuries, pain and suffering, extreme mental distress, anguish, and fear.

### iv. August 15, 2020 Abuse and False Arrest of Plaintiff Bailey Pfeifer (Downtown)

984.     On August 15, 2020, Plaintiff Bailey Pfeifer went with a friend to Millennium Park to participate in a Black-youth led protest calling for defunding CPD, CPD out of CPS, and abolishing ICE.

985.     Plaintiff Pfeifer marched with other protesters from Millennium Park to Michigan Avenue, and then turned north on Michigan Avenue towards Wacker Drive.

986.     When the crowd arrived at the intersection of Michigan Avenue and Wacker Drive, the protesters were prevented from marching further north.  The Michigan Avenue bridge was raised and there was a line of Chicago police officers, including officers with bicycles, preventing the protest from proceeding.

987.     Plaintiff Pfeifer was toward the front of the crowd, near the Chicago police officers, as the officers were striking individuals and deploying pepper spray.  An unidentified Chicago police officer sprayed Plaintiff Pfeifer with pepper spray on their shoulder, causing pain and a burning sensation.

988.     Plaintiff Pfeifer locked arms with other protesters.  Plaintiff Pfeifer and the other protesters complied with Chicago police officers' orders to "move back" and told the officers that there were young people behind them, that there was nowhere they could go, and that they could not move any faster.

989.     Chicago police officers, without masks, began shouting and spitting at the protesters.

990.     Without justification or warning, an unidentified Chicago police officer used a bicycle to strike Plaintiff Pfeifer, hitting them in the ribs multiple times with the handlebars.

991.     Without justification or warning, another unidentified Chicago police officer

raised a baton over their head and swung it down, striking Plaintiff Pfeifer's wrist. This use of force caused Plaintiff Pfeifer severe pain, leaving their wrist swollen and intensely bruised.

992.    The crowd began proceeding south on Michigan Avenue, as Chicago police officers advanced toward the protesters. The crowd then turned west on Randolph Street.

993.    Plaintiff Pfeifer believed the demonstration was coming to an end and that the crowd was dispersing.

994.    Plaintiff Pfeifer heard yelling and saw Chicago police officers using force against an individual who was on the ground and appeared to be helpless.

995.    Plaintiff Pfeifer moved toward the individual and was pushed by Chicago police officers. As Plaintiff Pfeifer fell to the ground, an unidentified Chicago police officer sprayed Plaintiff Pfeifer directly in the face with a chemical agent, blinding them.

996.    As Plaintiff Pfeifer was on their knees, blinded by the chemical agent, an unidentified Chicago police officer struck them in the head with a baton. This blow to the head caused them to temporarily lose consciousness and they were later diagnosed with a concussion.

997.    The photo below depicts Plaintiff Pfeifer, wearing black pants and a white shirt.



998.    As Plaintiff Pfeifer was blinded by the chemical agent and temporarily lost consciousness, their friend attempted to assist them in safely moving away from the police.  As they were walking away from the police line, an unidentified Chicago police officer held a baton across his body and without justification, used it to strike Plaintiff Pfeifer, pushing them away from the police line.



999.    After Plaintiff Pfeifer and their friend were moving further away from the police line, one of the unidentified Chicago police officers ran after them.  The officer grabbed Plaintiff

Pfeifer by the back of their hair and pulled them backwards and threw them to the ground.

1000.   Multiple Chicago police officers tackled Plaintiff Pfeifer and used their bodies to hold Plaintiff Pfeifer on the ground, causing Plaintiff Pfeifer to be unable to breathe and fearing that they were being trampled.

1001.   Plaintiff Pfeifer was then handcuffed, taken to a police vehicle and transported to a Chicago police station.

1002.   While in police custody, one or more unidentified Chicago police officers denied Plaintiff Pfeifer's requests for medical treatment for their injuries.  The only assistance Plaintiff Pfeifer received was from the other arrested protesters in the holding cell, who used the limited water provided for drinking to wash the chemical agent from Plaintiff Pfeifer's eyes.

1003.   Plaintiff Pfeifer was released the following day, on August 16, 2020, and falsely charged with misdemeanor count of Reckless Conduct.  Defendant Lieutenant Patricia Zuber (#351) was listed as the arresting officer.

1004.   Subsequent to their release from police custody, Plaintiff Pfeifer went to the hospital, where they were diagnosed with a "concussion with loss of consciousness, assault by poisoning with pepper dust," and an injury to their wrist.  The wrist injury was initially diagnosed as a fracture, but subsequently diagnosed as a serious bruise.

1005.   The charge against Plaintiff Pfeifer was dismissed on October 29, 2020, and the criminal case was terminated in their favor.

1006.   Plaintiff Pfeifer did not physically attack, assault, threaten, or resist the Defendant Officers or any other officer at any time or in any way.

1007.   Plaintiff Pfeifer did not commit any unlawful act and was engaging in constitutionally protected activity.

1008.   In the days and weeks following this incident, Plaintiff Pfeifer suffered significant pain in their head and wrist and about their body, along with excruciating pain, discomfort and burning where the chemical agent came in contact with their body.  They have suffered significant emotional distress, including increased anxiety, depression, and experiencing night terrors.  Additionally, they now experience increased fear, discomfort, and emotional distress when they are in the presence of police officers.

1009.   As a direct and proximate result of the actions of the Defendant Officers as detailed above, Plaintiff Pfeifer suffered and continues to suffer, *inter alia*, bodily injuries, pain and suffering, extreme mental distress, anguish, and fear.

### v.    August 15, 2020 Abuse of Plaintiff Charlie Atchley (Downtown)

1010.   On August 15, 2020, Plaintiff Atchley arrived at Millennium Park at approximately 4:00 p.m. to participate in a Black-youth led protest calling for defunding CPD, CPD out of CPS, and abolishing ICE as a protest marshal.

1011.   Plaintiff Atchley and other protesters marched from Millennium Park to Michigan Avenue, and then turned north on Michigan Avenue towards Wacker Drive.

1012.   When the crowd arrived at the intersection of Michigan Avenue and Wacker Drive, the protesters were prevented from walking further north because the Michigan Avenue bridge was raised.  As the crowd was standing in the intersection, Plaintiff Atchley observed Chicago police officers forming lines to the east and west of the protesters, blocking them from moving in either direction.

1013.   Plaintiff Atchley and other protesters attempted to disperse by taking the only route that Chicago police officers left open, heading back south down Michigan Avenue.

1014.   Plaintiff Atchley observed Chicago police officers running quickly into the crowd

from the back as other officers attempted to surround the protesters on all sides.

1015.   Plaintiff Atchley observed Chicago police officers knocking protesters off bikes, beating them with clubs, and using pepper spray.  Plaintiff Atchley and other protesters began to run away from the officers.

1016.   The Chicago police officers continued surging toward the protesters, pushing them south on Michigan Avenue, and Plaintiff Atchley and a group of protestors tried to disperse from the protest to the southwest.

1017.   After walking south from Michigan Avenue, Chicago police officers kettled Plaintiff Atchley and others and refused to allow them to leave.

1018.   Plaintiff Atchley was in the front of the group when Chicago police officers started to lunge into the encircled crowd of people.

1019.   An unidentified Chicago police officer began to shove Plaintiff Atchley back into the crowd multiple times using Plaintiff Atchley's bicycle.  Unidentified Chicago police officers caused injury to Plaintiff Atchley's leg, including lacerations resulting from the officers repeatedly striking them with their bike.

1020.   An unidentified Chicago police officer also repeatedly used a baton to strike Plaintiff Atchley on the back of their head.  The baton strikes caused Plaintiff Atchley's glasses to fall off their face.  The head strikes caused Plaintiff Atchley to become disoriented and to experience ringing in their ears.  An unidentified Chicago police officer struck Plaintiff Atchley in the ribs causing them shortness of breath.

1021.   After the unidentified Chicago police officers stopped beating Plaintiff Atchley, Plaintiff Atchley attempted to leave the area without their bicycle and glasses.

1022.   As Plaintiff Atchley attempted to leave, Chicago police officers again surrounded

her, kettling her against a wall. Officers instructed Plaintiff Atchley and the group to disperse and threatened them with arrest; however, the officers detained the group and provided them no pathway for dispersal.



1023.    Plaintiff Atchley and other protesters attempted to inform officers that some detained protesters were injured and in need of medical attention. Unidentified Chicago police officers finally acknowledge these pleas after one protester collapsed.

1024.    Unidentified Chicago police officers told Plaintiff Atchley and other protesters that they could not leave unless they allowed the officers to search their belongings. Plaintiff Atchley refused to consent to the search, so the unidentified Chicago police officers detained Plaintiff Atchley for an unknown amount of time, before finally allowing them to leave.

1025.    Plaintiff Atchley did not physically attack, assault, threaten, or resist the Defendant Officers or any other Chicago police officer at any time or in any way.

1026.    Plaintiff Atchley did not commit any unlawful act and was engaging in constitutionally protected activity.

1027.   As a direct and proximate result of the Defendant Officers' actions as detailed above, Plaintiff Atchley suffered and continues to suffer, *inter alia*, bodily injury, including bruising to their legs, back, and side, shortness of breath, trouble sleeping, a limp, as well as pain and suffering, extreme mental distress, anguish, fear, and the loss of their bicycle and glasses.

### III.   CPD's Policy and Practice Failures: Using Force Against Protesters, Unreasonable Force When No Force Is Required, and Failure to Discipline/Code of Silence

1028.   The City's long standing policies, practices, and customs for shutting down protests are the direct and proximate cause of the constitutional violations outlined in this Complaint.  The Plaintiffs suffered abuse at the hands of Chicago police officers in different parts of the City, however, each instance of harm was a direct result of the City's deficient policies and practices as detailed below.

### A.   CPD's Policy and Practice of Using Unreasonable Force, Violence, and False Arrests to Quell Protest

1029.   For over 100 years, CPD has inflicted unjustified beatings on people exercising their right to assemble and protest.  CPD also has a well-documented process of arresting protesters without probable cause—unlawfully depriving people of their freedom in retaliation for their protest activities.  Protesters taking to the streets to bring attention to unjust labor practices, segregation and other vestiges of white supremacy, AIDS-related public health crisis, war, and police murder of Black people have experienced brutal violence at the hands of CPD officers.  Throughout its history, CPD has falsely arrested thousands of protesters.

1030.   As described further below, CPD's violent protest-related policies and practices were first widely documented in 1855 and have continued for over a century.  CPD's response to the Summer 2020 uprisings demonstrate that the department's long history of brutalizing protesters and subjecting them to false arrests has not abated for over 165 years.

### i.   The Haymarket Incident

1031.   The modern CPD was established in 1855 to quell labor protests that had arisen in Chicago.  Elected officials established the new military-style police department not to fight crime, but to maintain order among wage workers who were overwhelmingly from immigrant communities and who were protesting for fair labor practices.

1032.   In 1877, the CPD used violent tactics in an attempt to thwart protests.  On July 25, 1877, a group of labor reformers requested police protection for a peaceful meeting about working conditions.  Instead of protecting the group, CPD broke up the group by beating them with batons.  The Police Superintendent at the time stated the police would have opened fire on the crowd if there were not small children in the area.

1033.   On July 26, 1877, the Deputy Superintendent ordered CPD officers to fire into a new crowd of protesters, killing an untold number of protesters and using batons against hundreds more.

1034.   CPD's pattern and practice of using violence against protesters continued in 1886 during what is now referred to as the Haymarket Incident.  At the time, workers were striking for an eight-hour work day.  During one strike on May 3, 1886, approximately 200 police officers opened gun fire and used batons on strikers, killing between 2 and 6 strikers.

1035.   The following day on May 4, 1886, approximately 2,000 labor protesters rallied in Haymarket Square in support of the strikers.  CPD officers advanced into the crowd in an attempt to disperse the gathering when an unknown individual threw an explosive device that instantly killed a police officer.[16]  In response, CPD officers opened fire into the crowd creating a scene the Chicago Tribune described as "wild carnage" where at least fifty dead or wounded

---

[16] Iam Hernon, The Wild East: Gunfights, Massacres and Race Riots Far From America's Frontier.

civilians lay in the streets.[17]

1036.   Historians have documented that CPD officials knew, in the immediate aftermath of this incident, that its officers engaged in reckless, deadly force.  A CPD captain filed a report stating that "the number of wounded workers was largely in excess of that of the [CPD]."[18] Charges were filed against Haymarket Protesters and eight labor organizers were found guilty of a litany of charges.  During the sentencing hearing, one of the organizers told the court that the CPD was "among the city's worst gangs, ransacking houses and stealing money and watches." Even though the person who threw the incendiary device was never identified, the state of Illinois eventually executed four men for their role in the Haymarket uprisings.

1037.   In 1893, the then Governor of Illinois, John Altgeld, pardoned the Haymarket protesters and stated that they were the victims of "hysteria, packed juries and a biased judge." Governor Altgeld also blamed the City of Chicago for failing to hold law enforcement officers accountable for repeated use of lethal force against protesters.[19]

### ii.  1919 Racial Unrest

1038.   In 1919, Eugene Williams, a Black teenager, attempted to integrate a Chicago public beach.  An angry mob of white people stoned Mr. Williams and he drowned to death in Lake Michigan.  When CPD officers arrived on the scene, they refused to arrest anyone in the white mob.  Instead, CPD officers beat the Black witnesses who demanded Eugene's murderers be arrested.  The fury over the Black teenager's murder was compounded by the CPD's refusal to act and as a result, protests and racialized violence spread throughout the city.  CPD responded with its own forms of racialized violence and brutality.

---

[17] *Id.*
[18] *Id.*
[19] *Id.*

1039.   In direct response to these uprisings, on August 20, 1919, then Governor Lowden established the Commission on Race Relations to "report upon the broad question of relations between the two races."  The Commission completed its work on December 6, 1921, and issued a 819-page report.[20]  The report concluded that the uprisings were "merely a symptom of serious and profound disorders lying beneath the surface of race relations in Chicago."[21]

1040.   Many of the Commissions' findings were a direct indictment of the CPD. Examples of the Commission's findings related to CPD include:

a.   The then State's Attorney testified before the Commission that, in relation to CPD's actions during the uprisings, "There is no doubt that a great many police officers were grossly unfair in making arrests.  They shut their eyes to offenses committed by white men while they were very vigorous in getting all the [Black] men they could get."[22]

b.   Data affirms this conclusion.  Two hundred and twenty nine people were accused of criminal offenses related to the unrest: 154 Black people and 75 white people. But of the 520 injured persons who were identified by race, 342 were Black and 178 were white.  Based on these numbers the Commission concluded that "the fact that twice as many [Black people] appeared as defendants and twice as many were injured as whites suggests the conclusion that whites were not apprehended

---

[20]   The Negro in Chicago: A Study of Race Relations and A Race Riot. The Chicago Commission on Race Relations. The University of Chicago Press. Chicago Illinois. (Hereinafter "1919 Commission Report") The Commission's findings are well known to this administration.  Prior to becoming Mayor, Lori Lightfoot chaired Chicago's Police Accountability Task Force, a Task Force formed by then Mayor Rahm Emmanuel in the wake of the release of the video depicting Chicago police officer Jason Van Dyke murder Laquan McDonald, a Black teenager.  The Task Force attached the 1919 Commission's findings to its report.
[21]   1919 Commission Report at 602.
[22]   *Id.*

as readily as [Black people.]"[23] "The failure of the police to arrest impartially, at the time of the rioting, whether from insufficient effort or otherwise, was a mistake and had a tendency to further incite and aggravate the [Black] population."[24] "[L]eaders among the [Black community] clearly indicate that discrimination in arrest was a principal cause of widespread and long standing distrust.[25]

c. The Commission noted a number of "minor tales" that "laid the foundation for Black "bitterness toward white police" including the arrest of a Black man after he had been beaten by white mob, multiple Chicago police officers failing to take action while witnessing white people beat and brutalize Black people, and Chicago police officers arresting, detaining, and clubbing Black people who sought out officers for protection and assistance during the unrest.[26]

d. During the unrest, CPD's record keeping was "incomplete and inaccurate." "[S]tation lists of injured were far from complete and. . . it was not uncommon to find innocent persons charged with serious offenses."[27] This shoddy record keeping was particularly problematic, because "many of the deaths and injuries occurred during clashes between white policemen and [Black people]."[28]

e. The Commission found "general prejudice" among CPD officers and "certain instances" that demonstrated "discrimination, abuse, brutality, indifference and

---

[23] *Id.* at 34.
[24] *Id.* at 36.
[25] *Id.* at 34.
[26] *Id.* at 34-35.
[27] *Id.* at 37.
[28] *Id.*

neglect."[29]  These instances include CPD officers who called a Black man who had been beaten by a white mob a n****r and struck him on his head and officers who struck a Black man on his head, threatened to shoot him and then held him incommunicado for seven days, and a supervisor who demonstrated indifference to the fact that officers under his command shot and killed multiple Black people.[30]

1041.   The Commission issued a series of detailed recommendations to the CPD and other City officials, that included the need for a detailed plan to address future uprisings, an end to discriminatory policing, an immediate investigation into reports that Chicago police officers neglect their duties and/or participated in riots and punishment for those officers found guilty of these offenses.[31]

1042.   A Grand Jury convened regarding the 1919 unrest concluded that CPD "is need of a thorough house cleaning.  Every officer, no matter what his position is, who fails in his duty should be dismissed."[32]

1043.   The CPD failed to implement any of the Commission's recommendations—and it has never cleaned house.

### iii.   CPD's Response to Protests During the Great Depression

1044.   During the Great Depression, Chicago residents formed action groups called Unemployment Councils to address the housing crisis facing the City and country.  Their demonstrations in 1931 were often ended in violence and sometimes arrests for distributing literature.  During one eviction protest, CPD shot four Black protesters.

---

[29] *Id.* at 38.
[30] *Id.* at 38-39.
[31] *Id.* at 641.
[32] *Id.* at 51.

1045.   The Memorial Day Massacre of 1937 occurred at a steelworkers' unionization protest.  CPD already incited violence with the group two days before Memorial Day by beating protesters attempting to march to the steel plant, injuring 18 demonstrators.  On Memorial Day, police clashed with protesters again marching towards the plant.  This time, the steelworkers were met with tear gas and gunfire; the officers were shooting protesters in their back as they fled.  As a result, 10 protesters died, at least 60 were wounded, and over 600 people were arrested.

### iv.     1968 Civil Rights Related Uprisings

1046.   CPD responded to the 1960's Black Freedom Movement with its now trademark violent and repressive tactics.  In 1968, uprisings occurred following the assassination of Martin Luther King, Jr.  In response, the CPD first used tear gas on protesters and then was later instructed to use more aggressive action.  Mayor Richard J. Daley ordered police to shoot to kill arsonists and shoot to maim or cripple anyone suspected of involvement in property-related crimes.

1047.   Police violence against protesters continued throughout 1968, most memorably during the Democratic National Convention.  For example, Chicago police officers cornered and tear gassed a large crowd of protesters outside the Conrad Hilton Hotel.  This incident was not isolated; numerous reports indicate police would not allow protestors to leave an area—or make it difficult to do so—then police would tear gas the protesters who were trapped.  Several other individuals were attacked and beaten with batons by Chicago police officers. In total, over 500 protesters and 100 civilians reported injuries from tear gas.

1048.   In response to the Black Freedom and anti-war protests in Chicago and around the country, President Johnson established the National Commission on the Causes and Prevention

of Violence through Executive Order 11412. This Commission was responsible for investigating and making recommendations regarding the "causes and prevention of lawless acts of violence in our society . . . and the causes and prevention of disrespect for law and order . . . and of violent disruptions of public order by individuals and groups."

1049.   In its final report, the 1968 Commission compared the response of the CPD to police departments responding to protest elsewhere and concluded that "in Chicago the authorities were restrictive in granting demonstration permits, some of the police, deliberately goaded by verbal and physical attacks of small militant groups, responded with excessive force not only against the provocateurs, but also against peaceful demonstrators and passive bystanders. Their conduct . . . polarized substantial and previously neutral segments of the population against the authorities and in favor of the demonstrators."[33]

1050.   The 1968 Commission detailed how the CPD "without coherent planning . . . clubbed and tear gassed guilty and innocent alike, chasing demonstrators through the streets . . . bystanders who had taken no part in the demonstrations were attacked by police officers. Several media representatives were clubbed and had their cameras smashed [by CPD officers]."[34]

1051.   The Commission also likened the CPD's violent response to protesters to white, racist segregationists. "[P]eople seem to have embraced the idea that . . . violent disobedience is justified for the purpose of achieving a desirable political goal. This idea found widespread support in the South as the white majority in that region resisted [integration] and some such notion was probably not far from the minds of the Alabama State Troopers when they attacked Dr. King's peaceful demonstration at Selma in 1965. No doubt it was also prominent in the

_____

[33] https://www.ncjrs.gov/pdffiles1/digitization/275ncjrs.pdf at 71.
[34] *Id.* at 73.

thinking of the Chicago policemen who administered punishment to the demonstrators in Chicago during the Democratic Convention of 1968."[35]

1052.   The Commission did a deep dive into the CPD's reaction to the uprisings in 1968 and issued a special sub report focusing exclusively on Chicago.  That report, *Rights in Conflict: the Violent Confrontation of Demonstrators and Police in the Parks and Streets of Chicago during the week of the Democratic National Convention of 1968*, authored by Daniel Walker and referred to as the Walker Report, concluded that CPD responded to the protests with "unrestrained and indiscriminate violence on many occasions," often inflicted upon "peaceful demonstrators, onlookers, and large numbers of residents who were simply passing through, or happened to live in, the areas where confrontations were occurring."

1053.   The  Walker Report further concluded that CPD violently retaliated against journalists and photographers.  Chicago police officers warned photographers: "you take my picture, and I'm going to get you."  A newspaper photographer described standing in a line with other cameramen when they were charged at by a group of Chicago police officers who "began beating their heads" and "chopping away at the cameras."  A network cameraman reported that a CPD officer hit him in the face with a baton and knocked his tooth out.  One Chicago police officer yelled "get their fucking cameras" before hitting a cameraman on the head and forcing him to the ground.  The CPD's actions intimidated some journalists into discontinuing their coverage.  One photographer explained that "I just stopped shooting, because every time you push the flash, they look at you and they are screaming about, 'get the fucking photographers and get the film.'"

1054.   The 1968 Commission quoted the testimony of a scholar who testified before it

---

[35]  *Id.* at 92.

and who, prior to his testimony, reviewed the report cited above regarding the 1919 unrest in Chicago and stated "[i]t is a kind of Alice in Wonderland with the same moving picture re-shown over and over again, the same analysis, the same recommendations, the same inactions."[36]

1055.   This same "moving picture" continues to this day—the CPD made no meaningful, sustained change to policy, practice, or procedure in the aftermath of the 1968 uprisings.

### v.   1976-1977 Marquette Park Protests

1056.   The CPD's violence against protesters for racial justice continued into 1976.  During June of 1976, members and supporters of Dr. Martin Luther King, Jr. Movement, Inc. ("King"), a not-for-profit aimed at obtaining equal opportunities for all people, marched in Black communities on the Southside of Chicago undisturbed by CPD.  When, however, protesters marched in Marquette Park, a predominantly white neighborhood, between June 8 and June 12, Chicago police officers unlawfully arrested many protesters.

1057.   On July 17, 1976, when protesters marched against racism in Marquette Park, they were met by violent bystanders who "hurled rocks, bottles, bricks and explosives at them," and many were injured as a result.  However, despite a court order requiring the CPD to provide adequate protection to the protesters, the CPD refused to apprehend the violent bystanders and conspired to incite violence against the protesters.

1058.   The following year on July 23, 1977, Black motorists protested against housing discrimination in Marquette Park after three homes purchased by Black residents in the neighborhood were bombed.  Protesters were met by violent bystanders who threw rocks and bottles at them, and one family was taken to the hospital after their vehicle was stoned.  Despite having a permit to protest in Marquette Park, several protest leaders were arrested by the CPD.

---

[36]  *Id.* at 117.

### vi.    CPD Violence Against Protesters Continued into the 1990s

1059.    The CPD's violence against protesters continued into the 1990s.  On April 10,

1990, students and parents gathered at Morrill Elementary School to protest the firing of the

school's Latinx principal.  White CPD officers screamed racial slurs at the protesters, chased

them, and used brutal force against them.  Chicago police officers injured 14 children who

required medical treatment as a result of the officers's abuse.

1060.    On April 23, 1990, the AIDS Coalition to Unleash Power ("ACT-UP") organized

thousands to converge on downtown Chicago to protest the exclusion of women from the Cook

County Hospital AIDS ward and the lack of funding for AIDS research and people living with

AIDS.  Chicago police officers donned rubber gloves in a hysterical and misguided attempt to

avoid contracting AIDS, while they brutalized protesters by pushing, shoving, tackling, and

throwing arrestees to the ground.  Skittish police horses stepped on protesters and a legal

observer was falsely arrested.

1061.    On December 29, 1990, protesters speaking out against the Gulf War gathered

near the Aragon Ballroom in the Uptown neighborhood of Chicago, following a concert by

musical acts Public Enemy and Sonic Youth.  Plain-clothed Chicago police officers were

witnessed striking protesters in the face, placing them in choke-holds, and conducting false

arrests against bystanders opposing their conduct and concert-goers simply leaving the venue.

1062.    On June 24 1991, ACT-UP again brought thousands to Chicago targeting the

American Medical Association and its national convention at a downtown hotel.  In front of the

hotel, Chicago police officer Rex Hayes reached through the police line and hauled a protester

through the line and onto the cement, punching the protester in the face as he lay defenseless on

the concrete.  The protester was falsely charged with attempting to disarm a police officer which

was revealed by video footage to be a false allegation. Officer Hayes, who had multiple civilian complaints against him, was dubbed the "million dollar man" due to the amount of money the City had to pay out to victims of his misconduct and was eventually fired.  Hayes' victim and a dozen other ACT-UP activists who suffered serious injuries including bruises and contusions, a fractured wrist, and head injuries all filed excessive force lawsuits, which were settled by the City for substantial money damages.

1063.   In August of 1996, activists protesting outside the Democratic National Convention were falsely arrested and injured by Chicago police officers.  More than half a dozen plaintiffs brought an excessive force and false arrest lawsuit that was settled by the City for substantial money damages.

### vii.    Anti-War Protests in the 2000s

1064.   CPD continued its illegal and unconstitutional policies and practices of violating protesters' rights into the 2000s.

### a.  Mass Arrest at the March 20, 2003 Anti-Iraq War Demonstration

1065.   On March 20, 2003, a mass demonstration and march against the War in Iraq began at the Federal Plaza in Chicago, Illinois.  Towards the end of the demonstration, Chicago police officers trapped over 800 protesters and by-standers on Chicago Avenue between Michigan Avenue and Mies Van Der Rohe Way without giving people orders to disperse and opportunities to leave.  Chicago police officers, clad in riot gear and holding batons, stood shoulder to shoulder in lines and prevented the marchers and others from leaving the area, despite numerous requests by individuals to do so.

1066.   With the consent of Chicago Police Superintendent Terry Hillard, Chicago police officers mass arrested all detained, leading to over 500 people taken to police stations.

1067.   After 500 people were handcuffed and taken into police custody, CPD Command Personnel allowed the remaining people to leave.  Before they could do so, people were compelled by the Chicago police officers to abandon their banners, signs, and other protest paraphernalia, and walk single file with their hands raised in the air through a gauntlet of officers.  In some instances, people's bags were searched before they could leave the area.

1068.   In addition to confining, ensnaring, and arresting the crowd, Chicago police officers engaged in excessive force which included storming into the crowd and striking people with batons.  Several women were assaulted after they sat down on the ground to indicate to the CPD that they were peaceful and non-violent.  One of the protesters—a striking and charming young man with a bright future ahead of him—spoke out, condemning an officers' egregious use of force.  In retaliation, Chicago police officers brutally arrested him by striking him in the face and breaking his nose.  Others individuals were intentionally handcuffed too tightly with the plastic flex cuffs which caused many wrist injuries and pain.

1069.   Of the 500-plus people taken into custody, 224 were subsequently released without charges because the CPD could not specifically identify who arrested them.

1070.   The more than 300 arrested who remained were formally charged with one count of Reckless Conduct, a class A misdemeanor under Illinois law, based on a fictional set of allegations.  The CPD alleged the crimes committed by the purported males in the crowd were wholly disparate from the crimes allegedly committed by purported females arrested in the exact same area.[37]

---

[37] For the "males," the boilerplate police narrative in virtually identical arrest reports was:

> The above subject was arrested for Reckless Conduct in that he endangered the bodily safety of citizens by acting in such a reckless manner so as to disrupt vehicular and pedestrian traffic.  The defendant acted with total disregard for the personal safety of motorists and pedestrians.

1071.   Those taken in police custody were held somewhere between 10 and 30 hours, and in a few cases up to 40 hours at police stations.  People in police custody were trapped in overcrowded cells; many were denied food, medical treatment, or personal hygiene items; and the CPD refused to let many of the protesters make or receive calls.

1072.   A federal civil rights class action was filed against the City of Chicago, Chicago Police Superintendent Hillard, and other CPD personnel alleging that those arrested were seized in violation of their rights to free speech, assembly, and liberty guaranteed by the First, Fourth, and Fourteenth Amendments and Illinois law, and that the City of Chicago was liable under *Monell v. N.Y.C. Dept. of Soc. Serv.* 436 U.S. 658 (1978).  Additionally, claims for excessive force, battery, and the denial of adequate medical care were brought on behalf of seven individual plaintiffs.

1073.   The Seventh Circuit, in a unanimous opinion, ruled in favor of the Class plaintiffs, denying the City and Chicago police defendants summary judgment on plaintiffs' constitutional claims.  *See Vodak v. City of Chicago*, 639 F.3d 738, 745-746 (7th Cir. 2011).  The Court's opinion was sweeping in nature, affirming the rights of all protesters to engage in spontaneous demonstrations.  The Court found:

---

For most "females," the following boilerplate narrative was used:

> The above subject along with 1000s of persons endangered the safety of others in that they blocked access to the fire station, positioned themselves in front of the water pumping station and blocked access to the emergency entrance to Northwestern Hospital and refused to leave the area after being ordered to do so by the police.

The evidence established these allegations lodged against the protesters were patently false.  There was no emergency room entrance to Northwestern Hospital on Chicago Avenue.  Moreover, video taken by the CPD did not depict women actively blocking any of the enumerated buildings or refusing orders to disperse as alleged.  Instead, CPD video supported the arrestees' allegations that people were trapped in the bounded area and that many were asking, even begging, Chicago police officers for the opportunity to leave the area, and that they were refused the opportunity to do so.

> The police were numerous, in riot gear, and formidable. The crowd was just milling about, predominantly peaceably (the defendants do not agree that the crowd was peaceable, but this is a disputable and disputed contention; it cannot be confirmed without a trial) . . . What they [police] could not lawfully do, in circumstances that were not threatening to the safety of the police or other people, was arrest people who the police had no good reason to believe knew they were violating a police order.

*Vodak*, 639 F.3d at 745-746. The Court further found that the minor misconduct committed by a few in the demonstration could not justify the mass arrest of hundreds, thereby implicitly upholding the right of protesters and others at a demonstration to be free from an arrest that is not predicated upon individual, particularized probable cause of criminal conduct, in conformity with precedent from across the country. *Id*. at 746.

1074. After the Seventh Circuit remanded the case to the District Court, the entire case was settled and resolved. Ultimately, the case cost the taxpayers of the City of Chicago approximately $15 million, with the plaintiffs receiving over $6.4 million in settlement awards. Around $9 million was paid to attorneys for the plaintiffs and outside counsel hired by the City to defend the CPD and City in fees and costs.

1075. The day the settlement was disclosed to the public, the CPD Superintendent, Garry McCarthy, acknowledged "important lessons" the CPD learned from *Vodak* about dealing with large groups of protesters, including the need to provide individuals with orders to disperse and opportunities to leave. A City spokesperson also claimed that the City has greatly improved its crowd-control methods by incorporating what was learned from the 2003 protest and subsequent litigation and settlement.

### b. August 17, 2011 Anti-Deportation Demonstration

1076. On August 17, 2011, protesters and legal observers gathered in Chicago for an anti-deportation demonstration. CPD officers hit two legal observers in the face and falsely arrested the legal observers after they attempted to assist a young woman and child that had been

battered by a CPD officer.

### c. Demonstration Against Trump in 2016 at UIC

1077.   On March 11, 2016, Presidential candidate Donald Trump decided to hold a political rally at the University of Illinois at Chicago (UIC) Campus.

1078.   A number of student-led groups and Black Lives Matter - Chicago, held a counter demonstration and march on and near the campus in response.  The purpose of the counter demonstration was to stand up for racial and religious equality, immigrant rights, and women's rights.

1079.   The demonstration was monitored and surveilled by the CPD.  At some point the CPD created a blockade at one end of the march stopping its movement.  The CPD also blocked off several streets severely impeding people's ability to leave the demonstration

1080.   Members of the CPD used their batons to push demonstrators and individuals in the crowd.

1081.   Several individuals were physically attacked and four were falsely arrested by CPD members.

1082.    One of the people attacked included a 45-year-old white woman, who verbally protested the police ramming a baton into her daughter.  A Chicago police officer grabbed the woman by the hair and threw her to the ground.  While on the ground, without legal justification, CPD officers kicked the woman on her body and beat her multiple times on her head and body with their batons.  She was struck in the head with a baton causing blood to drip down her face.  An officer also called her a "cunt."  As a result of the vicious beating by these Chicago police officers, this woman suffered numerous physical injuries, including multiple deep bruises all over her body, a large contusion to her right hand, and a large laceration to the top of her scalp

requiring emergency medical treatment resulting in the use of staples to close the wound in her head. In an attempt to cover up their egregious misconduct, these Chicago police officers sought approval to lodge felony charges against her making false allegations that she attacked an officer. After the felony review State's Attorney and Chicago police Detective reviewed the file, they both declined to authorize felony charges and recommended she be released without charges. One of the officers, nevertheless, chose to bring a misdemeanor charge against her for battery despite the lack of probable cause to do so. This case was ultimately dismissed and she successfully sued the Chicago police officers and City settling her lawsuit for $248,000.

1083.   Another person attacked was Sopan Deb, a member of the press who was covering the Trump rally. Without any warning, a Chicago police officer grabbed him from behind and threw him to the ground. The officer then placed his boot on Mr. Deb's neck while conducting the arrest. Mr. Deb sustained scratches to his chin. Mr. Deb clearly identified himself as a member of the press during and after the arrest. Mr. Deb was falsely charged with resisting arrest, and taken into police custody, but the charges were subsequently dropped by the Chicago and Illinois state police. Footage capturing Mr. Deb's arrest clearly shows Mr. Deb cooperating with the arresting officer as opposed to resisting the officer. None of the officers involved faced any disciplinary consequences.

1084.   CPD's policies and practices of using excessive force and abuse tactics against protesters continued through the Summer of 2020, as detailed above. CPD continued to engage in these abuse and unconstitutional tactics despite being under a Consent Decree that compels policy and practice reform.

**B.    CPD Officers Freely Express Animus Against Protesters with Impunity**

1085.   In 2015, the United States Department of Justice ("DOJ") documented the racist,

biased, and anti-protester views held by many Chicago police officers who often express discriminatory views on social media. One officer posted two graphic photos of slain Black men with the caption: "Hopefully one of these pictures will make the black lives matter activist organization feel a whole lot better!" The DOJ found that supervisors posted many of the discriminatory posts it analyzed. A more recent review of the same popular CPD social media accounts and blogs reveals CPD's animus towards protesters, Black and brown people remains unchanged. For example, on Second City Cop, a popular police blog, a commenter posted: "I have already canceled 1 monthly subscription to a supplement company due to their Social Justice Warrior-Virtue Signaling-BLM Pandering email they felt compelled to send me to illustrate their 'woke-ness.' It's time to start using these Communists rules of engagement against them. I purchase a product for the product, not to receive political rhetoric about the values of BLM (founded by two Black female Marxists). No thanks! I'll spend my money with companies not afraid to speak the truth, if there are any left."

1086. Another commenter on the same blog writes: "If I am ever in an outdoor restaurant and some agitator starts with a megaphone shouting 'Say her name' or some other nonsense I am going to shove it up their ass. This is what it comes down to, normal everyday citizens saying 'enough.' The days of fearing the retribution or being doxed on the internet is over. Stand up. Down be cowered by the mob. Once they start to see were [sic] not going to take it anymore and a few of these wannabe 60s radicals loses a few teeth, they will start to think twice. Go to your next Support the Blue Rally. Put that We Support Our Police Officer signs in your window. Don't be afraid. Stand up to this mob. Support the blue."

1087. Second City Cop's twitter posts also reflect the CPD's hatred of protesters and specifically for Black Lives Matter protesters. The Second City Cop tweets pictured below

advise violence against protesters, mock the movement, and laud Kyle Rittenhouse as a model

citizen.  Rittenhouse is the Illinois teenager who traveled to Kenosha, Wisconsin, where he shot

three Black Lives Matter protesters, killing two.  He is now facing homicide charges and attempt

homicide charges for those shootings.





## C. CPD's Widespread Practice of Excessive Force

1088. The CPD's violence and brutality against protesters is consistent with the Department's widespread policy and practice of using aggressive tactics that unnecessarily escalate encounters with individuals, increase tensions, and lead to excessive force. The CPD also fails to de-escalate encounters when it would be reasonable to do so. Even where some use of force may be justified, officers, as a matter of practice, use a higher level of force than is objectively reasonable. CPD's violence against protesters—and particularly against protesters who stand in opposition to police violence, corruption, and racism—is an extension of CPD's

long standing, widespread practice of excessive force. This widespread practice of violence has been documented and acknowledged by the DOJ, the Chicago Police Accountability Task Force (the "Task Force"), the federal courts, civil rights activists, City officials—including the Mayor and Superintendent of Police—and, above all, by the Black communities most targeted by CPD for violence and abuse.

1089.   In April 2016, the Task Force released a report about the system of training, accountability, and oversight of CPD officers (the "Task Force Report"). It found: "The community's lack of trust in CPD is justified. There is substantial evidence that people of color—particularly African-Americans—have had disproportionately negative experiences with the police over an extended period of time. There is also substantial evidence that these experiences continue today through significant disparate impacts associated with the use of force, foot and traffic stops and bias in the police oversight system itself."

1090.   The Task Force reported that racial bias in the CPD was "not a thing of the past." Instead, "data establishes that CPD's use of force disproportionately affects people of color. The same is true for foot and traffic stops. These enforcement actions have deepened a widespread perception that police are indiscriminately targeting anyone and everyone in communities of color without making individualized determinations of reasonable suspicion of criminal conduct. Racial bias extends to other areas as well, including the police oversight system itself."

1091.   In 2015, the Department of Justice, Civil Rights Division, Special Litigation Section, and the U.S. Attorney's Office for the Northern District of Illinois jointly initiated an investigation of the CPD and the accountability body charged with overseeing the police—the Independent Police Review Authority ("IPRA"). This investigation was undertaken to determine whether the CPD was engaging in a pattern or practice of unlawful conduct and, if so, what

systemic deficiencies or practices within the CPD, IPRA, and the City constituted this pattern or practice. The DOJ investigation assessed the CPD's use of force, and addressed CPD policies, training, reporting, investigation, and review related to officer use of force.

1092. In January 2017, the DOJ finished its investigation and released its findings (the "DOJ Findings Report"). In accordance with the allegations herein, the DOJ Findings Report concluded that "CPD officers engage in a pattern or practice of using force that is unjustified, disproportionate, and otherwise excessive . . . CPD officers use unnecessary and unreasonable force in violation of the Constitution with frequency, and that unconstitutional force has been historically tolerated by CPD."

1093. Based on its review of complaints, the DOJ determined that uses of force by the CPD "were not aberrational." Instead, "our holistic review of this information, combined with our investigation of CPD's training, supervision, accountability, and other systems, give us reasonable cause to believe that the unreasonable force we identified amounts to a pattern or practice of unlawful conduct."

1094. The CPD's pattern or practice of unreasonable force also includes the unnecessary, unjustified use of excessive, less-than-lethal force, including with Tasers, batons, emergency takedowns, body slamming, and hand-to-hand combat. According to the DOJ, the use of unreasonable force to quickly resolve non-violent encounters is a recurrent issue at CPD.

1095. The CPD, as a matter of pattern and practice, relies upon overly aggressive tactics that unnecessarily escalate encounters with individuals, increase tensions, and lead to excessive force. The CPD also fails to de-escalate encounters when it would be reasonable to do so.

1096. The DOJ observed this trend of escalation in shootings, finding that CPD officers regularly engaged in "unnecessarily escalating confrontations," which resulted in "avoidable

uses of force and resulting harm, including deaths." The DOJ also reported that CPD officers regularly use retaliatory force against people who object to being stopped, without cause.

1097.   In one incident recorded by the DOJ, officers forcibly brought a man to the ground because he stiffened and locked his arms while they were arresting him for walking his dog without a leash and refusing to present identification. Officers provided no justification for the level of force they used. They failed to explain why they did not attempt to resolve the situation with common (and common sense) de-escalation techniques.

1098.   The Task Force similarly found "many examples of CPD encounters with citizens in routine situations that have gone tragically wrong." The Task Force acknowledged widespread reports from Chicagoans that officers approach "routine situations with an overaggressive and hostile demeanor, using racially charged and abusive language."

1099.   The DOJ investigation and the Task Force findings directly resulted from the uprisings that occurred in the aftermath of the 2015 release of the video depicting CPD Officer Jason Van Dyke murder Black teenager Laquan McDonald. Some of the groups that provided foundation, leadership, and support for these uprisings, including Black Lives Matter-Chicago, filed a lawsuit seeking a consent decree that would govern CPD operations and prevent future abuse and racialized violence and won the right to enforce the Consent Decree that ultimately resulted from litigation filed by the Illinois Attorney General.[38] Even though the Consent Decree contains a number of provisions that should have remedied the policy and practice violations described in this Complaint, as described fully below, CPD has entirely failed to conform its practices to Consent Decree mandates.

---

[38] Organizations represented by the ACLU of Illinois and the Attorney General of the State of Illinois later filed their own lawsuits and eventually, these efforts resulted in a Consent Decree that has been in effect since April 2019.

### D.    The CPD Has Wholly Disregarded Consent Decree Requirements

1100.   An Independent Monitoring Team ("IMT"), overseen by Judge Robert M. Dow, Jr., assesses the City and CPD's compliance with the Consent Decree in biannual reports.  (Each report assesses a portion of the paragraphs of the Consent Decree and will assess all paragraphs at the end of three years.)  The IMT has so far issued two reports with a clear trend across both: the City and CPD have failed to comply with the reform schedule.  In the first report, the City and CPD failed to meet even preliminary compliance standards for 52 of 67 paragraphs of the Consent Decree.  The City and CPD missed 37 of 50 deadlines.  The City's record in the second report was no better.  In that report, filed on June 18, 2020, the City and CPD missed 52 of 74 deadlines.

1101.   The City's non-compliance and missed deadlines bear directly on CPD's civil rights abuses at the recent protests.  CPD failed to create adequate policies and procedures for use of force, impartial policing, and crisis intervention and failed to revise relevant use of force and accountability policies.

1102.   In its First Report (1:17-cv-06260 "Report 1") filed on November 15, 2019, the IMT described the CPD's consistent failures across the assessed paragraphs of the Consent Decree.  In terms of impartial policing, ¶ 58 requires that the CPD establish a policy to permit "members of the public to photograph and record CPD officers in the performance of their law enforcement duties."  CPD failed to meet any level of compliance with the paragraph or the corresponding deadline in the Consent Decree.  Even so, the IMT described the ¶ 58 policy as "necessary" given CPD unwillingness to be photographed.  (Report 1 at 50.)  Furthermore, the CPD refused to allow for community engagement in the creation of the draft policy, which is a requirement of the Consent Decree.  *See* ¶ 52.

1103.   In terms of use of force, CPD missed 16 out of 19 deadlines, and failed even preliminary compliance for 19 out of 25 Consent Decree paragraphs.  CPD did not achieve secondary or full compliance in any paragraphs concerning use of force.  CPD's use of force failures break down into policy and reporting deficits.  When reviewing the CPD's approach to use of force generally, the IMT explicitly recommended that "the CPD provide more detailed examples of various de-escalation techniques in each policy, rather than rely on the boilerplate language that is at the front end of each policy."  (Report 1 at 85.)

1104.   The Consent Decree requires that every two years, the IMT conduct a reliable, representative, and comprehensive survey of broad cross sections of Chicago's communities. The most recent survey, released in August 2020, reveals that community members are well aware of CPD's failures to comply with the Consent Decree requirements.  Less than half of people surveyed believe that CPD generally uses forces appropriately or adequately de-escalates situations.

1105.   The Consent Decree provisions related to the allegations in this Complaint include a number of provisions, that, if meaningfully implemented by the CPD prior to the Summer 2020 uprisings, were intended to prevent the injuries detailed in this Complaint.  These provisions include the following requirements and prohibitions:

    a.   Chicago police officers must not use impact weapons (e.g., baton, asp, improvised impact weapons) to intentionally strike a subject in the head or neck, except when deadly force is justified.

    b.   When safe and feasible to do so, Chicago police officers must give verbal commands and warnings prior to, during, and after using an impact weapon.

    c.   Chicago police officers must receive training on proper use of an impact weapon

before being permitted to carry such a weapon.

d. Chicago police officers must request appropriate medical aid for a subject who experiences an impact weapon strike when the subject appears to be in any physical distress or complains of injury, or when the subject sustained a strike to the head from an impact weapon or a hard, fixed object. Chicago police officers must render life-saving aid to the subject consistent with the officers' training until medical professionals arrive on scene.

e. Chicago police officers may only use force for a lawful purpose. Chicago police officers are prohibited from using force as punishment or retaliation, such as using force to punish or retaliate against a person for fleeing, resisting arrest, insulting an officer, or engaging in protected First Amendment activity (e.g., lawful demonstrations, protected speech, observing or filming police activity, or criticizing an officer or the officer's conduct).

f. The CPD will clarify in policy that Chicago police officers will permit members of the public to photograph and record Chicago police officers in the performance of their law enforcement duties in a public place, or in circumstances in which the officer has no reasonable expectation of privacy.

g. Chicago police officers will allow individuals to voluntarily comply with lawful orders whenever safe and feasible (e.g., allowing individuals the opportunity to submit to arrest before force is used).

h. Chicago police officers may only use OC devices for crowd dispersal when such force is necessary, objectively reasonable, and proportional to the threat presented to public safety. CPD will continue to require that the Superintendent or his or

her designee provides authorization before OC devices are used for noncompliant

groups, crowds, or an individual taking part in a group or crowd.

i.   The CPD will require that all Chicago police officers interact with all members of

the public in an unbiased, fair, and respectful manner.  The CPD will require that

officers refrain from using language or taking action intended to taunt or denigrate

an individual, including using racist or derogatory language.

**E.    The CPD's Widespread Code of Silence and Failure to Discipline Abusive Officers**

1106.   The CPD has maintained its widespread practice of excessive force for well over

100 years through promoting the "code of silence" and the failure to discipline Chicago police

officers trained and required to lie or remain silent about police misconduct, including the use of

excessive force and discriminatory policing.  Any officer who violates this code is penalized by

the CPD.

1107.   Police officers are educated at the CPD about the tenets of this code of silence.

They are instructed: "[W]e do not break the code of silence.  Blue is Blue.  You stick together.  If

something occurs on the street that you don't think is proper, you go with the flow.  And after

that situation, if you have an issue with that officer or what happened, you can confront them.  If

you don't feel comfortable working with them anymore, you can go to the watch commander and

request a new partner.  But you never break the code of silence."

1108.   In *Obrycka v. City of Chicago et al.*, No. 07-cv-2372 (N.D. Ill.), a federal jury

found that, as of February 2007, the City of Chicago "had a widespread custom and/or practice

of failing to investigate and/or discipline its officers and/or code of silence."

1109.   In December 2015, in a speech to Chicago aldermen, Mayor Emanuel

acknowledged that Chicago police use a "code of silence" to conceal abuses and wrongdoing by

their colleagues.

1110.   In April 2016, the Task Force found that the code of silence is "institutionalized and reinforced by CPD rules and policies that are also baked into the labor agreements between the various police unions and the City."

1111.   The DOJ investigation confirmed that the code of silence pervades the CPD: "City, police officers and leadership within CPD and its police officer union acknowledge that a code of silence among Chicago police officers exists, extending to lying and affirmative efforts to conceal evidence."  One CPD sergeant informed DOJ investigators that "if someone comes forward as a whistleblower in the Department, they are dead on the street."  The code of silence extends, as the DOJ found, to sergeants and other supervisors who take affirmative actions to cover up the misconduct of their subordinates.

1112.   The DOJ determined that the code is "strong enough to incite officers to lie even when they have little to lose by telling the truth."  This is because "officers do not believe there is much to lose by lying."

1113.   The CPD maintains a policy, practice, and custom of failing to discipline, supervise, monitor, and control its officers, including the Defendant Officers.  Consequently, the City allows its officers to believe they can abuse and violate the rights of individuals without consequence.  These policies, practices, and customs directly contribute to the code of silence.

1114.   According to the Citizens Police Data Project, between 1988 and 2020, only 3% of all complaints that CPD officers engaged in excessive force resulted in any discipline for the officer and only 1% of complaints related to First Amendment violations resulted in discipline. The DOJ reported that in the rare instance where a complaint of misconduct was sustained, "discipline is haphazard and unpredictable, and is meted out in a way that does little to deter

misconduct."

1115.   Given the systematic lack of discipline, CPD officers are allowed to amass dozens of complaints without penalty.  From 2007 to 2015, more than 1,500 Chicago police officers acquired ten or more Complaint Registers ("CRs").  Sixty-five of these officers had 30 or more CRs.  These numbers do not reflect the entire disciplinary history (e.g., pre-2007) of these officers.  They also underreport the problem.  While the CPD collects data on officer performance, including complaints and lawsuits, data is often incomplete and analysis is limited.

1116.   Given the lack of effective review or discipline, officers often use the same or similar language to justify their use of force.  As the DOJ determined: "We saw many instances where officers justified force based on a boilerplate description of resistance that provides insufficient specificity to understand the force used or resistance encountered."  The CPD regularly accepts such insufficient documentation without question, even when an officer's use of force is suspect or gives rise to a formal complaint.

1117.   Despite this seemingly facetious tweet stating that the Summer 2020 protests would result in a large number of tactical response reports (the forms Chicago police officers are required to complete to document uses of force), during the recent protests, Chicago police officers relied on the code of silence and routinely failed to complete this required documentation—even when Chicago police officers unlawfully used lethal force against protesters in full view of their supervisors.



1118.   While a number of Consent Decree provisions aim to eliminate the code of silence, the CPD has failed to comply with these terms.  IMT reports overarching concerns about the entire complaint process.  Specifically, the CPD failed to implement a policy in which the public knows how to submit complaints and that they may do so in multiple ways (¶¶ 425-26).  The IMT found that, for anyone looking for more information on filing complaints, the reporting page and helpful resources are hard to find.  The CPD reporting website is not user friendly, especially for non-English speakers.

1119.   Furthermore, the CPD failed to ensure that officers who report misconduct receive protection (¶ 436).  The CPD also failed to create a written policy detailing how complaints will be transferred to the Accountability Sergeant (¶ 457).  The draft policy the CPD created "does not specifically address why, when, or how an investigation will be transferred." Further, the CPD has failed to support the implementation of a "completely anonymous, double-blind safe

space portal" developed by the Officer of Inspector General, Joseph Ferguson. The portal intended to facilitate anonymous complaints from Chicago police department officers, but CPDhas failed to take the actions necessary to ensure that it is used to defeat the code of silence.

1120.   In the Second IMT Report (1:17-cv-06260), filed June 18, 2020, the CPD continued its pattern of systematic non-compliance with the assessed paragraphs of the Consent Decree.  The CPD's failures relate directly to the abuses witnessed at the recent protests.

## LEGAL CLAIMS

### COUNT I – 42 U.S.C. § 1983
### Violation of the Fourth Amendment – Excessive Force
### (All Plaintiffs Against All Defendant Officers)

1121.   Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

1122.   Count I is alleged against all Defendant Officers.

1123.   The actions of the Defendant Officers described above constituted unreasonable and excessive force, without legal cause, in violation of Plaintiffs' rights under the Fourth and Fourteenth Amendments to the United States Constitution.

1124.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiffs' clearly established constitutional rights.

1125.   The actions of the Defendant Officers were the direct and proximate cause of the violations of Plaintiffs' constitutional rights, bodily injury, pain, suffering, mental distress, anguish, humiliation, and loss of personal freedom, as set forth more fully above.

### COUNT II – 42 U.S.C. § 1983
### Violation of the First Amendment – Freedom of Speech and Assembly, Intimidation and
### Retaliatory Use of Force
### (All Plaintiffs Against All Defendant Officers)

1126.   Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

1127.    Count II is alleged against all Defendant Officers.

1128.    As described in detail above, Plaintiffs were participating in lawful, constitutionally protected activity on the public streets of the City of Chicago.

1129.    The actions of the Defendant Officers described above violated Plaintiffs' rights to freedom of speech and assembly guaranteed by the First and Fourteenth Amendments to the United States Constitution, in that Plaintiffs were abruptly prevented from further exercising their rights and suffered retaliation for having exercised their rights.

1130.    The Defendant Officers retaliated against Plaintiffs for engaging in protected speech by subjecting them to excessive force without legal justification.  Plaintiffs' protected speech was the substantial and motivating factor for the Defendant Officers' use of force against them.  The Defendant Officers' actions were intended to make Plaintiffs and other people engaging in constitutionally-protected speech and assembly at the protests wary of continuing to engage in such protected activities in the future and specifically to chill their rights guaranteed under the First Amendment.

1131.    At all relevant times, the Defendant Officers were aware that Plaintiffs were engaged in constitutionally-protected speech and assembly when they violated their rights.  The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiffs' clearly established constitutional rights.

1132.    The actions of the Defendant Officers were the direct and proximate cause of the violations of Plaintiffs' constitutional rights, bodily injury, pain, suffering, mental distress, anguish, humiliation, and loss of personal freedom, as set forth more fully above.

## COUNT III – 42 U.S.C. § 1983
### Violation of the Fourteenth Amendment – Equal Protection

**(All Plaintiffs Against All Defendant Officers)**

1133.   Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

1134.   Count III is alleged against all Defendant Officers.

1135.   The named and unidentified Defendant Officers subjected Plaintiffs, some of whom are Black and all of whom were protesting anti-Black racist police violence and in support of the movement for Black lives, to excessive force and/or unlawful detention and arrest, and/or suppressed their right to freedom of speech and assembly, with discriminatory motive and intent, and racial animus toward each and every Plaintiff individually and as a group, either because of their identity and/or because of what they were protesting and therefore violated Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment.

1136.   The actions of the Defendant Officers were the direct and proximate cause of the violations of Plaintiffs' constitutional rights, bodily injury, pain, suffering, mental distress, anguish, humiliation, and loss of personal freedom, as set forth more fully above.

**COUNT IV – 42 U.S.C. §§ 1983, 1985, 1986**
**Racially Motivated Conspiracy to Deprive Plaintiffs of Their Constitutional Rights**
**(All Plaintiffs Against All Defendant Officers)**

1137.   Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

1138.   Count IV is alleged against all Defendant Officers.

1139.   The named and unidentified Defendant Officers together reached an understanding, engaged in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to commit the unconstitutional over acts set forth in the facts above.

1140.   Because said conspiracy or conspiracies and the overt actions in furtherance thereof, including, but not limited to, each and every act alleged in the facts above, were done

with the knowledge and purpose of depriving Plaintiffs, some of whom are Black and all of whom were protesting anti-Black racist police violence and in support of the movement for Black lives, of the equal protection of the laws and/or of equal privilege and immunities under the law, and with racial animus toward each and every Plaintiff individually and as a group, either because of their identity and/or because of what they were protesting, and the other victims of this racially motivated conspiracy, the Defendants also deprived Plaintiffs of their right to equal protection of the laws under the Fourteenth Amendment, and 42 U.S.C. § 1985.

1141.   Additionally or alternatively, the Defendant Officers, knowing that the above § 1985 conspiracy to deprive Plaintiffs of their constitutional rights was about to be committed, and having the power to prevent or aid in preventing the commission of the acts in furtherance of said conspiracy, neglected and/or refused to do so, in violation of 42 U.S.C. § 1986.

1142.   The actions of the Defendant Officers were the direct and proximate cause of the violations of Plaintiffs' constitutional rights, bodily injury, pain, suffering, mental distress, anguish, humiliation, and loss of personal freedom, as set forth more fully above.

## COUNT V – 42 U.S.C. § 1983
### Violation of the Fourth Amendment – False Arrest
**(Plaintiffs Andrew Reichold, Brittany Sowacke, Ronald Reed, Sara Engiman, Miles Bennett Hogerty, Jeannine Wise, Justin Cosby, Damon Williams, Christopher Brown, Malcolm London, Jacob Dagit, Rachel Valenzuela, Patrick Romano, Delaney Dittman, and Bailey Pfeifer Against Relevant Defendant Officers)**

1143.   Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

1144.   Count V is alleged against Defendants Officer D. P. Condreva, Officer Michael Wilson, Officer David Floyd, Captain S. Mannion, Officer Brandon Patrick, Officer Sherrick Davis, Officer Levon London, Officer A.A. Khan, Officer R. A. Ayala, Officer Nebojsa Djurdjevic, Officer Brayan Jauregui, Lieutenant Patricia Zuber, and relevant unidentified Chicago police officers.

190

1145.   The actions by the Defendant Officers in falsely detaining, arresting, and imprisoning Plaintiffs without reasonable suspicion or probable cause violated Plaintiffs' Fourth and Fourteenth Amendment rights to be free from unreasonable search and seizure.

1146.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiffs' clearly established constitutional rights.

1147.   The actions of the Defendant Officers were the direct and proximate cause of the violations of Plaintiffs' constitutional rights, bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of personal freedom, and legal expenses, as set forth more fully above.

**COUNT VI – 42 U.S.C. § 1983**
**Violation of the Fourth and Fourteenth Amendments – Unlawful Search and Seizure of Property**
**(Plaintiffs Brittany Sowacke, Ronald Reed, Justin Cosby, Rachel Valenzuela, Miracle Boyd, Patrick Romano, Sarah Kroth, Maggie "Mars" Robinson, Clare Gervasi, and Charlie Atchley  Against Relevant Defendants)**

1148.   Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

1149.   Count VI is alleged against Defendants Officer Michael Wilson, Officer David Floyd, Officer David Sharp, Officer Nicolas Jovanovich, and relevant unidentified Chicago police officers.

1150.   The actions by the Defendant Officers in knowingly searching and seizing Plaintiffs' property during the events described in the Complaint, without a warrant, probable cause, or legal justification, violated Plaintiffs' right to be free from unreasonable search and seizure of Plaintiffs' property guaranteed by the Fourth and Fourteenth Amendments.

1151.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiffs' clearly established constitutional rights.

1152.   As a direct and proximate result of the Defendant Officers' actions, Plaintiffs suffered damages, including the loss of and damage to their property, as set forth more fully above.

## COUNT VII – 42 U.S.C. § 1983
### Conspiracy to Deprive Plaintiffs of Their Constitutional Rights
### (All Plaintiffs Against All Defendant Officers)

1153.   Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

1154.   Count VII is alleged against all Defendant Officers.

1155.   Each of the Defendant Officers, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

1156.   Each of the Defendant Officers took concrete steps to enter into an agreement to unlawfully use force on all Plaintiffs, and to detain and arrest certain Plaintiffs, knowing they lacked reasonable suspicions and/or probable cause to do so, and for the purpose of violating Plaintiffs' First, Fourth, and Fourteenth Amendment rights.

1157.   In furtherance of this conspiracy, each of the Defendant Officers committed specific overt acts, misusing their police powers for the purpose of violating Plaintiffs' rights. They accomplished this goal by using excessive force on all Plaintiffs and unlawfully arresting certain Plaintiffs.

1158.   Each individual Defendant Officer is therefore liable for the violation of Plaintiffs' rights by any other individual Defendant Officer.

1159.   As a direct and proximate result of the Defendant Officers' conspiracy, Plaintiffs suffered damages, including bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of personal freedom, and legal expenses, as set forth more fully above.

**COUNT VIII – 42 U.S.C. § 1983**
**Failure to Intervene**
**(All Plaintiffs Against All Defendant Officers And Superintendent Brown)**

1160.   Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

1161.   Count VIII is alleged against all Defendant Officers and Defendant Superintendent David Brown in his individual capacity.

1162.   During the events described above, the Defendants stood by without intervening to prevent the violation of Plaintiffs' constitutional rights under the First, Fourth, and Fourteenth Amendments, even though they had the opportunity and duty to do so.

1163.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiffs' clearly established constitutional rights.

1164.   As a direct and proximate result of the Defendants' failure to intervene, Plaintiffs suffered damages, including bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of personal freedom, and legal expenses, as set forth more fully above.

**COUNT IX – 42 U.S.C. § 1983**
**Violation of the Fourteenth Amendment – Failure to Provide Medical Care**
**(Plaintiffs Ronald Reed, Rachel Valenzuela, and Bailey Pfeifer Against Relevant Defendants)**

1165.   Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

1166.   Count IX is alleged against relevant unidentified Chicago police officers.

1167.   The Defendants' failures to take appropriate steps to provide Plaintiffs with adequate care for their very serious medical needs, as described more fully above, constituted deliberate indifference to Plaintiffs' serious medical needs and violated their Fourteenth Amendment rights.  Defendants knew of and disregarded the substantial risk of injury to Plaintiffs by failing to provide adequate medical care.

1168.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiffs' clearly established constitutional rights.

1169.   The actions of the Defendant Officers were the direct and proximate cause of the violations of Plaintiffs' constitutional rights, bodily injury, pain, suffering, mental distress, anguish, and humiliation, as set forth more fully above.

**COUNT X – 42 U.S.C. § 1983**
**Unlawful Policy and Practice**
**(All Plaintiffs Against Defendants City of Chicago and Superintendent Brown)**

1170.   Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

1171.   Count X is alleged against Defendants City of Chicago and Superintendent David Brown in his official capacity.

1172.   The Defendant Officers acted under the color of law, and under the authority of one or more interrelated de facto policies, practices, and/or customs of the Chicago Police Department, to violate Plaintiffs' rights as set for in the preceding claims.

1173.   The City of Chicago through its Police Department, Police Superintendent, Police Board, Mayor, and City Council has interrelated *de facto* policies, practices, and customs which included, *inter alia*:

      a.   Using excessive force against protesters without justification, including but not limited to: beating individuals with batons; beating protesters through punching, kicking, kneeing, and stomping; using chemical agents like pepper spray and tear gas; tackling protesters to the ground; and hitting individuals with bikes.

b.  Using lethal force against protesters, including but not limited to striking protesters on the head and neck with batons.

c.  Retaliating against protesters who record the police and/or speak out against police violence.

d.  Escalating encounters through taunts, slurs, pushes, shoves, and acts that illustrate CPD's animus toward protesters.

e.  Falsely arresting protesters for engaging in protected speech and assembly.

f.  Targeting those the CPD has identified as, or perceives to be, leaders, protest marshals, legal observers, and medics for excessive force and false arrest.

g.  Giving protesters no reasonable opportunity to leave and/or trapping protesters in enclosed areas.

h.  Using chemical agents like pepper spray and/or tear gas without prior warning.

i.  Breaking, stealing, or otherwise disposing of protesters' belongings, including bikes, cameras, phones, glasses, goggles, and backpacks.

j.  Failing to intervene to prevent police violence and other forms of misconduct.

k.  Failing to hold officers accountable who violate protesters' rights.

l.  Failing to train officers on how to appropriately respond to protesters.

m.  Maintaining, condoning, and failing to take any steps to end the code of silence in the CPD that allows Chicago police officers to violate protesters and other civilians' rights with impunity.

1174.   The interrelated policies, practices, and customs alleged above are or should be well-known within the CPD.

1175.   The CPD is aware of the harms suffered by Plaintiffs and other protesters as a result of the interrelated policies, practices, and customs alleged above.

1176.   The City has implemented, enforced, encouraged, and sanctioned CPD's policies, practices, and customs alleged above in violation of Plaintiffs' and other protesters' First, Fourth, and Fourteenth Amendment rights.

1177.   The City has acted with deliberate indifference to the First, Fourth, and Fourteenth Amendment rights of the Plaintiffs.  As a direct and proximate result of the acts and omissions of the City and CPD, the First, Fourth, and Fourteenth Amendment rights of the Plaintiffs have been violated.

1178.   Defendant Superintendent Brown, in his role as Superintendent of the CPD, was the final policymaker for CPD's response to the protests.

1179.   Defendant Superintendent Brown developed and maintained policies, practices, procedures, and customs of Chicago Police officers using excessive force against protesters and falsely arresting protesters, exhibiting deliberate indifference to the constitutional rights of Plaintiffs, including but not limited to those policies, practices, procedures, and customs described above, which caused the violation of Plaintiffs' rights as described herein and the resultant damages suffered.

1180.   Defendant Superintendent Brown had the power to prevent or aid in the prevention of the wrongs done and conspired to be done as described herein, yet failed or refused to do so, in violation of 42 U.S.C. § 1983.

1181.   Upon information and belief, Defendant Superintendent Brown was deliberately indifferent to the need for further training, supervision, or discipline related to the use of force against protesters, as reflected by the continued maintenance of the policies, practices, and customs of using excessive force that was carried out by Chicago Police officers under his control.

1182.   The actions and omissions of Defendant Superintendent Brown as described herein were done with knowing disregard for the constitutional rights of the Plaintiffs. Defendant Superintendent Brown acted maliciously, willfully, wantonly, and in reckless disregard of Plaintiffs' rights under the Constitution.

1183.   The policies, practices, procedures, and customs of the CPD were the direct and proximate cause of the violations of Plaintiffs' constitutional rights and the damages they suffered, including bodily injury, pain, suffering, mental distress, anguish, and loss of personal freedom, as set forth more fully above.

### COUNT XI – Illinois State Law Claim
### Violations of the Illinois Constitution
### (All Plaintiffs Against All Defendant Officers)

1184.   Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

1185.   Count XI is alleged against all Defendant Officers.

1186.   The actions taken by the Defendant Officers denied Plaintiffs their state constitutional rights to be free from an unreasonable seizure and to free expression and assembly in a peaceable manner; as provided by the Illinois Constitution, Article I, sections 1, 2, 4, 5, and 6, and were a direct and proximate cause of Plaintiffs' injuries as set forth above.

1187.   The actions of the Defendant Officers were the direct and proximate cause of the violations of Plaintiffs' Illinois State Constitutional Rights.

## COUNT XII – Illinois State Law Claim
## Intentional Infliction of Emotional Distress
## (All Plaintiffs Against All Defendant Officers)

1188.    Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

1189.    Count XII is alleged against all Defendant Officers.

1190.    The conduct and actions of the Defendant Officers set forth above were extreme and outrageous.  The Defendants' actions were rooted in an abuse of power and authority, and were done intentionally, willfully and wantonly, and/or knowing that there was a high probability that their conduct would cause Plaintiffs severe emotional distress as set forth above.

1191.    As a direct and proximate cause of the extreme and outrageous conduct of the Defendant Officers, Plaintiffs were injured and experienced severe emotional distress constituting intentional infliction of emotional distress under Illinois State law.

## COUNT XIII – State Law Claim
## False Arrest
## (Plaintiffs Andrew Reichold, Brittany Sowacke, Ronald Reed, Sara Engiman, Miles Bennett Hogerty, Jeannine Wise, Justin Cosby, Damon Williams, Christopher Brown, Malcolm London, Jacob Dagit, Rachel Valenzuela, Patrick Romano, Delaney Dittman, and Bailey Pfeifer Against Relevant Defendant Officers)

1192.    Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

1193.    Count XIII is alleged against Defendants Officer D. P. Condreva, Officer Michael Wilson, Officer David Floyd, Captain S. Mannion, Officer Brandon Patrick, Officer Sherrick Davis, Officer Levon London, Officer A.A. Khan, Officer R. A. Ayala, Officer Nebojsa Djurdjevic, Officer Brayan Jauregui, Lieutenant Patricia Zuber, and relevant unidentified Chicago police officers.

1194.    As described in detail above, the Defendant Officers falsely detained, arrested, and imprisoned Plaintiffs without reasonable suspicion or probable cause and without having reasonable grounds to believe that an offense was committed by Plaintiffs.

198

1195.   The misconduct in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the Plaintiffs' rights.

1196.   The actions of the Defendant Officers were the direct and proximate cause of the violations of Plaintiffs' rights, bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of personal freedom, and legal expenses, as set forth more fully above.

## COUNT XIV – State Law Claim
### Malicious Prosecution
**(Plaintiffs Andrew Reichold, Ronald Reed, Miles Bennett Hogerty, Justin Cosby, Damon Williams, Christopher Brown, Malcolm London, Jacob Dagit, Rachel Valenzuela, Delaney Dittman, and Bailey Pfeifer Against Relevant Defendant Officers)**

1197.   Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

1198.   Count XIV is alleged against Defendants Officer D. P. Condreva, Officer Michael Wilson, Officer David Floyd, Captain S. Mannion, Officer Brandon Patrick, Officer Sherrick Davis, Officer Levon London, Officer A.A. Khan, Officer R. A. Ayala, Officer Nebojsa Djurdjevic, Officer Brayan Jauregui, Lieutenant Patricia Zuber, and relevant unidentified Chicago police officers.

1199.   Defendants and unidentified Chicago police officers, individually, jointly and/or in conspiracy, initiated and continued a malicious prosecution without probable cause against Plaintiff.

1200.   The prosecutions of Plaintiffs terminated in their favor and in a manner that is indicative of innocence.

1201.   The Defendant Officers' actions were committed in a willful and wanton manner.

1202.   The Defendants' actions directly and proximately caused injury and damage as set forth above.

## COUNT XV – Illinois State Law Claim
### Conspiracy

**(All Plaintiffs Against All Defendant Officers)**

1203.   Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

1204.   Count XV is alleged against all Defendant Officers.

1205.   The Defendant Officers together reached an understanding, engaged in and continue to engage in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to violate Plaintiffs' rights guaranteed by the Illinois constitution and to be free from false arrest, malicious prosecution, and the intentional infliction of severe emotional distress on Plaintiffs.

1206.   In furtherance of this conspiracy or conspiracies, the Defendant Officers, together with their un-sued co-conspirators, committed the overt acts set forth above.

1207.   The Defendant Officers acted with malice, willfulness, and reckless indifference to Plaintiffs' rights.

1208.   Each individual Defendant is therefore liable for the violation of Plaintiffs' rights by any other individual Defendant.

1209.   The conspiracy or conspiracies were and are continuing in nature.

1210.   As a direct and proximate result of the Defendant Officers' conspiracy, Plaintiffs suffered damages, including mental distress, anguish, humiliation, violations of their rights, and legal expenses, as set forth more fully above.

**COUNT XVI – State Law Claim**
**Respondeat Superior**
**(All Plaintiffs Against Defendant City of Chicago)**

1211.   Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

1212.   Count XVI is alleged against Defendant City of Chicago.

1213.   In committing the acts alleged in this Complaint, each of the individual Defendant Officers were members of, and agents of, the CPD, acting at all relevant times within the scope of their employment.

1214.   Defendant City of Chicago is liable as principal for all torts in violation of state law committed by its agents.

**COUNT XVII – State Law Claim**
**Indemnification**
**(All Plaintiffs Against Defendant City of Chicago)**

1215.   Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

1216.   Count XVII is alleged against Defendant City of Chicago.

1217.   In Illinois, pursuant to 735 ILCS 10/9-102, public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

1218.   The Defendant Officers acted within the scope of their employment in committing the misconduct described herein.  Therefore, Defendant City of Chicago is liable as their employer for any resulting damages or award of attorney's fees.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor against the Defendants in the following manner:

1.      Award Plaintiffs compensatory and punitive damages.

2.      Award Plaintiffs reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988.

3.      Award Plaintiffs such other and further relief as this Court may deem appropriate and just.

## JURY DEMAND

Plaintiffs demand trial by jury.

Dated: November 19, 2020

Respectfully submitted,

/s/ Vanessa del Valle
Vanessa del Valle

Vanessa del Valle, Adam Gilmore*, Emily
Grant*, Isaac Green*
Roderick and Solange MacArthur
Justice Center
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 606611-3609
312-503-5932
vanessa.delvalle@law.northwestern.edu

/s/ Sheila A. Bedi
Sheila A. Bedi

Sheila A. Bedi, Luke Fernbach*, Lorellee
Kampschnieder*, Terah Tollner*, Jay
Trewn*
Community Justice and Civil Rights Clinic
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 60611-3609
312-503-8576
sheila.bedi@law.northwestern.edu
*Law student licensed pursuant to Illinois
Supreme Court Rule 711

/s/ Joey L. Mogul
Joey L. Mogul

Joey L. Mogul, Janine Hoft, Ben Elson
Jan Susler, Brad Thomson
People's Law Office
1180 N. Milwaukee Ave.
Chicago, IL 60642

773-235-0070
joeymogul@peopleslawoffice.com
janinehoft@peopleslawoffice.com
ben@peopleslawoffice.com
brad@peopleslawoffice.com
jsusler@peopleslawoffice.com

Brendan Shiller, Sierra Reed, Tia Haywood,
Wayne Slaughter
Shiller Preyar Jarard & Samuels Law
Offices
at the Westside Justice Center
601 South California
Chicago Illinois 60612-3305
312-226-4590
info@shillerpreyar.com